This document was signed electronically on May 18, 2018, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated:  May 18, 2018



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) Case No. 18-50757 (Jointly Administered) |
| FIRSTENERGY SOLUTIONS CORP., | ) |
| et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Adversary Proceeding No. 18-05021 |
| | ) |
| ———————————— | ) |
| | ) Judge Alan M. Koschik |
| FIRSTENERGY SOLUTIONS CORP., | ) |
| et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ENERGY REGULATORY | ) |
| COMMISION, et al. | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM DECISION
## <u>SUPPORTING ORDER GRANTING PRELIMINARY INJUNCTION</u>

On Saturday, March 31, 2018, FirstEnergy Solutions Corp. ("FES"), along with certain of its affiliates (each a "Debtor," and collectively, the "Debtors"), filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* On Sunday, April 1, 2018, debtors FES and FirstEnergy Generation, LLC ("FG") (together, the "Plaintiffs") filed a complaint (Docket No. 1) (the "Complaint") against the Federal Energy Regulatory Commission ("FERC"), thus commencing the above-captioned adversary proceeding. The Complaint seeks a declaratory judgment against FERC as well as preliminary and permanent injunctive relief preventing FERC from taking certain actions that could interfere with the jurisdiction of this Court to consider two motions to reject executory contracts (the "Rejection Motions") filed in the underlying bankruptcy case (No. 18-50757 Docket Nos. 44 and 45). Also on April 1, 2018, the Plaintiffs filed the instant *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction Against FERC (Docket No. 3) (the "Motion"). The Court granted a temporary restraining order (Docket No. 11) (the "TRO") on April 2, 2018, and on April 16, 2018, that TRO was amended and extended with the agreement of the parties (Docket No. 52) (the "Amended TRO").

The Amended TRO was set to expire May 11, 2018, at 11:59 p.m. After several status conferences, extensive briefing by the principal parties, as well as by several intervenors, including the Ohio Valley Electric Corporation ("OVEC") and Krayn Wind LLC ("Krayn") as intervenor-defendants and the Official Committee of Unsecured Creditors (the "Committee") as intervenor-plaintiff, and a group composed of many of the sponsoring companies of OVEC (other than Debtor FES) appearing together as an *amicus curie*, and the submission of a stipulation of uncontested facts (Docket No. 112) (the "Stipulations"), the Court held a hearing on whether to grant the preliminary injunction the Plaintiffs requested in the Motion on May 11,

2018 (the "Preliminary Injunction Hearing"). At the Preliminary Injunction Hearing, the parties submitted an agreed consolidated list of exhibits and binders containing those agreed exhibits. On motion, the Court admitted those exhibits into evidence. After oral argument from the parties, the Court issued an oral ruling stating that it would grant the preliminary injunction requested in the Motion, and later that same day, May 11, 2018, entered an order granting a preliminary injunction (Docket No. 114) (the "Preliminary Injunction Order").

At the conclusion of the Preliminary Injunction Hearing, after reading its oral findings and conclusions pursuant to Federal Rule of Civil Procedure 52(a)(2), made applicable in this bankruptcy adversary proceeding by Federal Rule of Bankruptcy Procedure 7052, the Court indicated its intent to make additional written findings and conclusions under Civil Rule 52(b). The Court invited a motion from any party, pursuant to Federal Rule of Bankruptcy Procedure 8002(b)(1)(A), to provide that the time for appeal run for all parties from the entry of those additional findings. Such a motion was made and either joined or unopposed by all parties who participated in the oral argument, and the Court granted that oral motion. This Memorandum Decision constitutes the Court's further written findings and conclusions pursuant to Civil Rule 52(b), and shall also be deemed to be the order granting the parties' Rule 8002(b) motion. Pursuant to Rule 8002(b)(1)(A), the time to file an appeal from the Preliminary Injunction Order and this decision, pursuant to Rule 8002(a), runs from the entry of this Memorandum Decision. Pursuant to Rule 8002(b)(2), any notices of appeal filed after entry of the Preliminary Injunction Order and before the entry of this Memorandum Decision are now effective.

## JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. Venue is proper pursuant to 28 U.S.C. § 1409(a). This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  In addition, while there is no motion to terminate, annul, or modify the automatic stay before the Court pursuant to 11 U.S.C. § 362(d), this proceeding directly implicates the scope of the automatic stay and the Court's enforcement of that stay and, therefore, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) as well.  Therefore, the Court has jurisdiction to enter final orders and judgments in this adversary proceeding, including with respect to the Motion.

## FACTUAL AND PROCEDURAL HISTORY

The following factual and procedural history is derived from the Court's own docket, including the parties' Stipulations and the exhibits admitted into evidence.[1]  On this basis, no party offered direct examination or requested cross-examination of any witnesses; there was no live testimony at the Preliminary Injunction Hearing.  The Plaintiffs, collectively, and the Defendants, collectively, each also submitted a separate set of exhibits and moved the Court to take judicial notice of those exhibits.  The Court granted that motion and took judicial notice of the requested exhibits.[2]

### I.   The Federal Energy Regulatory Commission

In the Federal Power Act, 16 U.S.C. § 791 *et seq.*, Congress created the Federal Power Commission and vested it with certain powers over interstate commerce in electricity, determining that "the business of transmitting and selling electric energy for ultimate distribution

---

[1] All citations to exhibits in this Memorandum Decision refer to the parties' joint exhibits, notwithstanding any citation format that suggests separate Plaintiffs' and Defendants' exhibits.  Due to the eleventh-hour nature of the agreement between the parties to forego live testimony and submit joint exhibits, the parties did not relabel or renumber the exhibits as joint exhibits

[2] Counsel to the Plaintiffs objected to a proposed *use* by OVEC's counsel of certain exhibits offered via a request for judicial notice—certain filings made by third-parties in OVEC'S FERC Proceeding—but not to the motion asking the Court to take judicial notice of those exhibits.  The Court did not formally sustain or overrule that objection, but clarified that the Court did not interpret OVEC's counsel as attempting to establish the truth of the facts asserted by third-parties in those FERC filings, but rather only the *existence* of those filings demonstrating the interest of numerous parties in the potential impact of the Debtor's proposed rejection of the multi-party intercompany power agreement between and among OVEC and other parties (defined, *infra*, as the "ICPA.")

4

to the public is affected with a public interest." 16 U.S.C. § 824(a). FERC is, *inter alia*, the successor to the Federal Power Commission and is the administrative agency of the United States federal government vested with exclusive authority to regulate rates for (i) interstate transmissions and (ii) wholesale sales of electric energy. It is empowered to establish rules and regulations governing such rates.

## II.    FirstEnergy Solutions and the Debtors

FES is an Ohio-based power company and a wholly-owned subsidiary of non-Debtor FirstEnergy Corp. ("FEC"). FES provides energy-related products and services to retail and wholesale customers. FES owns and operates, through its subsidiary FirstEnergy Generation, LLC ("FG"), certain fossil-fueled generation facilities. FES also owns nuclear-powered generating facilities through its subsidiary FirstEnergy Nuclear Generation, LLC ("NG"), whose facilities are operated by Debtor FirstEnergy Nuclear Operating Company ("FENOC"). FES purchases the entire output of both FG and NG, as well as the output of other FE Corp. subsidiaries, and sells that output to one or more regional transmission organizations, principally PJM Interconnection LLC ("PJM"). This represents the great majority of FES's power purchases and sales, totaling close to 10,000 megawatts ("MWs") of capacity, and generation of 52 terrawatt hours (TWh) in 2017.

## III.    The Power Purchase Agreements (PPAs)

FES is party to nine "bundled" long term power purchase agreements (Pls.' Ex. I) (together, the "PPAs"), pursuant to which FES purchases capacity, power, related services, and renewable energy credits (RECs). The PPAs were entered under market-based rate authority granted by FERC. The PPAs govern the rates, terms, and conditions of wholesale sales of electricity. The PPAs together involve approximately 500 megawatts (MW) of capacity, and in

2017 resulted in FES purchasing a total of 1.3 TWh of electricity. The PPAs are set to expire by their terms between 2024 and 2033.

FES may have entered into one or more of the PPAs, including that certain one with Krayn, in part to assist several of its non-debtor affiliates comply with a federal consent decree. On March 18, 2005, the United States, on behalf of the Environmental Protection Agency ("EPA"), along with the States of New York, New Jersey, and Connecticut, entered into that certain Consent Decree (Defs.' Ex. J-17) ("Consent Decree") with two affiliates of the Debtors— Ohio Edison Company ("Ohio Edison"), a wholly-owned subsidiary of FEC, and Pennsylvania Power Company, a wholly-owned subsidiary of Ohio Edison. These two entities are not bankruptcy debtors and are not parties to this adversary proceeding. On May 20, 2005, the United States filed a motion in the District Court for the Southern District of Ohio, requesting approval of the Consent Decree, which approval was granted on July 11, 2005.

The Consent Decree provides that "[w]ithin three and a half years after entry of this Consent Decree, Ohio Edison shall provide proof . . . that it has entered into one or more contracts with providers of wind energy for purchase of at least 93 megawatts. . . . Such power purchase contracts shall be for 20 years of electric generation capacity generated by wind in Pennsylvania, New Jersey, and/or western New York. . . ." (Consent Decree at ¶ 130.) FES' PPA with Krayn is dated August 20, 2008. When Ohio Edison filed reports with, *inter alia*, the Department of Justice and the EPA evidencing its compliance with the Consent Decree on February 13, 2009, Ohio Edison included a full copy of FES's PPA with Krayn as evidence of compliance.

6

## IV. The Inter-Company Power Agreement (ICPA)

FES is also party to a multi-party intercompany power agreement styled as the Amended and Restated Inter-Company Power Agreement Dated as of September 10, 2010, along with thirteen[3] other power companies and OVEC pursuant to which FES and the other power companies have both the right and obligation to purchase power from OVEC (the "ICPA"). Defendants' Exhibit 1. OVEC, together with its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation ("IKEC"), is an investor-owned utility that operates two coal-fired power plants (the "Power Stations")—the Kyger Creek plant in Cheshire, Ohio and the Clifty Creek plant in Madison, Indiana—as well as transmission facilities through which it connects and transmits power to its various constituents. OVEC reports that it currently employs approximately 660 individuals, and supports an additional 650 retired employees and their surviving spouses through pensions and other benefits.

OVEC and IKEC were formed on October 1, 1952, to provide electric power in support of the operation of uranium enrichment facilities then under construction by the Atomic Energy Commission (the "AEC") near Portsmouth, Ohio. The AEC's facilities are now operated by its successor agency, the Department of Energy ("DOE"). On October 15, 1952, OVEC and the AEC entered into a power supply agreement supporting the AEC's Portsmouth facilities (the "DOE Power Agreement").

On July 10, 1953, OVEC and fifteen public utility companies (each, a "Sponsoring Company") entered into the original version of the ICPA. The original ICPA was filed with the Federal Power Commission, the predecessor to FERC. The ICPA was executed to support the

---

[3] The Stipulations reveal that there are currently thirteen sponsoring companies of OVEC pursuant to the ICPA, including FES. At the time the ICPA was executed, there were fourteen.

7

DOE Power Agreement and provide for excess energy sales to the Sponsoring Companies of power and energy not utilized by DOE or its predecessors.

On September 29, 2000, DOE notified OVEC of its cancellation of the DOE Power Agreement, effective April 30, 2003. The ICPA was subsequently amended and restated in its entirety, first on March 13, 2006, and again on September 10, 2010. The term of the current iteration of the ICPA extends through June 30, 2040.

Through Assignment and Assumption Agreements executed on February 27, 2014 (Defs.' Exs. 3 and 4), FES agreed to assume all liabilities and obligations—and was assigned all rights and interests—of certain preexisting ICPA Sponsoring Companies.

The ICPA, and all of the amendments thereto, collectively constitute a cost-sharing agreement based upon each company's "power participation ratio," which dictates the allocation of both benefits and payment obligations under the ICPA. All of the costs associated with OVEC's operation, including the eventual decommissioning of the Power Stations, are collectively allocated to all of the Sponsoring Companies based upon their power participation ratios. Each Sponsoring Company is also obligated to purchase a percentage of OVEC's power output based on its respective power participating ratio at the rate established by the ICPA. FES' power participation ratio under the ICPA is 4.85 percent. In 2017, FES purchased approximately 0.6 TWh of energy from OVEC.

## V.     The FERC Proceeding

On March 26, 2018, several days before the Debtors filed their underlying chapter 11 bankruptcy cases in this Court, OVEC initiated an action before FERC captioned *Ohio Valley Electric Corporation v. FirstEnergy Solutions Corp.*, Docket No. EL18-135 (the "FERC Proceeding"). OVEC's complaint in the FERC Proceeding asks FERC to find that FES' then-

8

anticipated breach of the ICPA, pursuant to which FES was obligated to purchase electrical power and pay for its contractual share of the costs incurred by OVEC, "would amount to a termination of [FES'] purchase obligation in violation of the filed rate doctrine and the ICPA." (Docket No. 1 Ex. A at 1-2.). OVEC's prayer for relief in its FERC Complaint sought the following:

> a. A FERC order granting OVEC's Complaint: (1) by making a finding that FES's breach constitutes a violation of its obligations under the OVEC ICPA, and (2) by making a determination that permitting FES to terminate its obligations under the OVEC ICPA would be contrary to the public interest in violation of the Mobile-Sierra Doctrine;

> b. Alternatively, a FERC order declaring that it has exclusive jurisdiction to ascertain whether FES's breach of its purchase obligation under the OVEC ICPA: (1) is a matter exclusively within FERC's jurisdiction, and (2) that such termination would be contrary to the public interest in violation of the Mobile-Sierra Doctrine; and

> c. Alternatively, if FERC determines that it lacks exclusive jurisdiction, to initiate proceedings to determine whether termination of FES's purchase obligations under the OVEC ICPA would be contrary to the public interest in violation of the Mobile-Sierra doctrine and to advise the bankruptcy court of its conclusions.

> (Stipulations ¶ 30.)

## VI.    The Bankruptcy Cases and This Adversary Proceeding

The Debtors filed their chapter 11 cases on Saturday, March 31, 2018. Two of the Debtors, the Plaintiffs herein, filed this adversary proceeding and the Motion on Sunday, April 1, 2018. The Debtors also filed the Rejection Motions on Sunday, April 1, 2018. The first of the Rejection Motions (No. 18-50757 Docket No. 44) (the "ICPA Rejection Motion") seeks to reject the ICPA pursuant to 11 U.S.C. § 365(a), which if granted would relieve the Debtors of obligations to continue performing under the ICPA and leave the counterparties with prepetition bankruptcy claims for their resulting damages from the breach as determined by applicable non-bankruptcy law. The second (No. 18-50757 Docket No. 45) (the "PPA Rejection Motion") seeks

9

to reject the nine PPAs, including the one with Krayn, also pursuant to 11 U.S.C. § 365(a). In the Rejection Motions, the Debtors seek authority to reject the respective agreements *nunc pro tunc* to the March 31, 2018 petition date. The Rejection Motions have not been consolidated into this adversary proceeding and the Court has not yet considered any of the Rejection Motions on their merits. [4]

The Motion both sought a temporary restraining order and seeks a preliminary injunction against FERC. The Court held an *ex parte* hearing on the requested temporary restraining order on April 2, 2018, and issued an order that day pursuant to Federal Rule of Civil Procedure 65(b), made applicable in bankruptcy proceedings via Federal Rule of Bankruptcy Procedure 7065 (Docket No. 11) (the "TRO"). The TRO temporarily restrained FERC "from initiating or continuing, or encourage any person or entity to initiate or continue, to require or coerce the Plaintiffs to continue performing under the executory contracts … or limiting Plaintiffs to seeking abrogation of such contract [sic] under The Federal Power Act." (*Id.* at 4.) The TRO provided that it would expire on April 16, 2018.

On April 3, 2018, OVEC filed its motion to intervene. (Docket No. 16.) On April 16, 2018, the Court entered an agreed order granting OVEC leave to intervene. (Docket No. 53.)

Also on April 16, 2018, the Court entered an agreed order among the Plaintiffs, FERC, and OVEC, amending and extending the TRO (Docket No. 52) (the "Amended TRO"). The Amended TRO provided that the temporary restraint against FERC would extend through 11:59 p.m. on May 11, 2018. The Amended TRO further provided that FERC could continue to take certain procedural steps in the FERC Proceeding, provided that FERC remained "restrained from

---

[4] Without limiting FERC's jurisdiction, the Court approved a stipulation between the Debtors and a counterparty to one of the PPAs, Meyersdale Windpower, LLC. (No. 18-50757 Docket No. 502.) Subsequent compromises with one or more of the counterparties to PPAs may have resolved, or may yet resolve, part of the Rejection Motions with respect to such individual executory contracts.

10

(a) entering any order that would require or coerce the Plaintiffs to continue performing under the executory contracts … or (b) otherwise addressing the substance or merits of the FERC Proceeding." The Amended TRO further provided that "to the extent any provision of the automatic stay applies, 11 U.S.C. § 362, it is lifted on consent of the Plaintiffs to permit" the certain specific procedural steps in the FERC Proceeding to proceed.

More motions to intervene followed. The Court allowed the following additional parties to intervene, on various limited terms: The Committee (Docket No. 69), Krayn (Docket No. 73), and the Pass-Through Certificateholders and the Ad Hoc Noteholder Group (Docket No. 98). The Court also granted leave to a group of certain Sponsoring Companies of OVEC to collectively file an *amicus* brief in opposition to the Motion. (Docket No. 106.)

In the aggregate, the parties submitted more than 150 pages of briefs and several hundred pages of declarations and exhibits. On May 10, 2018, the day before the Preliminary Injunction Hearing, the parties submitted the Stipulations. The Court held the Preliminary Injunction Hearing on May 11, 2018.

## LEGAL ANALYSIS

Both the Plaintiffs and the Defendants, primary and intervenor alike, exhausted the better part of their briefing and oral argument on the issue of whether the Court can and should use Section 105(a) of the Bankruptcy Code to issue a preliminary injunction to protect its jurisdiction when proceedings elsewhere might threaten that jurisdiction and might not be automatically stayed. That emphasis is understandable because prior court decisions that considered whether a FERC proceeding divests a bankruptcy court of jurisdiction to consider the rejection of power contracts subject to the Federal Power Act have presumed, without detailed analysis, that the Bankruptcy Code's automatic stay does not apply to such proceedings.

11

However, an applicable decision of the Court of Appeals for the Sixth Circuit compels this Court to take a fresh look at the applicability of the automatic stay in this context, notwithstanding the fact that the leading cases from other circuits have given it short shrift. The question central to this analysis is whether the "police and regulatory powers" exception to the automatic stay in 11 U.S.C. § 362(b)(4) applies to the FERC Proceeding or any proceeding similar to the FERC Proceeding in which a counterparty to a power contract regulated by FERC seeks to enforce the power contract notwithstanding the debtor's rejection of the contract pursuant to Section 365(a). The Court concludes that it does not. Therefore, FERC is automatically stayed from taking any action or asserting any jurisdiction that would interfere with a debtor's right to seek authority to reject a power contract pursuant to Section 365(a). FERC is not free, notwithstanding the fact that in other contexts it exercises regulatory power, to prevent a chapter 11 debtor-in-possession who has successfully rejected a power contract from avoiding performance under the contract and reducing its financial exposure for the breach of contract to an allowed prepetition bankruptcy claim.

In addition, to the extent that the FERC Proceeding might otherwise be within the police powers exception to the Bankruptcy Code's automatic stay, 11 U.S.C. § 362(a), the Court also concludes that the Plaintiffs are entitled to injunctive relief pursuant to 11 U.S.C. § 105(a) to preserve the Court's jurisdiction over the Debtors' cases, their estates, and their Rejection Motions. In reaching this conclusion, the Court follows the reasoning of the Court of Appeals for the Fifth Circuit that "a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating [a debtor's] rejection [of a filed rate contract] by requiring continued performance at the pre-rejection filed rate." *Mirant Corporation v. Potomac Electric Power Company and FERC (In re Mirant Corporation)*, 378 F.3d 511, 523 (5th Cir. 2004).

12

## I. The Automatic Stay Applies to the FERC Proceeding Because Section 362(b)(4)'s Police and Regulatory Power Exception Does Not.

Except as provided in 11 U.S.C. § 362(b), the filing of a bankruptcy petition operates as a stay, applicable to all entities, of, among other things—

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; [and]
>
> . . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362(a)(1) and (3).

However, the filing of a bankruptcy petition does *not* operate as a stay, under 11 U.S.C. § 362(a)(1) or (3),

> of the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C. § 362(b)(4). A "governmental unit" includes, *inter alia*, any "department, agency, or instrumentality of the United States." 11 U.S.C. § 101(27). Therefore, FERC is a governmental unit.

As a threshold matter, FERC argues that it is immune from suit because it has not waived its sovereign immunity for this proceeding. However, Congress has abrogated the sovereign immunity of the United States with respect to section 362 of the Bankruptcy Code,[5] 11 U.S.C. §

---

[5] To the extent relevant, 11 U.S.C. § 106 also abrogates sovereign immunity with respect to 11 U.S.C. §§ 105 and 365 and allows a bankruptcy court to hear and determine any issues with respect to the application of such sections to government units.

106(a). A bankruptcy court "may hear and determine any issue arising with respect to the application of such sections to governmental units." 11 U.S.C. § 106(b). FERC dismisses this argument on the grounds that the automatic stay is only a matter of timing because at some point the automatic stay and the Debtors' bankruptcy case will end. This argument is blind to the fact that this adversary proceeding is *entirely* about timing and the serious threat that the delays caused by FERC proceedings would have on the Debtors' bankruptcy cases and their reorganization efforts absent the application of the automatic stay or the imposition of a preliminary or permanent injunction. The Court concludes that FERC is does not enjoy sovereign immunity from this adversary proceeding.

Acts taken in violation of the automatic stay are void *ab initio* and therefore without effect, even if they are taken in the good faith belief that an exception to the stay applies, including the police powers exception of Section 362(b)(4). *See, e.g., NLRB v. Edward Cooper Painting, Inc.*, 804 F.3d 934, 940 (6th Cir. 1986). "Once a bankruptcy proceeding begins in one court, the concurrent jurisdiction of other courts is partially stripped." *Chao v. Hospital Staffing Services., Inc.,* 270 F.3d 374, 383 (6th Cir. 2001).

If a governmental unit is acting pursuant to its "police or regulatory power," it can continue preexisting proceedings, it can commence new proceedings, and it can enforce any judgment rendered in such proceedings other than a money judgment. If that same governmental unit takes actions that are not pursuant to its "police or regulatory power" and attempts to recover a prepetition claim against the debtor or obtain or control the property of the estate, existing proceedings must stop, and any new proceedings and orders are void *ab initio*. When a governmental unit decides to undertake an enforcement action and believes its action falls within the police power exception, it need not petition the bankruptcy court for permission to proceed in

14

the ordinary course.  However, the agency runs the risk that its determination that the exception to the stay applies will later be found to be erroneous, that its action is in fact "outside the exception's ambit," and the action will be found to be void *ab initio*.  *Chao,* 270 F.3d at 384-85 (citing *Edward Cooper Painting,* 804 F.2d at 940).  If the bankruptcy court and the non-bankruptcy forum "reach differing conclusions as to whether the automatic stay bars maintenance of a suit in the non-bankruptcy forum, the bankruptcy forum's resolution has been held determinative."  *Chao,* 270 F.3d at 384.

    **A.**    **The Police Powers Exception to the Automatic Stay Does Not Permit Actions That Serve Exclusively or Primarily to Elevate the Claims of Certain Prepetition Creditors Over Others.**

       The scope of the Bankruptcy Code's police and regulatory power exception to the automatic stay, pursuant to 11 U.S.C. § 362(b)(4), is a question of federal bankruptcy law and statutory interpretation.  It does not depend on the law governing the governmental unit itself, other than by applying as a matter of fact that agency's proposed or threatened actions to the standard established by the Bankruptcy Code's statutory exception.  The controlling authority governing the interpretation of the police and regulatory power exception to the automatic stay in the Sixth Circuit is *Chao v. Hospital Staffing Services, Inc.,* 270 F.3d 374 (6th Cir. 2001).

       In *Chao*, a home health care provider filed for a chapter 11 case in Florida, though its headquarters was in Memphis, Tennessee.  The reorganization failed; after remaining in chapter 11 for almost a year, the debtor converted its case to chapter 7.  The debtor's obligations under postpetition superpriority debtor-in-possession financing, secured by all assets of the estate, previously authorized by the bankruptcy court pursuant to 11 U.S.C. § 364(d), were approximately $8 million.  The newly-appointed chapter 7 trustee reported to the bankruptcy court that he expected the liquidated value of the estate to be about $5 million.

Six days after the conversion, the Secretary of Labor filed an action in federal district court in Tennessee to prevent transportation in interstate commerce of the health care provider's records under the "hot goods" provision of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a), which allows the Secretary of Labor to restrain the transportation and sale in interstate commerce of goods produced in violation of wage, overtime, and other protections of the FLSA. Approximately 600 of the debtor's employees had not been paid their wages during the debtor's last weeks of operation. While these unpaid wages already represented postpetition administrative expense claims, not mere prepetition priority wage claims, the superpriority postpetition financing lien nevertheless left no unencumbered assets to pay the employees. The records the Secretary sought to enjoin from being moved from Memphis were vital to collecting Medicare and private insurance reimbursements owed to the debtor's estate, and therefore vital to the chapter 7 trustee. The United States District Court in Tennessee entered an injunction to enforce the FLSA "hot goods" provision, requiring the trustee to deposit more than $600,000 with the clerk of court in order to pay the unpaid employees, which would "purge the taint" from the records and allow them to be moved in interstate commerce again.

On appeal, the Sixth Circuit held that while the "police power exception ordinarily would permit FLSA 'hot goods' actions to proceed … [t]he peculiar circumstances of [that] case, however, reveal that the Secretary [undertook that] action not in furtherance of public policy but primarily to assert and protect the private rights of certain individuals." *Chao*, 270 F.3d at 382. Therefore, the police power exception to the automatic stay did not apply, the automatic stay governed, and the nonbankruptcy forum (in that case, a district court in a different district than the venue of the bankruptcy case) therefore had no jurisdiction to entertain the suit brought by the governmental unit, the Department of Labor. *Id.*

16

"To determine whether an action qualifies as a proceeding pursuant to a governmental unit's police or regulatory power, and therefore falls outside the ambit of the automatic stay, this court applies two tests: the *pecuniary purpose test* and the *public policy test*." *Id.* at 385 (emphasis added).

> Under the pecuniary purpose test, reviewing courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety. Those proceedings which relate primarily to matters of public safety are excepted from the stay. Under the public policy test, reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy. Those proceedings that effectuate a public policy are excepted from the stay.

*Id.* at 385-86 (quoting *In re Commerce Oil Co.*, 847 F.2d 291, 295 (6th Cir. 1988)). Pursuant to these complementary tests, an action will only be exempt from the automatic stay of the Bankruptcy Code if the action has been instituted to effectuate the public policy goals of the governmental entity, as opposed to actions instituted to protect the regulator's own pecuniary interest in the debtor's property or to adjudicate private rights. *Chao* at 386 (quotation omitted). "Congress did not except from the automatic stay all lawsuits undertaken by appropriate governmental authorities; it expressly limited the exception to suits by a governmental unit 'to enforce such governmental unit's police and regulatory power.' This court's pecuniary interest and public policy tests recognize this limitation and are designed to sort out cases in which the government is bringing suit in furtherance of *either* its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors." *Id.* at 389 (emphasis in original).

The pecuniary interest test requires a court to inquire "whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety," *Chao,* 270 F.3d at 385 (quoting *Commerce Oil* at 295), and more specifically, "whether the action 'would result in a pecuniary

17

advantage to the government vis-à-vis other creditors of the debtor's estate.'" *Chao,* 270 F.3d at 385 (quoting *In re Commonwealth Cos.*, 913 F.2d 518, 523-24 (8th Cir. 1990)).

The "public policy test calls upon courts to analyze whether *a particular lawsuit* is undertaken by a governmental entity in order to effectuate public policy or, instead, to adjudicate private rights." *Chao,* 270 F.3d at 389; *see also Missouri v. U.S. Bankruptcy Court for the E. Dist. of Ark.*, 647 F.2d 768, 775 (8th Cir. 1999) ("'police or regulatory power' refers to the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the res or property by the bankruptcy court."). Thus, for example, *Chao* noted that in many instances, a "hot goods" action would serve public policy more than private rights, that applying the public policy test "is a difficult undertaking, and many cases will be close." *Id.* However, "when the action incidentally serves public interests but more substantially adjudicates private rights, courts should regard the suit as outside the police power exception, particularly when a successful suit would result in a pecuniary advantage to certain private parties vis-a-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities." *Id.* at 390.

> **B.      While Serving No Direct Pecuniary Interest of FERC, the Obvious and Dominant Purpose of the FERC Proceeding is to Use a Collateral Regulatory Proceeding to Give Certain Private Creditors a Pecuniary Advantage Over Others.**

Just as the "hot goods" action in *Chao*, the FERC Proceeding in this case passes the pecuniary interest test but fails the public policy test, because if OVEC or the PPA counterparties succeed in obtaining the relief they seek in the FERC Proceeding, the primary impact will be a pecuniary advantage to those counterparties relative to other similarly situated creditors of the estate. Seeking that result is the obvious and dominant purpose of the FERC Proceeding.

18

The Debtors have already rejected certain other contracts that are not filed rate contracts. They may yet reject more such contracts. Pursuant to 11 U.S.C. § 365(g), rejection is treated as a prepetition breach of the contract and, pursuant to 11 U.S.C. § 502(g), gives rise to a claim against the estate that is treated as if it arose prepetition. In advancing the theory that this Court could authorize the rejection of such contracts but that FERC could then still require the Plaintiffs to perform on them anyway, *i.e.,* pay ongoing obligations on those contracts postpetition notwithstanding the rejection, OVEC and the PPA counterparties seek to nullify the practical effects of rejection, stand on a different platform than all other holders of rejection claims against the Debtors, and create a result financially indistinguishable from mandatory assumption, as the Code requires for "any commitment by the debtor to a Federal depository institutions regulatory agency … to maintain the capital of an insured depository institution" under 11 U.S.C. § 365(o). In other words, OVEC and the PPAs seek an opportunity in the FERC Proceeding to elevate the priority of the Plaintiffs' obligations to those counterparties to administrative expenses, regardless of whether the Plaintiffs succeed on their Rejection Motions.

The Stipulations, the exhibits introduced into evidence, and the statements of the parties at the Preliminary Injunction Hearing all support the conclusion that the FERC Proceeding was commenced to advance the private rights of OVEC. Similar requests for similar relief by the PPA counterparties, or even by FERC itself acting without the urging of those parties, would likewise be only incidentally related to the core public policy of the Federal Power Act and would be more substantially about litigating who gets what from the insolvent enterprise, which is the primary domain of this Court, not FERC. FERC's core purpose under the Federal Power Act (and the Natural Gas Act) is to "promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates." *National Association for the*

19

*Advancement of Colored People v. Federal Power Commission,* 425 U.S. 662, 670 (1976). No

party advanced arguments or evidence suggesting that the proposed Rejection Motions present

any material threat to the plentiful availability of electricity in the markets where FES sells it,

and the Stipulations show that in terms of both capacity available to FES and actual supply to

FES, OVEC and the PPA counterparties are only a small part of the FES portfolio, even if it

were the case—which it appears not to be, based on subsequent developments in this case—that

OVEC and the PPA counterparties could not resell their capacity and supply into the market

shortly, maybe nearly instantaneously, after losing FES as a buyer. Merely seeking to reduce the

credit risk of filed rate contracts by preventing a bankruptcy court from even considering

motions to reject them is not a plausible exercise of FERC's police and regulatory power; it is

even questionable whether minimizing the credit risk of such contracts is a central aim of the

Federal Power Act when, outside of bankruptcy court, FERC itself has the ability to completely

abrogate such contracts (not only excusing performance but excusing liability for breach) for

completely solvent entities.

  It is clear from *Chao* that a regulatory proceeding need not be wholly unrelated to the

public policy of the legislation administered by the regulatory agency to still fail the public

policy test. *Chao* acknowledged that the FLSA's minimum wage, overtime pay, child labor, and

exemptions, which the Secretary of Labor was trying to enforce via its injunction against the

hospital records, all definitely did state national labor policy. *Id.* at 390-91. That was

insufficient to make suits to enforce compliance with such obligations into exercises of police or

regulatory power, however. Likewise here. Because the FERC Proceeding was "undertaken

principally to adjudicate private rights, with only an incidental public interest in the litigation,"

*Chao,* 270 F.3d at 391, this Court finds that it is not excepted from the automatic stay pursuant to

11 U.S.C. § 362(b)(4), and therefore remains subject to the automatic stay pursuant to 11 U.S.C. § 362(a). If FERC were to plunge ahead based in a different interpretation of Section 362(b)(4), that action would be a fool's errand because any order it might issue to compel the Debtors' performance under the ICPA or any PPA would, in substance, be designed to obtain or control the property of the estate and therefore, be void *ab initio*.

## II.     Injunctive Relief to Preserve the Court's Jurisdiction is Warranted Here.

Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). That section grants the bankruptcy court the power to take appropriate equitable measures needed to implement other sections of the Code. *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002). Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quotations omitted); *see also* 28 U.S.C. § 1334(e). Accordingly, appellate courts have held that protecting a bankruptcy court's comprehensive jurisdiction over the estate when it might otherwise be threatened is an appropriate use of section 105. *Shugrue v. Air Line Pilots Association International (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990) (while "[t]he bankruptcy court's equitable powers cannot be exercised in derogation of other sections of the Bankruptcy Code … § 105, like § 362, is a means by which the bankruptcy court can protect its jurisdiction") (quotations omitted); *N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695 (8th Cir. 1985) ("we hold that the bankruptcy court has the discretion and authority to enjoin federal regulatory proceedings under § 105 when those proceedings would threaten the debtor's estate, and when the court has jurisdiction over a petition in bankruptcy …").

21

Therefore, while this Court has already concluded that the FERC Proceeding is subject to the automatic stay and any order in that proceeding to try to control the property of the estate and distribute it in violation of the Bankruptcy Code's statutory priority requirements would be void *ab initio*, this Court has the power to enjoin FERC under Section 105 even if the automatic stay did not apply and also to avoid the cost and delay of unnecessary proceedings that would ultimately be held void. *Mirant Corporation v. Potomac Electric Power Co. (In re Mirant Corporation)*, 299 B.R. 152 (Bankr. N.D. Tex. 2003) (concluding without specific discussion of the Section 362(b)(4) factors that FERC would not otherwise be stayed from proceeding postpetition, but that injunctive relief to prevent such proceedings was warranted); *Mirant Corporation v. Potomac Electric Power Co. (In re Mirant Corporation)*, 378 F.3d 511 (5th Cir. 2004) (reaching same conclusion on both automatic stay and injunction issues, though noting that enjoining proceedings not stayed by Section 362(b)(4) should be done only in "exceptional circumstances"); *In re Baldwin-United Corporation Litigation.*, 765 F.2d 343, 348 (2d Cir. 1985) ("the bankruptcy court has authority under section 105 broader than the automatic stay provisions of 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings," recognizing "the need to proceed expeditiously in any reorganization without time-consuming and costly distractions in other districts").

When a bankruptcy court considers using its power under Section 105 to enjoin administrative proceedings otherwise not stayed by Section 362, it should apply the usual rules for deciding whether to issue injunctions. *Accurate Die Casting Co. v District 54, International Association of Machinists (In re Accurate Die Casting Co.)*, 59 B.R. 853, 854-55 (Bankr N.D. Ohio 1986). Federal Rule of Bankruptcy Procedure 7065, incorporating Federal Rule of Civil

22

Procedure 65, allows a bankruptcy court to issue a preliminary injunction. Within the Sixth

Circuit, the factors relevant to deciding whether to grant or deny a preliminary injunction are:

1. Whether the movant has shown a strong or substantial likelihood of success on the merits;

2. Whether the movants have shown irreparable injury in the absence of the requested injunction;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others;

4. Whether the public interest would be served by issuing a preliminary injunction.

*Id.* at 855; *accord Unsecured Creditors' Committee v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1228 (6th Cir. 1985) (bankruptcy judge's oral ruling contained findings corresponding to these four factors and was sufficient to satisfy Rule 65 requirement that injunction must state the reason why it was issued).

In addition, caselaw in some districts "has established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to a case before it." *Alert Holdings, Inc. v. Interstate Protective Services, Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (citing *LTV Steel Co. v. Board of Education of the Cleveland City School District (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988). It is not clear whether Courts within the Sixth Circuit consider this a true exception to the irreparable harm requirement or merely a cognizable form of irreparable harm. *See Unencumbered Assets Trust v. Hampton-Stein (In re National Century Financial Enterprises, Inc.)*, 407 B.R. 895, 902 (Bankr. S.D. Ohio 2009)

18-05021-amk    Doc 125    FILED 05/18/18    ENTERED 05/18/18 20:59:32    Page 23 of 39

(plaintiffs "demonstrated that irreparable injury …. is likely in the absence of a preliminary injunction" because the possible collateral attack on the reorganization in a state court was "harm [that] would be an affront to this Court's jurisdiction and would not be compensable with monetary damages").

A.     **The Plaintiffs Will Likely Prevail on the Merits.**

Because the Rejection Motions themselves have not been consolidated into this adversary proceeding, the only relief that the Plaintiffs seek in this adversary proceeding is a declaratory judgment regarding the jurisdiction of the Court to adjudicate and grant the Debtors effective relief pursuant to the Rejection Motions, *i.e.,* relief from postpetition performance and payment obligations under the power agreements they seek to reject, and injunctive relief to preserve that jurisdiction.  They are likely to prevail.

a.     **Bankruptcy Courts Have Jurisdiction over Motions to Reject Power Contracts Regulated by FERC and the Treatment Accorded the Resulting Damage Claims of the Affected Counterparties.**

While FERC states that it does not contest the Bankruptcy Court's jurisdiction to consider the Debtor's Rejection Motions, it nevertheless argues that *after* a debtor-in-possession, such as each Debtor here, rejects a filed rate power contract, FERC can conduct a "regulatory review" at the conclusion of which FERC may demand the Debtors perform the terms of the contract anyway, with appellate review lying only in the federal courts of appeals.  The Debtors suspect, and the Preliminary Injunction Hearing made clear, that this construct used by FERC to describe its alleged concurrent jurisdiction over the power contracts at issue is, at best, a costly procedural delay of the final determination of the treatment rejection claims will receive in the bankruptcy case.  At worst, it is an inappropriate violation of the Bankruptcy Code's priority scheme.  It appears very likely that the Debtors will ultimately succeed on the merits in obtaining

24

a declaratory judgment that such interference would be unlawful under the Bankruptcy Code and that such conclusion is in no way inconsistent with the Federal Power Act.

As announced by the Court in its May 11, 2018 oral ruling, Bankruptcy Code Section 365(a) allows chapter 11 debtors-in-possession to reject burdensome contracts, in the sound exercise of their business judgment, after notice and a hearing, unless the Code provides an exception for a certain type of contract. *See, e.g., N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513 (1984) (holding that Section 365(a) allowed a chapter 11 debtor-in-possession to reject a collective bargaining agreement before Congress later imposed restrictions on such rejections pursuant to Section 1113). The Debtors' arguments in their briefs and at hearing demonstrated that no such exception exists that would be applicable here. This conclusion is supported by analysis of both the Bankruptcy Court for the Northern District of Texas and the Court of Appeals for the Fifth Circuit in their published opinions in the Mirant Corporation case. *Mirant Corporation v. Potomac Electric Power Company and FERC (In re Mirant Corporation),* 299 B.R. 152 (Bankr. N.D. Tex. 2003), *aff'd* 378 F.3d 511 (5th Cir. 2004).[6]

As the *Mirant* bankruptcy court properly noted, "[i]f rejection of the [filed rate contracts] were to be followed (or preceded) by an order of the Commission which required Debtors to perform those agreements, their rejection would be meaningless." *Mirant*, 299 B.R. at 162. While "the Code is not clear on its face as to whether the Commission could order Debtors to perform a rejected contract," many provisions of the Code both within and outside of section 365 make little sense if a debtor might be required to perform a rejected contract:

> Section 1113 provides a specific mechanism for rejection of collective bargaining agreements which contemplates performance pending rejection. *See* section 1113(e). Section 1169 safeguards continued provision of rail service following rejection of a lease of a line …. Section 365 itself requires partial performance by

---

[6] The bankruptcy court in *Mirant* was reversed by the District Court. *In re Mirant Corporation,* 303 B.R. 304 (N.D. Tex. 2003). That decision was reversed by the Fifth Circuit's decision cited in the main text.

the trustee (or debtor in possession) following rejection of certain types of agreements. *See* section 365(h) (dealing with the tenant's rights where debtor-lessor rejects a lease); section 365(i) (dealing with a vendee's rights upon rejection by a debtor-vendor of a contract for the sale of realty); section 365(n) (dealing with a licensee's rights upon rejection by a licensor of a contract involving intellectual property); and section 365(o) [regarding the assumption of any commitment by a debtor to a federal depository institution's regulatory agency to maintain capital of an insured depository institution.]

*Id.* "These provisions suggest … that rejection of a contract in most circumstances relieves the trustee (or debtor in possession) of any obligation to perform. The absence of a provision requiring any post-rejection performance of contracts involving supply or purchase of power or dealing with public utilities, strongly suggests Congress intended such contracts to be dealt with the same as other ordinary contracts." *Id.* at 162-63 (footnote omitted). "At a minimum, these provisions add weight to the conclusion that Congress did not intend that the Commission would be able to eviscerate the effect of a contract's rejection by forcing performance of that contract." *Id.* at 163.

The Fifth Circuit largely adopted the *Mirant* bankruptcy court's interpretation of the significance of the plethora of "specific limitations on and exceptions to the § 365(a) general rejection authority, including exceptions prohibiting rejection of certain obligations imposed by regulatory authorities," *id.* at 521, without any such limitation or exception affecting energy contracts (filed rate or otherwise). The court also noted the existence of other provisions that showed that Congress was aware that a bankruptcy reorganization could implicate the authority of a regulatory rate-setting entity. *Id.* (citing 11 U.S.C. §§ 1129(a)(6) and 362(b)(4)). For example, the Bankruptcy Code specifically provides in 11 U.S.C. § 1129(a)(6) that confirmation of any reorganization plan involving a debtor engaged in an industry with regulated rates was contingent on the approval of the rates by the regulatory agency with jurisdiction. *Id.* The Fifth Circuit concluded:

In light of the numerous specific exceptions to the general § 365(a) authority to reject contracts that Congress chose to include in the Bankruptcy Code, including those for other contracts subject to extensive regulation, and the absence of any exception for contracts subject to FERC jurisdiction, it is clear that Congress intended § 365(a) to apply to contracts subject to FERC regulation. *Cf. NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA.").

*Id.* at 522. Indeed, this Court observes that whereas *Bildisco* gave rise to legislative amendments to the Bankruptcy Code regarding the rejection of a labor union's collective bargaining agreement, in the fourteen years since *Mirant* was decided by the Fifth Circuit, Congress has not provided any exception to rejection of regulated power contracts pursuant to Section 365(a).

Soon after the Fifth Circuit issued its decision in *Mirant*, another case from the Southern District of New York expressly disagreed with the central holding in *Mirant* and held that a proposed rejection of a filed rate energy contract was a collateral attack on the filed rate and thus within FERC's exclusive jurisdiction, not the jurisdiction of the bankruptcy court. *In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006) (Casey, J.).[7]

Calpine was the seller of electricity under the filed rate contracts at issue. Its long-term contracts locked Calpine into selling to utilities and other commercial and government customers at prices below prevailing spot market prices. Natural gas prices had increased substantially in the period preceding Calpine's bankruptcy filing, and Calpine at the time operated the largest fleet of natural-gas fired power plants in North America.

*Calpine's* procedural history is similar to this case. Certain contract counterparties anticipated the bankruptcy filing and, on December 19, 2005, filed a complaint with FERC

---

[7] *Calpine* was authored by the same district judge who authored the earlier opinion also widely cited in the parties' briefs: *NRG Power Marketing v. Blumenthal (In re NRG Energy, Inc.),* 2003 WL 21507685 (S.D.N.Y. June 30, 2003) (Casey, J.).

seeking an order to compel Calpine to continue to perform on the long-term filed rate contracts at issue. The next day, Calpine did in fact file for bankruptcy protection. The day after that, December 21, 2005, Calpine commenced an adversary proceeding against FERC and sought a preliminary injunction against FERC from requiring Calpine's continued performance under any of the power purchase agreements. Also on December 21, 2005, Calpine filed its motion to reject certain of its most burdensome power contracts. In the adversary proceeding, the bankruptcy court granted a temporary restraining order. Prior to any hearing in the bankruptcy court on the preliminary injunction, however, the district court withdrew the reference with respect to both the adversary proceeding and the rejection motions.

The District Court in *Calpine* held that rejection and cessation of performance under the filed rate contracts at issue would be tantamount to a change to the duration of the filed rate, which in turn would be a modification of the "rate" under the expansive definition of that term in the applicable caselaw. *Calpine*, 337 B.R. at 32-33. The Court found that because "Calpine seeks rejection based on dissatisfaction with the rates . . . thus constituting a collateral attack on the filed rate itself." *Id.* at 36.

*Calpine* then found that "there are no provisions in the FPA that specifically limit FERC jurisdiction in the bankruptcy context" and that "the Court searches the Bankruptcy Code and finds little evidence of congressional intent to limit FERC's regulatory authority." *Id.* at 33. This Court finds *Calpine's* frame of reference to be backwards. Section 365 represents a broad grant of power subject to specific limitations and exceptions, which, as *Mirant* noted, is a long list but not one that includes filed rate power contracts. As the Supreme Court held in *Bildisco*, "the language [of § 365(a)] by its terms includes all executory contracts except those expressly exempted." 465 U.S. at 521. *Calpine* acknowledges this and then explains it away by noting that

28

"in *Bildisco*, however, the parties conceded the rejection power of the bankruptcy court," and that more importantly, the agency before the Court in *Bildisco*, the NLRB, "does not possess exclusive jurisdiction over the terms of collective bargaining agreements, thus, in *Bildisco*, there was no jurisdictional conflict." *Calpine,* 337 B.R. at 34. Thus, *Calpine* held that the bankruptcy court "lacks jurisdiction to authorize the rejection of the [filed rate contracts] because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts," *Calpine,* 337 B.R. at 36, and that because of the purportedly special nature of such contracts, rejection of such contracts and cessation of performance thereunder would not really be a rejection and breach of a contract but "the unilateral termination of a regulatory obligation." *Id.*

The Court finds this distinction, and *Calpine's* attempt to distance itself from the more straightforward reading of *Bildisco*, to be unconvincing. While given the force of statute or regulation under applicable caselaw, *see Montana-Dakota* and *Lockyer*, *infra*, filed rate contracts remain contracts. They are not actual regulations, subject to notice-and-comment rulemaking processes, let alone actual federal statutes, that would lie outside the ambit of Section 365 simply by virtue of not being "contracts" at all.

The contrary argument was advanced at oral argument by counsel for OVEC, who argued that a privately-negotiated power contract, when approved by FERC, was "essentially the equivalent of them writing the reg as it relates to the wholesale power in that area for that term under those conditions and say, it's as if I said it. As if I, FERC, said it." (Preliminary Injunction Hrg. Tr. 137.) This Court sees this as the most convincing possible argument for the Defendants—that filed rate contracts essentially ascend from being mere contracts to being actual regulations. Structurally, this reading might both (1) dodge Section 365(a) entirely, as that

29

statute only allows the rejection of executory contracts or unexpired leases, and could no more reject an actual regulation than it could reject the Constitution, and (2) at least arguably make a debtor-in-possession's[8] ongoing performance an ordinary course regulatory compliance obligation. *See, e.g.,* 28 U.S.C. § 959(b) ("a trustee … including a debtor in possession, shall manage and operate the property in his possession … according to the requirements of the valid laws of the State in which such property is situated").

However, while seductive, this argument is substantively flawed. FERC's imprimatur in accepting a contract as a filed rate contract might give that contract the force of federal regulation in the sense of requiring further FERC action to modify or abrogate it, but it does not follow from that that the obligation in question is then a true regulation—something that FERC could have imposed (let alone actually did impose) on the parties without their consent after notice and comment rulemaking, and something that section 365 could no longer touch. Supreme Court opinions discussing FERC's treatment of filed rate contracts still primarily use the language of contracts. *See generally NRG Power Marketing, LLC v. Maine Public Utilities. Commission*, 558 U.S. 165 (2010); *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish Cty.*, 554 U.S. 527 (2008). This stands in contrast to cases where the Court reviews actual FERC regulations regarding wholesale electricity rates. *See, e.g., FERC v. Electric. Power Supply Association*, 136 S.Ct. 760 (2016) (reviewing FERC regulation requiring wholesale electric market operators to compensate users or demand response providers at the same rate as generators for users' commitment to reduce electricity use during peak periods). The ICPA is in the public record, but it reads and performs like a contract, not a regulation; the

---

[8] A chapter 11 debtor-in-possession has, with a few exceptions not relevant here, the rights and powers of a bankruptcy trustee unless a chapter 11 trustee is appointed by order of the Court. 11 U.S.C. § 1107.

PPAs are not filed in the record but they also read in all material respects like contracts, because they are.

As such, this Court cannot adopt *Calpine's* conclusion that bankruptcy court lack jurisdiction to consider motions to reject filed rate contracts, or give effective relief thereunder by allowing performance to cease and the damages to be reduced to a claim against the estate, on the basis that the Debtors are actually seeking unilateral termination of a regulatory obligation.

### b. The Filed Rate Doctrine, the Federal Power Act, and FERC's Regulatory Authority Are Not Offended by, and Do Not Preempt, the Bankruptcy Court's Exclusive Jurisdiction Over Motions to Reject Power Contracts and the Treatment of Counterparty Claims in Bankruptcy Cases.

In enacting the Federal Power Act, Congress "declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." 16 U.S.C. §824(a).

FERC's plenary and exclusive jurisdiction over wholesale power rates, terms, and conditions of service is embodied in the "filed rate doctrine," which provides that "so long as the filed rate is not changed in the manner provided by the [Federal Power Act] it is to be treated as though it were a statute, binding upon the seller and purchaser alike." *Northwestern Public Service Co. v. Montana-Dakota Utilities Co.*, 181 F.2d 19, 22 (8th Cir. 1950), *aff'd*, *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951); *see also California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) ("Once filed with a federal agency, such tariffs are the equivalent of a federal regulation.") (quotation omitted). Moreover, the filed rate doctrine is not limited to "rates" per se. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). It includes "the entirety of a rate schedule including contractual provisions, methodologies for allocating costs, restrictions on availability of the

31

schedule as well as quantity and price terms." *Tennessee Gas Pipeline Co. v. FERC*, 860 F.2d 446, 447 n.1 (D.C. Cir. 1988).

The filed rate doctrine applies even to contracts freely negotiated between parties, once those contracts are filed with, and approved by, FERC. Under the *Mobile-Sierra* doctrine, named for the foundational and concurrently-decided cases of *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S. Ct. 373, 100 L.Ed. 373 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), "FERC must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Morgan Stanley Capital Grp., Inc. v. Public Utility District No. 1 of Snohomish Cty., Washington*, 554 U.S. 527, 530 (2008); *see also* 16 U.S.C. §§ 824d(a) (rates, charges, and rules and regulations related thereto subject to FERC jurisdiction shall be "just and reasonable") and 16 U.S.C. § 824e; *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) ("The regulatory system created by the Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity.").

Under the filed rate doctrine, a party "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms." *Montana-Dakota*, 341 U.S. at 251.

The central legal question presented by both the FERC Proceeding, based on the remedies OVEC requested from FERC, and this adversary proceeding, based on the prayer for relief in the Complaint, is this: If this Court authorizes a debtor to reject a filed rate contract, and

32

the debtor ceases performance on it, has the debtor "changed," "abrogated," or otherwise modified the contract (the "rate") itself, violating the doctrine that gives such contracts the force of regulations committed to FERC's jurisdiction?

This Court holds that rejection, including the attendant cessation of performance, does not intrude on FERC's jurisdiction over filed rates. If Plaintiffs were solvent and simply stopped making payments under the PPAs or ICPA, the counterparties could not reasonably argue that Plaintiffs had somehow modified or abrogated those agreements; they would seek damages for the breaches of those contracts in court or in arbitration (as the ICPA provides) under the terms of the contracts as written. Those breaches would lead to claims. If the Plaintiffs then filed bankruptcy, the claims would become claims against the estate. Treatment of those claims are governed by the Bankruptcy Code, including the confirmation of a reorganization plan in chapter 11, and the economic reality of the debtor's estate. Rejection has exactly the same effect (breach) and the same result (a claim against the estate).

The Court of Appeals in *Mirant* reversed the district court, specifically disagreeing with the premise of the district court's decision that the debtor's proposed rejection of the filed rate contract was a collateral attack on the filed rate. *In re Mirant Corp.*, 378 F.3d 511, 519-20 (5th Cir. 2004) ("We conclude that the [Federal Power Act] does not preempt Mirant's rejection of the [filed rate contract] because it would only have an indirect upon the filed rate."). While a contract's filed rate will presumably be a relevant factor in a trustee's decision to reject any filed rate contract, "[a] debtor's use of the filed rate as a criteria to select for rejection under § 365(a) those contracts which impose the greatest burden upon the bankruptcy estate does not convert that rejection decision into a prohibited collateral attack on the filed rate when the electricity purchased under the rejected contract is not necessary to fulfill a debtor's supply obligations."

33

*Id.* at 520. "A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection." *Id.* at 522.

*Mirant* also rejected FERC's argument that the discounted dividend a counterparty to a rejected power contract would inevitably receive on account of its allowed claim in a bankruptcy case represented a modification of the rate in violation of the filed rate doctrine. "FERC's argument is unpersuasive because it is entirely dependent upon *Mirant's* bankruptcy status. . . . [A]ny amount [the counterparty] receives in satisfaction of its breach of contract claim will depend solely upon the terms applicable to unsecured creditors as a class under the reorganization plan confirmed by the bankruptcy court. *See* 11 U.S.C. § 1129."

The economic disappointment a power contract counterparty experiences in a debtor-party's bankruptcy case cannot be avoided by invoking the Federal Power Act and the filed rate doctrine any more than can the disappointment of any other general unsecured creditor be avoided by invoking the law of contract or tort. Non-bankruptcy law governs the claims of creditors in most cases, but the bankruptcy law apportions a bankruptcy estate's limited assets to the creditors. For this reason, bankruptcy law controls the rights and remedies relevant to the Rejection Motion and, therefore, the Plaintiffs are likely to succeed on the merits in this adversary proceeding.

> **B.     A FERC Order Compelling Postpetition Performance of the ICPA and PPAs by the Plaintiffs Would Cause Irreparable Harm.**

In this case, resolving the issue of the Plaintiffs' likelihood of success on the merits also largely resolves the issue of whether they will suffer irreparable harm in the absence of an injunction, because establishing that the Court has jurisdiction to grant the Rejection Motions and permit the cessation of performance of the ICPA and PPA also largely establishes that the

Plaintiffs would suffer irreparable injury if the Court were to lose the jurisdiction to do those things.

The principal reason that the Plaintiffs brought this adversary proceeding so quickly after filing their underlying bankruptcy petitions was the district court decision in *NRG Power Marketing v. Blumenthal (In re NRG Energy, Inc.)*, 2003 WL 21507685 (S.D.N.Y. June 30, 2003) (Casey, J.). The debtor-plaintiff in that case was the seller of power under a power purchase agreement, obligated to sell Connecticut Light & Power energy at a fixed price under a long-term contract at unfavorable rates. While also contending that CLP was in breach of the agreement, the debtor filed for bankruptcy on March 14, 2003, and immediately moved to reject the contract. The debtor party to the power purchase agreement with CLP did not seek a TRO or injunction from the bankruptcy court against FERC. In response, the very next day, the Connecticut attorney general and state utilities regulator filed an action with FERC, and the day after that, FERC issued an order directing NRG to continue performing under the contract.

On June 2, 2003, the bankruptcy court, proceeding on a theory of concurrent jurisdiction, heard the rejection motions on the merits and granted them, but declined to enjoin FERC from enforcing the order to perform the contract notwithstanding its rejection. The debtor-plaintiff responded by moving the district court for declaratory and injunctive relief.

After the district court failed to enter a temporary restraining order, FERC proceeded while the district court considered the motion for an injunction against it. On June 25, 2003—after the contract had already been rejected—FERC issued a *second* order requiring the debtor to continue to provide power to CLP pursuant to the filed rate contract, pending final review of whether termination of the contract was within the public interest.

35

The entirety of the *NRG* court's analysis of the application of the automatic stay was a single paragraph with no citations:

> Plaintiff may believe that it is entitled to cease performing under the Agreement given that Defendants allegedly violated the automatic stay provision of the Bankruptcy Code in initiating the FERC action and because the bankruptcy court allowed Plaintiff to reject the Agreement. However, FERC acted within its legal authority, delegated to it under the FPA, when it ordered Plaintiff to continue to comply with its obligations under the Agreement.

*NRG* at *4. Section 362(b)(4) and the scope of the automatic stay is not even mentioned in *NRG*. *NRG* also does not analyze whether bankruptcy courts have exclusive jurisdiction over motions to reject power contracts and the treatment of counterparties' bankruptcy claims, or whether the Federal Power Act preempts Bankruptcy Code Section 365.

*NRG's* holding was instead a procedural *fait accompli*. *NRG* concluded that because, pursuant 16 U.S.C. § 825*l*(b), "actions taken by FERC are reviewable only be the federal courts of appeals," *id.* at *3, the district court (necessarily including the bankruptcy court, defined by 28 U.S.C. § 151 as a unit of the district court) lacked subject matter jurisdiction over the action, and that the debtor's remedy "would be to seek review of FERC's order by a federal court of appeals." *NRG* at *4. The delay resulting from such review would presumably impose on any debtor an imperative to settle with the counterparty so as to have time to confirm a reorganization plan before financing expires, professional fees mount to an unsustainable level, and/or the creditors who must vote to accept the plan lose their patience. This was precisely the result in *NRG* before the district court's decision could be reviewed by the Court of Appeals.

OVEC has already filed a complaint before FERC and asked it to issue precisely the kind of orders that *NRG* held divested the bankruptcy court of jurisdiction to consider a rejection motion, or effectively negated such a rejection by mandating postpetition performance of a rejected contract notwithstanding rejection. The possibility that FERC might decline to issue

such orders does not ameliorate this harm; movants for preliminary injunctions are not required

to demonstrate impossible clairvoyance and prove that, but for the proposed injunction, the

enjoined entity would take the enjoined action. The more central inquiry is whether the action

could be either harmlessly undone or compensated with monetary damages. If FERC were not

stayed or enjoined from issuing such an order and did issue such an order, and the result actually

was that this Court lost effective jurisdiction over a critical piece of the restructuring of the

debtors and their estates notwithstanding 28 U.S.C. § 1334(e) and 11 U.S.C. § 365(a), there

would be no practical way to repaire the damage inflicted by the mere fact of making the debtor

litigate postpetition performance obligations in multiple forums, defeating a central goal of the

Bankruptcy Code of providing an efficient and centralized forum for the reorganization of

debtor-creditor relations.

      **C.**    **FERC and the Intervenor-Defendants Will Not be Substantially Harmed by the Preliminary Injunction.**

FERC will not be harmed by the issuance of a preliminary injunction, because this Court

is asserting no authority to modify a filed rate in derogation of FERC's exclusive jurisdiction

over such matters. Rather, the preliminary injunction will prevent a lengthy proceeding that is

likely to be *void ab initio,* and instead permit the Debtors and their creditors to focus on the

bankruptcy case that will vindicate the power contracts at issue and their filed rate by allowing

damage claims pursuant to those contracts and rates.

With respect to OVEC, the OVEC Sponsoring Companies, and the PPA counterparties,

the prospect that the Debtors might reject executory contracts that the Bankruptcy Code allows

them to reject cannot be a cognizable "substantial harm," particularly when the Rejection

Motions are not yet being heard on their merits. Moreover, those parties are entitled to due

process in this Court and in the Debtors' bankruptcy cases. They will be entitled to allowed

37

claims based on applicable non-bankruptcy law for breach of contract damages resulting from the rejection of their contracts. The financial disappointment derived from the fact that their claims may not be paid in full in these bankruptcy reorganization cases will be fairly shared with all other unsecured creditors of the Debtors' estates.

### D. The Public Interest Favors Injunctive Relief.

"The public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization." *Lazarus Burman Associates. v. National Westminster Bank USA (In re Lazarus Burman Associates.)*, 161 B.R. 891, 901 (Bankr E.D.N.Y. 1993). In the early days of this case, it is clear to the Court that there is great concern on the part of the public, including employees, local communities, customers, and creditors over the status of the Debtors' bankruptcy cases and the prospects for a successful reorganization of their businesses as expeditiously as possible. These prospects would be put at risk if the preliminary injunction were not entered. Therefore, the public interest favors granting the Motion.

## CONCLUSION

Assuming that the Plaintiffs, as debtors-in-possession, are successful with their Rejection Motions and obtain an order authorizing them to reject the PPAs and the ICPA, the sole or primary form of relief sought in the FERC Proceeding would elevate the general unsecured claims created by such rejections to administrative expense priority, contrary to the priority scheme Congress established in the Bankruptcy Code. Agency action solely or primarily seeking such relief does not constitute the use of such agency's "police or regulatory power," and therefore is not excepted from the automatic stay pursuant to the exception enacted at 11 U.S.C. § 362(b)(4). Orders of any stayed administrative agency attempting to compel such a result would be void *ab initio*.

In addition, if the FERC Proceeding were excepted from the automatic stay as an exercise of FERC's police and regulatory power, protecting the Court's jurisdiction to both authorize rejection of executory filed-rate contracts and grant effective relief following such rejection is an appropriate use of this Court's general equitable powers under 11 U.S.C. § 105(a). The Plaintiffs here have shown a substantial likelihood of success on the merits of their Complaint in this adversary proceeding. Enjoining FERC is necessary to prevent irreparable harm to the Debtors' estates and the reorganizational goals of the Bankruptcy Code, including the power to reject contracts. Neither FERC nor the private parties to the contracts are substantially harmed in a legally cognizable manner by the entry of the injunction. Finally, the public interest will best be served by the injunction this Court has already entered.

The Rejection Motions have not been consolidated into this adversary proceeding, and therefore this Memorandum Decision expresses no view on the merits of those Rejection Motions.

The Court has already entered its separate order granting the preliminary injunction based on the Court's May 11, 2018 oral ruling. Therefore, there will be no further order entered pursuant to this Memorandum Decision. The 14-day time period for appeal shall run from the date this Memorandum Decision is docketed by the Clerk pursuant to Rule 8002(b)(1)(A), as stated in the third paragraph of this Memorandum Decision.

# # #