**<u>Judicial Notice DJ-1</u>**

**Complaint filed in *Ohio Valley Electric Corp. v. FirstEnergy Solutions Corp.*, Docket No. EL18-135 (Mar. 26, 2018) (the "<u>FERC Proceeding</u>")**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Ohio Valley Electric Corporation, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | Docket No. EL18- |
| v. | ) | |
| | ) | |
| FirstEnergy Solutions Corp., | ) | |
| | ) | |
| Respondent. | ) | |

**COMPLAINT OR, IN THE ALTERNATIVE,**
**REQUEST FOR DECLARATORY ORDER**

Pursuant to section 306 of the Federal Power Act ("FPA")[1] and Rule 206 of the Federal Energy Regulatory Commission's ("FERC" or the "Commission") Rules of Practice and Procedure,[2] Ohio Valley Electric Corporation and its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation (collectively, "OVEC"), respectfully submits this Complaint ("Complaint") against FirstEnergy Solutions Corp. ("FirstEnergy"). FirstEnergy is a counterparty to the Inter-Company Power Agreement ("ICPA")[3], a long-term power supply and cost-recovery agreement under which FirstEnergy is obligated to pay for its contractual share of the costs incurred by OVEC to meet its obligations under the ICPA. The Complaint asks the Commission to find that FirstEnergy's anticipated breach of the ICPA would amount to a termination of FirstEnergy's purchase obligation in violation of the filed rate doctrine and

---

[1] 16 U.S.C. § 825e.

[2] 18 C.F.R. § 385.206.

[3] The ICPA is included as Attachment A to this pleading.

138316284.1

the ICPA. FirstEnergy has announced its intention to declare bankruptcy in the next few weeks and is expected to seek rejection of the ICPA in the bankruptcy court.[4]

The Commission has the authority and obligation to ensure enforcement of the ICPA[5] because the ICPA is a wholesale power arrangement subject to FERC's exclusive jurisdiction – and not jurisdiction of a bankruptcy court – and because the ICPA, as a filed rate, is "binding upon the seller and purchaser alike." Neither commercial nor equitable concerns are a defense by the purchaser against its obligation to pay the filed rate.[6] In fact, the Commission's failure to enforce the filed tariff rate against a customer, even where parties had agreed to a different rate, would amount to unlawful discrimination.[7] As discussed *infra*, moreover, if the Commission failed to intercede, the result would necessitate a change to the filed rate reflected in the ICPA, a potential increase in costs to OVEC's other customers, and in some cases resultant higher consumer rates, all in the amount of hundreds of millions of dollars over the remaining life of the contract.

The United States District Court for the Southern District of New York – the court to have most recently addressed the question – has held that a bankruptcy court's rejection of a FERC-jurisdictional power supply contract "directly interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts or otherwise constitutes

---

[4] *See* Samuel Riehn, "FirstEnergy Confirms FES Bankruptcy," Seeking Alpha (Mar. 1, 2018), *available at* https://seekingalpha.com/article/4152235-firstenergy-confirms-fes-bankruptcy.

[5] Section 309 of the FPA, 16 U.S.C. § 825h, gives the Commission the power "perform any and all acts…necessary or appropriate to carry out" its obligations under the Act, including its obligation to ensure adherence to the filed rate. Thus, for example, if the Commission has erroneously permitted a utility to undercharge a customer, the Commission has the inherent authority to correct its error and order the customer to pay a surcharge as a means to address the resulting undercollection. *See, e.g., Cambridge Electric Light* Co., 66 FERC ¶61,346 at 62,162 (1994) (citing *United Gas Improvement Co. v. Callery Properties, Inc*., 382 U.S. 223, 229 (1965)).

[6] *Maislin Indus., US, Inc. v. Primary Steel, Inc*., 497 U.S. 116, 126-28 (1990).

[7] *Id*. at 130.

a collateral attack on the filed rate."[8]  But even under the narrowest reading of FERC's authority vis-à-vis that of the bankruptcy courts, FERC's authority is exclusive where the actions of the debtor would result in changes to a FERC-filed rate.[9]

If the Commission declines to act on OVEC's Complaint, OVEC alternatively requests, under Rule 207(a)(2) of FERC's Rules of Practice and Procedure[10] and section 554(e) of the Administrative Procedure Act ("APA"),[11] that the Commission issue a declaratory order finding that it has exclusive jurisdiction over the ICPA.  Such an order is within the Commission's authority as it would resolve the substantial marketplace uncertainty created by FirstEnergy's anticipated bankruptcy filing and potential attempt to reject the ICPA.

Even assuming, *arguendo*, under the broadest possible interpretation of a bankruptcy court's jurisdiction to authorize rejection of the ICPA, the bankruptcy court nonetheless must consider determinations by this Commission whether or not rejection of the contract would be in the public interest.[12]  Thus, OVEC also makes this alternative request for declaratory order: Should the Commission determine that it does not have exclusive authority over the ICPA, OVEC requests that the Commission issue a declaratory order advising the bankruptcy court that rejection of the ICPA would be contrary to the public interest.  And, should the Commission conclude that it needs more information to make that determination, OVEC would support FERC's initiation of proceedings in which affected parties could submit comments and briefs on the issue.

---

[8] *In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. Jan. 27, 2006).

[9] *In re Mirant Corp.*, 378 F.3d 511, 519 (5th Cir. 2004).

[10] 18 C.F.R. § 385.207(a)(2).

[11] 5 USC § 554(e) (2012).

[12] *In re Mirant Corp.*, 378 F.3d at 524-26; *In re Mirant Corp.*, 318 B.R. 100, 108 (N.D. Tx. 2004) (on remand).

3

All of these points are discussed in more detail, *infra*. Briefly, OVEC requests the following relief:

1. A Commission order granting OVEC's Complaint (1) by making a finding that FirstEnergy's anticipatory breach of the ICPA constitutes a violation of its obligations under that agreement, and (2) by making a determination that permitting FirstEnergy to terminate its obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierra* doctrine (and to establish such additional procedures as may be necessary to make the latter determination);

2. Alternatively, a Commission order declaring that it has exclusive jurisdiction to ascertain whether FirstEnergy's anticipatory breach of its purchase obligation under the ICPA, by rejection of the contract in bankruptcy or otherwise, (1) is a matter exclusively within the jurisdiction of the Commission, and (2) that such termination would be contrary to the public interest in violation of the *Mobile Sierra* doctrine (and to establish such additional procedures as may be necessary to make the latter determination); and

3. Alternatively, should the Commission determine that it lacks exclusive jurisdiction, to initiate proceedings to ascertain whether termination of FirstEnergy's purchase obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierra* doctrine (and to establish such additional procedures for the development of a record as may be necessary to make the latter determination) and to advise the bankruptcy court both of its intention to make such a determination and of its ultimate conclusions.

## I. SERVICE AND COMMUNICATIONS

All correspondence and communications to the Complainant in this docket should be addressed to the following individuals, whose names should be entered on the official service list maintained by the Secretary in connection with these proceedings:[13]

---

[13] OVEC requests waiver of 18 C.F.R. § 385.203(b)(3), to the extent necessary, to allow the placement of four OVEC representatives on the official service list in this docket.

David D'Alessandro
Harvey L. Reiter
Jonathan P. Trotta
M. Denyse Zosa
Stinson Leonard Street LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
(202) 785-9100
david.dalessandro@stinson.com
harvey.reiter@stinson.com
jtrotta@stinson.com
denyse.zosa@stinson.com

Brian Chisling
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3075
bchisling@stblaw.com

## II.   BACKGROUND

OVEC owns and operates two coal-fired generating power plants, the Kyger Creek plant in Ohio and the Clifty Creek plant in Indiana, with a combined capacity of approximately 2,400 MW.   OVEC has approximately 660 employees (and has approximately 650 retired employees and surviving spouses receiving pension and other benefits from OVEC).   OVEC and its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation ("IKEC"), were formed on October 1, 1952 for the purpose of providing electric power in support of the operation of uranium enrichment facilities then under construction by the Atomic Energy Commission ("AEC") near Portsmouth, Ohio.   The AEC's facilities are now operated by the Department of Energy ("DOE"), as successor to the AEC.   OVEC and AEC entered into a power supply agreement supporting the AEC's Portsmouth facilities on October 15, 1952 ("DOE Power Agreement").

OVEC and OVEC's owners or their utility-company affiliates (called "Sponsoring Companies") signed the ICPA on July 10, 1953 to support the DOE Power Agreement and provide for excess energy sales to the Sponsoring Companies of power and energy not utilized by DOE or its predecessors. Initially set for 25 years, this agreement was later

5

extended through December 31, 2005. The current term of the ICPA extends through June 30, 2040. On September 29, 2000, DOE notified OVEC of its cancellation of the DOE Power Agreement, effective April 30, 2003. Since the termination of the DOE Power Agreement, OVEC's entire generating capacity has been exclusively available to the Sponsoring Companies under the terms of the ICPA. The ICPA, and all amendments thereto, constitute a FERC-filed, cost-based power agreement.[14] The current Sponsoring Companies of OVEC are as follows (and share the following OVEC "power participation ratio" benefits and payment obligations under the ICPA):

| Sponsoring Company | % Share | Parent Entity[15] |
|---|---|---|
| Allegheny Energy Supply Company LLC | 3.01% | FE |
| Appalachian Power Company | 15.69% | AEP |
| Buckeye Power Generating, LLC | 18.00% | Buckeye |
| The Dayton Power and Light Company | 4.90% | AES |
| Duke Energy Ohio, Inc. | 9.00% | Duke |
| FirstEnergy Solutions Corp. | 4.85% | FE |
| Indiana Michigan Power Company | 7.85% | AEP |
| Kentucky Utilities Company | 2.50% | PPL |
| Louisville Gas and Electric Company | 5.63% | PPL |
| Monongahela Power Company | 0.49% | FE |
| Ohio Power Company | 19.93% | AEP |
| Peninsula Generation Cooperative | 6.65% | Wolverine |
| Southern Indiana Gas and Electric Company | 1.50% | Vectren |
| | 100.00% | |

Under the ICPA, OVEC must "make Available Energy available to each Sponsoring Company in proportion to said Sponsoring Company's Power Participation Ratio."[16] While no

---

[14] The Commission accepted the ICPA in a delegated letter order issued on May 23, 2011. *Ohio Valley Elec. Corp.*, Docket Nos. ER11-3181-000, ER11-3440-000 and ER11-3441-000 (May 23, 2011) (delegated letter order).

[15] The abbreviations of the Sponsoring Companies' parent entities are as follows: American Electric Power Company, Inc. ("AEP"); The AES Corporation ("AES"); Buckeye Power, Inc. ("Buckeye"); Duke Energy Corporation ("Duke"); FirstEnergy Corp. ("FE"); PPL Corporation ("PPL"); Vectren Corporation ("Vectren"); Wolverine Power Supply Cooperative, Inc. ("Wolverine").

[16] ICPA, Section 4.03.

Sponsoring Company is "obligated to avail itself of any Available Energy,"[17] they are each individually responsible for their proportionate share of the fixed and operating costs of the project, including the costs of additions, upgrades, repairs, employee benefits (including post-retirement benefits obligations) and eventually decommissioning.[18] In addition, they are responsible for adjustment charges for "Minimum Loading Event Costs" if they fail to take their "Power Participant Ratio" share of the facilities' energy output.[19] Their obligations under the ICPA are individual, not joint.[20] That is, each Sponsoring Company is responsible only for its assigned *pro rata* portion of the OVEC's costs. FirstEnergy's proportionate share of the OVEC costs – including the eventual and substantial costs of environmentally sound decommissioning is just under 5%.[21] In these respects the ICPA is more accurately viewed not as a conventional purchased power agreement, but a joint venture whose participants have committed to support the operation of OVEC's facilities from "cradle to grave."

The unique nature of the agreement – the fact that the rights and obligations of all the parties to the ICPA are "several and not joint or joint and several"[22] for the life of the generating facilities – is directly related to OVEC's breach claim in the event FirstEnergy is able to reject the ICPA in bankruptcy. In November 2016, Moody's announced that it had "placed the ratings of the Ohio Valley Electric Corporation (OVEC) under review for downgrade," an action it said was prompted by "the downgrade of FirstEnergy Corp's (FirstEnergy) subsidiaries FirstEnergy Solutions Corp. (FES: Caa1 negative) and Allegheny Energy Supply Company, LLC (AES: B1

---

[17] *Id.*

[18] *See id.*, Sections 7.01, 7.02, 7.03 and 8.04.

[19] *Id.*, Section 5.05.

[20] *Id.*, Section 9.11.

[21] *Id.*, Section 1.0117 (identifying FirstEnergy's Power Participation Ratio as 4.85%).

[22] *Id.*, Section 9.11.

7

negative) which together are contractually obligated to cover about 8% of OVEC's expenditures."[23] FirstEnergy, Moody's noted, had publicly announced its "intention to exit its merchant business entirely within 18 months even if it requires a restructuring or bankruptcy at FES."[24] In Moody's view, because each of the OVEC's Sponsoring Company's obligations are several, OVEC is similar in nature to a municipal joint action agency, and thus Moody ascribes a credit rating to OVEC tied to its weakest link, or (in other words) OVEC's lowest rated Sponsoring Company, FirstEnergy Solutions Corp., which contributes just under 5% of revenues.

FirstEnergy's efforts to exit the merchant generation business continue to have real impact on OVEC. Just last month, FirstEnergy Corporation's CEO announced that "the company's merchant generation business is likely headed for bankruptcy protection by the end of March."[25] "While I cannot speak for the unregulated business," he stated, "I would be shocked if they go beyond the end of March without some type of filing."[26] Based on this announcement – and the clear implication that FirstEnergy would reject the ICPA in bankruptcy – "Moody's lowered the subsidiary's rating from below investment grade to likely in default."[27] Standard & Poor's Financial Services LLC had already downgraded FirstEnergy's bond rating for the same

---

[23] Moody's Investor Services Rating Action (November 4, 2016), included as Attachment B to this filing.

[24] *Id.*

[25] Gavin Bade, "FirstEnergy CEO says generation subsidiary headed for bankruptcy protection," Utility Dive (Feb. 23, 2018), *available at* https://www.utilitydive.com/news/firstenergy-ceo-says-generation-subsidiary-headed-for-bankruptcy-protection/517743/.

[26] Samuel Riehn, "FirstEnergy Confirms FES Bankruptcy," Seeking Alpha (Mar. 1, 2018), *available at* https://seekingalpha.com/article/4152235-firstenergy-confirms-fes-bankruptcy.

[27] *Id.*

reason last summer.[28]  That a bankruptcy filing by FirstEnergy would likely be coupled with an attempt to reject the ICPA is obvious and widely expected.  OVEC's negative outlook from Fitch Ratings Inc.'s rating service expressly "reflects the risk of revenue shortfall should one of OVEC's sponsors opt to file for bankruptcy and reject their obligation under OVEC's…ICPA."[29]  OVEC is making this filing in direct response to the expectation that FirstEnergy will seek to reject the ICPA in its bankruptcy case.

## III.  JURISDICTION

The Commission should exercise exclusive jurisdiction over this Complaint because FirstEnergy's anticipated bankruptcy rejection of the ICPA has already harmed OVEC, will adversely affect OVEC's other Sponsoring Companies and their customers, and because the Commission has exclusive jurisdiction to address changes to the ICPA, including termination of FirstEnergy's purchase obligation.

In cases involving contract interpretation, the Commission generally possesses concurrent jurisdiction with courts with respect to a legal action for breach of a filed contract.[30]  The Commission enjoys primary jurisdiction over disputes involving construction of a contract subject to its jurisdiction.[31]  Whether the Commission should exercise primary jurisdiction in such cases is within its own discretion.[32]  The Commission considers the following three factors

---

[28] John Funk, "FirstEnergy Solutions downgraded on bankruptcy expectation, FE parent seen as stable," Cleveland Plain Dealer (Aug. 21, 2017), *available at* http://www.cleveland.com/business/index.ssf/2017/08/firstenergy_solutions_downgrad.html.

[29] Fitch Ratings Inc., Press Release on OVEC (Aug 9, 2017), included as Attachment C to this filing. The press release adds Fitch's view that " the obligations held by FirstEnergy Solutions Corp (FES; CC; 4.85% share) and Allegheny Energy Supply Co (AES; B/Stable; 3.01% share) pose a greater concern in Fitch's opinion, given FirstEnergy Corp.'s (FE; 'BBB-'/Outlook Stable) plans to exit the merchant power business."

[30] *Pan Am. Petrol. Corp. v. Super. Ct. of Del.*, 366 U.S. 656 (1961).

[31] *See, e.g., United States v. W. Pac. R.R. Co.*, 352 U.S. 59 (1956); *AEP Generating Co.*, 32 FERC ¶ 61,364 (1985), *reh'g granted on other grounds*, 36 FERC ¶ 61,226 (1986).

[32] *W. Pac. R.R. Co.*, *supra*, 352 U.S. at 64-66.

9

in deciding whether to assert primary jurisdiction over contractual issues otherwise pending before the courts:

> i. whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision;
>
> ii. whether there is a need of uniformity of interpretation of the type of question raised by the dispute; and
>
> iii. whether the case is important in relation to the regulatory responsibilities of the Commission.[33]

Where, as in this case, there is no dispute about the meaning of the contract, however, the usual considerations about whether the Commission should exert primary jurisdiction (or defer to the courts for ordinary contract interpretation issues) are not present.[34] Instead, as in this case, the issue is exclusively the Commission's to resolve. As discussed *infra*, FirstEnergy's anticipated rejection of the ICPA is effectively a collateral attack on the filed rate in the contract. In such instances, the Commission's jurisdiction is not merely primary, but exclusive. The only question, therefore, is whether the Commission should consider OVEC's Complaint before the anticipatory breach occurs.[35] The answer is that "[t]he disclaimer of a contractual duty *is* a breach of contract even if the time specified in the contract for performing the duty has not yet arrived. It is what is called anticipatory breach."[36] And here, it is obvious that FirstEnergy will attempt to seek to reject the ICPA in bankruptcy. Thus, this dispute involves FirstEnergy's anticipated breach of the ICPA, a filed rate subject to the Commission's exclusive jurisdiction.

---

[33] *Ark. La. Gas Co. v. Hall*, 7 FERC ¶ 61,175, 61,322 (1979).

[34] *See In re Calpine Corp.*, 337 B.R. at 36, discussed in Section IV, *infra*.

[35] Under bankruptcy law, rejection of a contract constitutes an anticipatory breach of the contract giving rise to rejection damages as a result of the rejecting party's (here FirstEnergy) future non-performance.

[36] *Combs v. Int'l Ins. Co.*, 354 F. 3d 568, (6th Cir. 2004), *quoting Wis. Power & Light Co. v. Century Indem. Co.*, 130 F.3d 787, 793 (7th Cir.1997) (emphasis added).

10

## IV. COMPLAINT FOR ANTICIPATORY BREACH

This Commission has the authority and obligation to ensure enforcement of the ICPA,[37] because the ICPA is a wholesale power arrangement subject to FERC's exclusive jurisdiction – and not jurisdiction of a bankruptcy court – and because the ICPA, as a filed rate, is "binding upon the seller and purchaser alike."[38] Neither commercial nor equitable concerns are a defense by the purchaser against its obligation to pay the filed rate.[39] In fact, the Commission's failure to enforce the filed tariff rate against a customer, even where parties had agreed to a different rate, would amount to unlawful discrimination.[40] The foregoing does not mean that the Commission lacks the authority itself to modify or terminate a filed rate, but where that filed rate is embodied in, and fixed, by a voluntary agreement, the burden – a very steep one – is on the party seeking the change to demonstrate that the change is in the public interest.[41] That is the situation here, as ICPA Article 9.09 expressly provides that absent the consent of all parties, those seeking changes to the provisions of the agreement must meet the *Mobile-Sierra* public interest test.

### A. The Public Interest Standard

Regarding the public interest standard, OVEC urges the Commission to find, not only that it has exclusive jurisdiction over any attempt by FirstEnergy to reject its

---

[37] Section 309 of the FPA, 16 U.S.C. § 825h, gives the Commission the power "perform any and all acts …necessary or appropriate to carry out" its obligations under the Act, including its obligation to ensure adherence to the filed rate. Thus, for example, if the Commission has erroneously permitted a utility to undercharge a customer, the Commission has the inherent authority to correct its error and order the customer to pay a surcharge as a means to address the resulting undercollection. *See, e.g., Cambridge Electric Light* Co., 66 FERC ¶61,346 at 62,162 (1994) (citing *United Gas Improvement Co. v. Callery Properties, Inc*., 382 U.S. 223, 229 (1965)).

[38] *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co*., 181 F.2d 19 (8th Cir. 1950), *aff'd*, 341 U.S. 246 (1951).

[39] *Maislin Indus. US, Inc. v. Primary Steel, Inc*., 497 US 116, 126-28 (1990).

[40] *Id*. at 130.

[41] *See United Gas Pipeline Co. v. Mobile Gas Serv. Corp*., 350 U.S. 332 (1956), *Federal Power Comm'n v. Sierra Pacific Power Co*., 350 U.S. 348 (1956) and *NRG Power Mktg. v. Maine Pub. Utils. Comm'n*, 585 U.S. 165 (2010).

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 12 of 220

obligations under the ICPA, but that doing so would run contrary to the public interest in violation of the *Mobile-Sierra* doctrine. "Under the *Mobile-Sierra* doctrine, [FERC] must presume that the [electricity] rate set in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement [of the [FPA], see 16 U.S.C. § 824d(a)], and the "presumption may be overcome only if FERC concludes that the contract seriously harms the public interest."[42] This follows from the Federal Power Act's regulatory system, which "is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity."[43] Hence, the presumption is that "[i]n wholesale markets, the party charging the rate and the party charged [are] often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them."[44] There are only limited circumstances under which changing rates fixed by a voluntarily negotiated contract would be in the public interest under *Mobile Sierra* – such as when "there is unfair dealing at the contract formation stage," or where contracts were executed during periods of market dysfunction and the market dysfunctions "were caused by illegal action of one of the parties."[45] Those circumstances are not present here.

     Not only would FirstEnergy be unable to satisfy the *Mobile Sierra* burden that termination of its obligations would be in the public interest, but FirstEnergy's rejection of the contract in bankruptcy would *adversely* affect the public interest in several ways.

---

[42] *Morgan Stanley v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530, 128 S. Ct. 2733, 2736 (2008).

[43] *Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968).

[44] *Morgan Stanley, supra*, 128 S. Ct. at 2746 (quoting *Verizon Commc'n, Inc. v. FCC*, 535 U.S. 467, 479 (2002)).

[45] *Morgan Stanley*, 128 S. Ct. at 2747.

As an initial matter, because the Sponsoring Companies' obligations are several and not joint, if FirstEnergy is able to reject its obligations under the ICPA, the resulting cost shortfalls are not payable by the other Sponsoring Companies and will go unreimbursed every month over the life of the contract (i.e., until at least 2040), absent the types of ameliorative changes to the filed rate discussed in Section IV.B, *infra*.[46] This will further impact OVEC's credit rating (which already has been impacted by the prospect of contract rejection), further raising OVEC's borrowing costs. Those higher borrowing costs will directly result in higher costs to the remaining Sponsoring Companies and their customers. In the case of OVEC's rural electric cooperative Sponsoring Companies, for example, whose customers are *their* owners, all of these increased costs will be borne by the ultimate ratepayers.

Moreover, the ICPA contemplates that the Sponsoring Companies will cover the eventual and substantial cost of environmentally sound decommissioning of the OVEC plants when they are retired from service in 2040 or thereafter. When assessing the potential environmental remediation costs – including the clean closure of the site's landfills and ponds – and all other ancillary charges that will be associated with restoring each location to a condition suitable for industrial use, OVEC has estimated that the costs for both sites currently exceed $240 million, assuming all expenditures would have occurred in 2017. Because the retirement of the units will not take place until 2040 under the ICPA, however, the final decommissioning costs are simply too difficult to quantify with any reasonable measure of certainty, though this figure will only increase in the future given

---

[46] More specifically, OVEC is referring to replacing FirstEnergy with a new Sponsoring Company at a discount, and/or renegotiation of the ICPA to reallocate the revenue shortfall associated with FirstEnergy's rejection of the contract.

13

potential changes in environmental regulations and other escalation of costs. And without FirstEnergy's ongoing contributions, those projected decommissioning costs are likely to escalate even further and by amounts that neither OVEC (nor any other party) can currently predict with an exact level of certainty.

As indicated, OVEC currently has approximately 660 employees (and has approximately 650 retired employees and surviving spouses receiving pension and other benefits from OVEC). The ICPA requires the Sponsoring Companies to pay all salaries and benefits of such employees, as well as pensions and post-retirement benefits through 2040 and thereafter. Such obligations are likely to be significant and very difficult to estimate.

Further, the ICPA similarly requires the Sponsoring Companies to pay all of OVEC's borrowing costs. As result of OVEC's construction of significant emissions' control equipment at both of its plants, as of December 31, 2017, OVEC's outstanding debt obligations were approximately $1.4 billion. FirstEnergy's 4.85% *pro rata* responsibility for this debt amounts to $67.9 million. However, if FirstEnergy is allowed to reject its obligations under the ICPA, OVEC and the remaining Sponsoring Companies would need to come up with some way to close the gap in OVEC's recovery of its costs, which would likely result in further increased debt and borrowing costs for OVEC's remaining Sponsoring Companies, with a disproportionately adverse effect on the costs of OVEC's power and energy to them and their customers. OVEC would be faced with a number of options, including potentially borrowing additional funds (including to refinance FirstEnergy's portion of maturities as they come due at ever-increasing borrowing costs), attempting to locate a new Sponsoring Company to replace FirstEnergy's ownership interest a discount, and/or a renegotiation of the ICPA with all Sponsoring Companies to reallocate

14

the revenue shortfall associated with FirstEnergy's rejection of the contract. All of these options would raise and reallocate the costs of power and energy generated by the OVEC facilities. Furthermore, OVEC understands that many of OVEC's Sponsoring Companies bid their entitlement to OVEC's power and energy into nearby markets (principally, PJM). While power and energy from OVEC is currently economic to dispatch, there is no guaranty that if OVEC's costs continue to increase, this proposition will continue to remain true, may result in upward pressure on market prices in the PJM market.

All of these consequences would be adverse to the public interest.

## B. FERC's Authority Over Termination of FirstEnergy's Purchase Obligation is Exclusive.

For a number of years, the Commission took the position that parties seeking relief from the terms of filed wholesale contracts must seek such relief in proceedings before FERC, and that any effort by one party to reject a FERC-regulated contract in a bankruptcy proceeding "is actually a collateral attack upon a filed rate."[47] The United States District Court for the Southern District of New York expressly endorsed that position in *In re Calpine*.[48] It held that a bankruptcy court's rejection of a power purchase agreement "directly interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts or otherwise constitutes a collateral attack of the filed rate."[49]

The rationale for the court's holding is instructive. It recognized that the Commission has exclusive jurisdiction "over the rates, terms, conditions, and *duration* of

---

[47] *In re Mirant*, 378 F.3d at 518.

[48] *In re Calpine Corp.*, 337 B.R. at 36.

[49] *Id.*

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 16 of 220

wholesale energy contracts,"[50] and that rejection of wholesale power purchase agreements "would directly interfere" with that jurisdiction.[51]

In arguing that the bankruptcy court nonetheless had jurisdiction, Calpine, the debtor in that case, maintained that:

> bankruptcy courts have a broad power to reject executory contracts, rejection constitutes breach, FERC has exclusive jurisdiction over approval, modification, or termination of wholesale energy contracts, not over breaches, and as such rejection is outside of FERC's exclusive jurisdiction.[52]

The district court rejected this argument. Instead, the cases in which FERC "has declined jurisdiction over breach issues," it said, "involved alleged breaches the resolution of which called for simple contract interpretation well within the jurisdiction of the courts."[53] "The breach here," it held, "is not a dispute, nor does it require any contract interpretation, it is a complete cessation of performance under the terms and conditions of the Power Agreements."[54] "Against FERC's vast authority over filed rate energy contracts," the district court's search of the Bankruptcy Code found "little evidence of congressional intent to limit FERC's regulatory authority."[55] "Absent overriding language," it held, "the Bankruptcy Code should not be read to interfere with FERC jurisdiction."[56]

To be sure, the District Court's decision in *In re Calpine* conflicts with, but also separately distinguishes, an earlier decision of the Fifth Circuit in *In re Mirant*. In the

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 33.

[56] *Id.*

16

*Mirant* case, the Fifth Circuit stated that the Commission's authority is exclusive only with respect to the application of the filed rate doctrine where there is a change to the filed rate.[57] Thus, it ruled that "while the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale."[58] If rejecting a contract has only an "indirect effect" on the filed rate, the bankruptcy court's authority is not preempted.[59]

This jurisdictional conflict was again considered by United States District Court for the Southern District of New York in the matter of *In re Boston Generating LLC*, a subsequent bankruptcy case involving the proposed rejection of a contract for the transportation of natural gas. In a preliminary ruling ("*Algonquin I*"), the district court explained that natural gas contracts "require consideration of the Natural Gas Act [('NGA')]," which "grants FERC 'exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.'"[60] Noting the rulings from both the *Mirant* and *Calpine* courts, *Algonquin I* recognized that there was "*no binding precedent* that applies a bankruptcy court's authority to reject an executory contract to a contract regulated by FERC under the NGA."[61] In a subsequent ruling in those proceedings ("*Algonquin II*"), the Southern District of New York concluded that while the bankruptcy court did enjoy the authority to reject a contract governed by the NGA, "the Debtors *must also* obtain a ruling

---

[57] *In re Mirant, supra*, 378 F.3d at 519.

[58] *Id*.

[59] *Id*. at 519-20.

[60] *In re Boston Generating, LLC*, No. 10 CIV. 6528 DLC, 2010 WL 4288171 at *4 (S.D.N.Y. Nov. 1, 2010) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988)).

[61] *In re Boston Generating, LLC*, No., 2010 WL 4288171 at *6 (emphasis added).

from FERC that abrogation of the contract does not contravene the public interest."[62] *Algonquin II* afforded FERC the *exclusive* authority to make this public interest determination, and went on to hold that if "FERC does not approve the Debtors' rejection of the [transportation contract], *the Debtors may not reject the contract*."[63]

OVEC acknowledges that in a January 2006 case – *Cal. Oversight Bd. et al. v. Calpine Energy Servs., et al.*[64] FERC had stated its intention to "follow" *Mirant*: finding that the Fifth Circuit had "spoken to the issue" in *Mirant*, FERC stated that it planned "to follow that authority."[65] FERC added, however, that it nonetheless would make a determination whether the rejection of the Calpine wholesale contract at issue before it would be in the public interest "and then inform the Bankruptcy Court of its views."[66] But there are ample reasons for the Commission to conclude, based on more recent precedent, both that (1) it should not continue to follow *Mirant* and that (2) in any event, *Mirant* does not preclude the relief sought in OVEC's Complaint.

First, it was only a few weeks after the Commission's decision in *Cal. Oversight Bd.* that the United States District Court for the Southern District of New York – addressing the same Calpine contracts at issue in that case – issued the opinion, discussed *supra*, that FERC's rate authority preempted the bankruptcy court's authority to reject FERC-jurisdictional contracts.[67] To OVEC's knowledge, the Commission has not considered the

---

[62] *In re Boston Generating, LLC*, No. 10 CIV. 6528 DLC, 2010 WL 4616243 at *1 (S.D.N.Y. Nov. 12, 2010) (emphasis added).

[63] *Id*. at *3 (emphasis added).

[64] 114 FERC ¶ 61,003 (2006).

[65] *Id*. at P 11.

[66] *Id*. at P 12.

[67] *In re Calpine Corp.*, *supra*, 337 B.R. at 36.

impact of the Southern District of New York's opinions (*i.e.*, *Calpine and Algonquin I and II*), in any other case and therefore has not expressly revisited its decision to follow *Mirant*. The District Court decision in *Calpine*, however, did lift the restraining order that was then "restricting FERC from determining the disposition of energy contracts,"[68] a constraint that undoubtedly influenced the Commission's decision, a few weeks earlier, to follow *Mirant*.

Second, the *Calpine* opinion also explained, in detail, the reasons why the District Court concluded that the Fifth Circuit's *Mirant* decision was incorrect and indistinguishable, not least of which is the fact that a bankruptcy court rejection hearing would likely provide an inadequate forum in which to consider public interest factors. The court's analysis bears recitation here:

> The Court is aware that its holding here is in obvious conflict with the holding of the Fifth Circuit in *Mirant*, 378 F.3d 511, and the conclusions of the FERC Order.[10] Mirant is not controlling here and relies heavily on Fifth Circuit cases that have no Second Circuit corollaries. Nevertheless, were the Court to adopt and apply Mirant faithfully, it would still find that FERC has exclusive jurisdiction over the fate of the Power Agreements.
>
> In *Mirant*, public utility PEPCO, pursuant to deregulation legislation, sold its electric generation facilities and assigned most of its power purchase agreements to Mirant, a power purchaser and provider. 378 F.3d at 515. Because some of the power purchase agreements contained language that foreclosed PEPCO from assigning them, PEPCO and Mirant entered into a separate agreement (also FERC-regulated), which provided that PEPCO would continue to buy energy under the unassigned agreements and that Mirant would purchase that energy from PEPCO at the filed rates set in those contracts. Id. When Mirant later filed for Chapter 11 bankruptcy, it sought to reject the contracts that bound it to buy the energy from PEPCO. *Id.* at 516. The district court withdrew the reference to the bankruptcy court of the rejection motions and later found, inter alia, that the FPA deprived it of jurisdiction. *Id.* at 516-17.
>
> The Fifth Circuit reversed the district court. It recognized first that a rejection of a contract under § 365 constitutes a breach, not a modification of the

---

[68] *Id.* at 30.

contract. *Id.* at 519. Central to the Fifth Circuit's holding is the notion that "[w]hile the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is 38*38 based upon another rationale." *Id.* Though above-market rates were part of Mirant's decision to reject the contracts, the court found that Mirant's main justification was that it did not need the energy it was purchasing from PEPCO to fulfill its own obligations to supply electricity; "Mirant may choose to reject this agreement as unnecessary to its reorganized business because it represents excess capacity in its system to supply electricity." *Id.* at 520. The only thing separating Mirant's rejection motion from being an unlawful collateral attack on the rate was the fact that it did not want the energy at all. Indeed, in reaching its holding, the Mirant Court quoted Fifth Circuit precedent that held: "The district court would have jurisdiction if [the debtor] claimed that it cannot take [the supplier's] electricity regardless of price. If, however, [the debtor] can fulfill its purchase obligations at lower rate, then [the debtor] merely seeks rate relief not available in district court." Id. (quoting *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1472 (5th Cir. 1987)). The Court concluded that, under the circumstances, the rejection of the contracts would only have an "indirect effect" on the rate, and thus the FPA would not preempt the district court from exercising its jurisdiction under the Bankruptcy Code.

As noted, this Court does not construe the filed rate doctrine so narrowly as to only reach modifications of the rate. Just the same, Mirant's holding militates against Calpine. Here, while Calpine expressly states that it seeks relief from the Power Purchase Agreements because it is forced to sell energy at rates far below market, it does not offer "another rationale." *Id.* at 519. Calpine remains "ready and willing to supply the same amount of wholesale electric power— but at competitive market prices"(Posoli Aff. P28), so there is no excess capacity issue presented, but merely a desire to get a better rate.[11] The Mirant Court clearly held that it would find FPA preemption where, as here, a debtor was able to fulfill its obligations but only at a lower rate. *Mirant*, 378 F.3d at 520. Rejection in such a situation does not "indirectly effect" the filed rate; it is a collateral attack on it.

The Court's conclusion in this case is consistent with general policy considerations, including the proper allocation of power in our system of separated powers. The Supreme Court has held that "[t]he clear assignment of power to a branch . . . allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." *Loving v. United States*, 517 U.S. 748, 758, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). This principle seems particularly applicable here. By holding that FERC has exclusive jurisdiction to modify or terminate the Power Agreements in this case, an issue of great public interest will be heard in a branch accountable to the electorate in a forum that specializes in considering the public interest.

20

To this end, although the Court takes no formal position on what standard would apply were it to have jurisdiction, the Court does note that the standard issue may very well compel the Court's finding that it lacks jurisdiction altogether to authorize the rejection of the Power Agreements. Both the *Mirant* decision and the FERC Order predicate bankruptcy court jurisdiction to reject energy contracts on the belief that the public interest is adequately considered at a rejection hearing, at least in part through FERC's participation. *See Mirant*, 378 F.3d at 525 39*39 ("Use of the business judgment standard would be inappropriate because it would not account for the public interest inherent in the transmission and sale of electricity. . . . We presume that the district court would also welcome FERC's participation. . . ."); FERC Order ¶ 12 (displaying willingness to "inform the Bankruptcy Court [on] the impact on the public interest of a potential rejection"). This process would allow the bankruptcy court to sit in judgment of FERC's determination of the public interest, a prospect prohibited by established case law. See MCorp Fin. Inc., 502 U.S. at 41, 112 S.Ct. 459 (disallowing the bankruptcy court to scrutinize the legitimacy of federal agency action); *In re Federal Communications Commission*, 217 F.3d 125, 135 (holding that a federal agency "need not defend its regulatory calculus in the bankruptcy court"); *In re NRG Energy*, 2003 WL 21507685 at *3 (holding that, under the FPA, actions taken by FERC are reviewable only by a court of appeals). To the extent that, under the FPA, the fate of wholesale power contracts cannot be determined without consideration of the public interest, the executive agency FERC should determine that interest. *Cf. Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co*., 328 U.S. 123, 131, 66 S.Ct. 947, 90 L. Ed. 1123 (1946) ("When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest.")[69]

OVEC submits that the more recent District Court decision is better reasoned and that FERC should follow it in addressing OVEC's Complaint. Like the *Calpine* case, this is not a case involving a matter of contract interpretation. No party is seeking bankruptcy rejection because the other party has failed to comply with the ICPA's terms nor is it a circumstance where this contract provides a unilateral right of termination. Breaching an obligation under the ICPA involves public interest considerations that are within FERC's special competence and exclusive jurisdiction. The special circumstances in this case

---

[69] *Id*. at 37-39.

involve a multi-party contract between OVEC and the Sponsoring Companies to pay the fixed cost of OVEC's generating facilities through June 2040. Beyond that date, the Sponsoring Companies also are responsible for the costs incurred for the demolition and decommissioning of such facilities. The decision by one of the Sponsoring Companies to exit its merchant generation business through bankruptcy should not provide a basis for avoiding the contractual commitment that it made to pay its proportionate share of the costs of the facilities and its consequent impact on OVEC, its remaining Sponsoring Companies and their customers. The District Court's opinion better accommodates these uniquely FERC-related public interest concerns than does the *Mirant* opinion.

But even if the Commission continues to follow the *Mirant* holding, this case falls within the area of exclusive Commission jurisdiction recognized in *Mirant*. As noted earlier, *Mirant* finds no Commission preemption of bankruptcy court jurisdiction where rejection of a contract would have only an indirect effect on filed rates.[70] Even under the narrowest reading of FERC's authority vis-à-vis that of the bankruptcy courts, FERC's authority is exclusive where the debtor's actions would result in changes to a FERC-filed rate.[71] Unlike the *Mirant* case, rejection of the ICPA will have a *direct* effect on the filed rate and, as discussed below, a resulting adverse effect on customers.

In this case the *ICPA* is the filed rate. The direct result of contract rejection would be to change to the filed rate currently reflected in the ICPA and to increase costs to OVEC's remaining customers (and in certain circumstances ratepayers) which could equal

---

[70] *In re Mirant, supra*, 378 F.3d at 519-20.

[71] *Id.* at 519.

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 23 of 220

hundreds of millions of dollars over the remaining life of the contract.[72]  This eventuality is a direct consequence of the structure of that agreement itself.  As discussed earlier, the ICPA is akin to a joint venture arrangement (including "cradle to grave" coverage of all costs regardless of usage) and is viewed as such by the markets and the rating agencies.  The obligation of the off-takers under the ICPA is several but not joint, exposing OVEC to the risk of nonpayment in the event of a defaulting Sponsoring Company because the non-defaulting Sponsoring Companies are not obligated to cover the shortfall.  Because of the several, not joint, liabilities of the Sponsoring Companies under the ICPA, even Moody's points out that a FirstEnergy rejection of its obligations, coupled with no other changes to the ICPA would likely lead to a further downgrade in OVEC's credit rating.[73]  A similar downgrade risk would result if there was a payment default by a Sponsoring Company that OVEC would not be able to cover by its existing reserves or through a replacement of the defaulting Sponsoring Company.[74]  But coverage through use of OVEC's existing reserves would be a mere temporary fix, and OVEC would not only need to seek a replacement for FirstEnergy, it may have to offer any such replacement Sponsoring Company a substantial discount – in effect a different filed rate.  Or, to keep OVEC "whole" in the absence of a new replacement Sponsoring Company, the remaining existing Sponsoring Companies would need to increase their proportionate ownership shares *and* corresponding cost responsibilities, which for many of these remaining Sponsoring Companies will result in increased rates passed on to their customers and to the public.  All of these consequences

---

[72] What could follow is a legal "out" of the ICPA for other Sponsoring Companies.  As costs increase towards the end of the useful life of the ICPA, the obligation to demolish and clean up the facilities may be saddled upon only those Sponsoring Companies who have not rejected the agreement.

[73] Attachment B.

[74] *Id.*

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 24 of 220

stem not from a mere "simple" rejection by a bankrupt debtor who no longer needs power at any price, like the *Mirant* debtor. Rather, these consequences — which are the direct effect of rejection of the ICPA by FirstEnergy — reflect multiple, multi-party, interconnected changes to the filed rate, with a direct impact on rates paid by the consuming public.

Bankruptcy rejection serves as the functional equivalent to determination that the obligations under the ICPA are unjust and unreasonable from the debtor's perpsective, thus permitting termination. Under applicable FERC case law, however, this requires consideration of the public interest in terminating a contract obligation. Only FERC can make the determination whether FirstEnergy's termination of its obligations under the ICPA would be consistent with the public interest. As a result, this Commission should hold that a bankruptcy court lacks jurisdiction to consider rejection of the ICPA.

## V.     COMPLIANCE WITH RULE 206 COMPLAINT FILING REQUIREMENTS

### A.     Description of Alleged Violation and Quantification of Impacts (18 C.F.R. § 385.206(b)(1)-(5)).

Parts I – IV of this Complaint set forth the required information. As stated therein, FirstEnergy's anticipated rejection of the ICPA would constitute a breach of its obligations under a rate schedule on file with the Commission, the threat of which has already resulted in a downgrade to OVEC's credit rating. FirstEnergy's rejection of its obligations will ultimately saddle OVEC's remaining Sponsoring Companies and their customers with hundreds of millions of dollars in additional costs over the remaining life of the agreement.

### B.     Other Pending Proceedings (18 C.F.R. § 385.206(b)(6)).

The issues presented herein are not pending in an existing Commission proceeding or a proceeding in any other forum in which OVEC is a party.

**C. Specific Relief or Remedy Requested (18 C.F.R. § 385.206(b)(7)).**

OVEC's specific request for relief is set forth in more detail in the body of this Complaint.

**D. Supporting Documentation (18 C.F.R. § 385.206(b)(8)).**

All documents supporting the facts set forth in this Complaint are included as attachments hereto.

**E. Use of Alternate Dispute Resolution Mechanism (18 C.F.R. § 385.206(b)(9)).**

OVEC has not used the Commission's Enforcement Hotline, Dispute Resolution Service or tariff-based dispute resolution mechanisms. The exigencies of the situation facing OVEC – FirstEnergy's threatened imminent bankruptcy filing – have made any attempt to pursue other alternatives impractical.

**F. Form of Notice (18 C.F.R. § 385.206(b)(10)).**

A form of notice of this Complaint suitable for publication in the Federal Register is provided as an attachment hereto and submitted in electronic form.

**G. Basis for Fast Track Request (18 C.F.R. § 385.206(b)(11)).**

OVEC does not request fast-track processing of its Complaint under Rule 206(b)(11) of the Commission's Rules of Practice and Procedure.

**H. Service (18 C.F.R. § 385.206(c)).**

OVEC has served a copy of this Complaint upon the Respondent simultaneous with its filing of the Complaint with the Commission. OVEC has also served copies of the Complaint upon all other Sponsoring Companies to the ICPA and to the relevant state authorities.

## VI.  PETITION FOR DECLARATORY ORDER

### A.   The Commission Should Issue a Declaratory Order Finding that FirstEnergy's Breach of the ICPA Would Result in a Change to the Filed Rate.

Under Rule 207(a)(2) of the Commission's Rules of Practice and Procedure[75] and section 554(e) of the APA,[76] the Commission may issue declaratory orders "to terminate a controversy or remove uncertainty."[77]  Any person seeking to terminate a controversy or remove uncertainty regarding a matter within the Commission's jurisdiction may file a request for a declaratory order…."[78]  Because "a declaratory order represents a binding statement of policy,"[79] it is "useful to persons seeking reliable, definitive guidance from the Commission."[80]

While the Commission's decision whether to grant a declaratory order is discretionary,[81] the Commission has exercised that discretion where, as here, its guidance is needed to address a matter of important public policy.  As discussed in Sections II – IV, *supra*, the Commission has ample legal basis to conclude that a breach of the ICPA by FirstEnergy would trigger a change to the filed rate embodied in that agreement.

Accordingly, if the Commission concludes that a complaint is the wrong vehicle to address OVEC's concerns, OVEC alternatively requests a declaration that the Commission  has exclusive

---

[75] 18 C.F.R. § 385.207(a)(2).

[76] 5 USC § 554(e) (2012).

[77] *ITC Grid Dev't, LLC*, 154 FERC P 61,206, P 42 (2016); *Pioneer Wind Park I LLC*, 145 FERC 61,215, P 35 (2013) (granting in part petition for declaratory order, stating that Section 554(e) of the Administrative Procedure Act and section 207(a)(2) of the Commission's Rules of Practice and Procedure provide us the authority and discretion to rule on a petition for declaratory order in order to "remove uncertainty.").

[78] *Informal Staff Advice on Regulatory Requirements*, 113 FERC ¶ 61,174, P 17 (2005). *Am. Elec. Power Serv. Corp.*, 82 FERC ¶ 61,131, 61,472 (1998) (stating that "[f]or definitive rulings, interested persons may seek declaratory orders from the Commission, which have binding effect").

[79] *Obtaining Guidance on Regulatory Requirements*, 123 FERC ¶ 61,157, P 19 (2008).

[80] *Id.*

[81] *Pioneer Wind Park I, LLC*, 145 FERC at P 35.

26

jurisdiction to address FirstEnergy's rejection of the ICPA and to determine that such a rejection would result in a change to the filed rate reflected in that agreement. Such a determination would avoid prolonged litigation over FirstEnergy's obligations under the ICPA and the ensuing damage to OVEC's credit rating while this issue plays out in the bankruptcy court.

## B. Alternatively, the Commission Should Issue a Declaratory Order Finding that FirstEnergy's Rejection of the ICPA Would Be Contrary to the Public Interest.

As noted at the outset of this pleading, OVEC also requests a declaratory order even if the Commission concludes that its authority is not exclusive. A declaratory order addressing whether rejection of the ICPA contract is in the public interest would be of significant value to the bankruptcy court. More than that, even a bankruptcy court following *Mirant*, at a minimum, would be *obliged* to consider determinations by this Commission whether rejection of the ICPA would be in the public interest. "Supreme Court precedent supports applying a more rigorous standard" than the "business judgment standard" to motions to reject contracts of a "special nature," like collective bargaining agreements.[82] And as the Fifth Circuit noted, "the nature of a contract for the interstate sale of electricity at wholesale is also unique."[83] "Use of the business judgment standard," it stated, "would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity."[84] In remanding the case back to the bankruptcy court,

---

[82] *In re Mirant Corp.*, 378 F.3d at 524-25.

[83] *Id.* at 525.

[84] *Id.*

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 28 of 220

the Fifth Circuit advised that FERC would be able to assist it in balancing the public interest equities.[85]

On remand, the lower court embraced the Fifth Circuit's directives, stating that it would:

> carefully scrutinize the impact of rejection upon the public interest and would, *inter alia*, ensure that rejection will not cause any disruption in the supply of electricity to other public utilities or to consumers or lead to unjust or excessive rates. If rejection would compromise the public interest in any respect, it would not be authorized unless Debtors show that they cannot reorganize without the rejection. Before authorizing a rejection, the court would give the FERC an opportunity to participate as a party in interest for all purposes in this case under 11 U.S.C. § 1109(b) and FED. R. BANKR. P. 2018(a), and would afford the FERC an opportunity to engage in appropriate inquiry to enable it to evaluate the effect that such a rejection would have on the public interest.[86]

OVEC believes the Commission has sufficient information to declare that rejection of the ICPA would, in fact, be contrary to the public interest. As discussed earlier, the ICPA is not a bilateral agreement, but, as the rating agencies have viewed it, the agreement is more in the nature of a joint venture arrangement. Rejection of the ICPA will thus impact not only OVEC, but the other joint venture participants. In the short run, it raises OVEC's borrowing costs and, over the remaining life of the contract would shift hundreds of millions of dollars of OVEC's expenses for which FirstEnergy is now responsible to OVEC's remaining owners and their customers.

But even if the Commission were to conclude that it needs more information to ascertain where the public interest lies if FirstEnergy is permitted to reject the ICPA, it should still determine that it would address the question in a declaratory order. The Commission could do so

---

[85] *Id.* at 526. *See also, Cal. Oversight Bd. et al. v. Calpine Energy Servs., L.P. et al.*, 114 FERC ¶ 61,003, PP 5-11 (2006).

[86] *In re Mirant Corp.*, 318 B.R. at 108.

after opening the proceeding to the filing of comments and briefs so that it has the record it needs to address the issue.

**VII.   CONCLUSION**

For the reasons set forth above, OVEC seeks the following relief from the Commission:

1. A Commission order granting OVEC's Complaint (1) by making a finding that FirstEnergy's anticipatory breach of the ICPA constitutes a violation of its obligations under that agreement, and (2) by making a determination that permitting FirstEnergy to terminate its obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierra* doctrine (and to establish such additional procedures as may be necessary to make the latter determination);

2. Alternatively, a Commission order declaring that it has exclusive jurisdiction to ascertain whether FirstEnergy's termination of its purchase obligation under the ICPA, by rejection of the contract in bankruptcy or otherwise, (1) is a matter exclusively within the jurisdiction of the Commission, and (2) that such termination would be contrary to the public interest in violation of the *Mobile Sierr*a doctrine (and to establish such additional procedures as may be necessary to make the latter determination); and

3. Alternatively, should the Commission determine that it lacks exclusive jurisdiction, to initiate proceedings to ascertain whether termination of FirstEnergy's purchase obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierr*a doctrine (and to establish such additional procedures for the development of a record as may be necessary to make the latter determination) and to advise the bankruptcy court both of its intention to make such a determination and of its ultimate conclusions.

Respectfully submitted,


Brian Chisling                          /s/  David D'Alessandro
Simpson Thacher & Bartlett LLP          David D'Alessandro
425 Lexington Avenue                    Harvey L. Reiter
New York, NY 10017                      Jonathan P. Trotta
(212) 455-3075                          M. Denyse Zosa
bchisling@stblaw.com                    Stinson Leonard Street LLP
                                        1775 Pennsylvania Ave., NW
                                        Suite 800
                                        Washington, DC 20006
                                        (202) 785-9100
                                        david.dalessandro@stinson.com
                                        harvey.reiter@stinson.com
                                        jtrotta@stinson.com
                                        denyse.zosa@stinson.com

                                        *Counsel for*
                                        Ohio Valley Electric Corporation


Dated:  March 26, 2018

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | |
|---|---|
| Ohio Valley Electric Corporation, <br> Complainant <br><br> v. <br><br> First Energy Solutions Corp., <br> Respondent. | ) <br> ) <br> ) <br> ) <br> )      Docket No. EL18-___-000 <br> ) <br> ) <br> ) <br> ) |

**NOTICE OF COMPLAINT**

(_____, 2018)

Take notice that on March 26, 2018, the Ohio Valley Electric Corporation and its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation (collectively, Complainant) filed a formal Complaint against FirstEnergy Solutions Corp. (Respondent) pursuant to section 306 of the Federal Power Act, 16 U.S.C. §825e, and Rule 206 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (Commission), 18 C.F.R. 385.206 (2018), asking the Commission to enjoin Respondent's anticipated breach of the Inter-Company Power Agreement (ICPA), as more fully explained in the Complaint.

Complainant certifies that copies of the Complaint were served on the contacts for Respondent as listed on the Commission's list of Corporate Officials.

Any person desiring to intervene or to protest this filing must file in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 CFR 385.211, 385.214). Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a notice of intervention or motion to intervene, as appropriate. The Respondent's answer and all interventions, or protests must be filed on or before the comment date. The Respondent's answer, motions to intervene, and protests must be served on the Complainants.

The Commission encourages electronic submission of protests and interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov. Persons unable to file electronically should submit an original and 5 copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426.

This filing is accessible online at http://www.ferc.gov, using the "eLibrary" link and is available for electronic review in the Commission's Public Reference Room in Washington, D.C. There is an "eSubscription" link on the web site that enables subscribers to receive email

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 32 of 220

notification when a document is added to a subscribed docket(s).  For assistance with any FERC Online service, please email FERCOnlineSupport@ferc.gov, or call (866) 208-3676 (toll free). For TTY, call (202) 502-8659.

Comment Date:  5:00 pm Eastern Time on **[DATE]**, 2018.

Kimberly D. Bose,
Secretary.

**<u>Judicial Notice DJ-2</u>**

***Motion to Intervene of the Dayton Power and Light Company Under EL18-135**, filed in the FERC Proceeding on March 27, 2018*

Submission Description: (doc-less) Motion to Intervene of The Dayton
Power and Light Company under EL18-135-000.

Submission Date:        3/27/2018 2:40:28 PM

Filed Date:             3/27/2018 2:40:28 PM

Dockets
-------
EL18-135-000         Complaint or, In the Alternative, Request for
Declaratory Order

Filing Party/Contacts:

Filing Party                          Signer (Representative)
Other Contact (Principal)
------------                          -----------------------
------------------------
The Dayton Power and Light Company    randall.griffin@aes.com
john.horstmann@aes.com

Basis for Intervening:
     The Dayton Power and Light Company ("DP&L") moves for leave to
intervene in this proceeding.  DP&L is a part owner of the Ohio Valley
Electric Corporation ("OVEC") and, as such, will be directly affected by
the outcome of this proceeding.

        DP&L is also an Ohio public utility that owns transmission
facilities subject to operational control by the PJM Interconnection, LLC
("PJM"), and provides electric distribution services to deliver electric
energy to approximately 500,000 customers in the Dayton Ohio area.  DP&L
is a wholly-owned, indirect subsidiary of The AES Corporation.  DP&L is
affiliated with entities that own generation assets operating within PJM
and elsewhere.  DP&L has a direct and immediate interest in this
proceeding and is not adequately represented by any other party to this
proceeding.

        DP&L is considering whether or not to submit written comments
in this proceeding and reserves its rights to supplement this
intervention with additional comments either individually or as a member
of a group of entities with similar interests.

Document Content(s)

861674_Interv.TXT.....................................................1-1

## Judicial Notice DJ-3

***Motion to Intervene of American Electric Power Service Corporation Under EL18-135,*** **filed in the FERC Proceeding on March 29, 2018**

Submission Description: (doc-less) Motion to Intervene of American
Electric Power Service Corporation under EL18-135-000.

Submission Date:          3/29/2018 4:53:01 PM

Filed Date:               3/29/2018 4:53:01 PM

Dockets
-------
EL18-135-000          Complaint or, In the Alternative, Request for
Declaratory Order

Filing Party/Contacts:

Filing Party                          Signer (Representative)
Other Contact (Principal)
------------                          -----------------------
------------------------
American Electric Power Service Corporation hgarcia1@aep.com

Basis for Intervening:
Pursuant to Rules 212 and 214 of the Commission's Rules of Practice and
Procedure, 18 C.F.R. §§ 385.212, 214, American Electric Power Service
Corporation ("AEPSC") moves to intervene in this proceeding on behalf of
its affiliates Appalachian Power Company, Indiana Michigan Power Company,
Kentucky Power Company, and Ohio Power Company, (collectively, "AEP East
Operating Companies").

AEP is a multi-state electric utility holding company system providing
electric service at retail and wholesale in eleven states. The AEP East
Operating Companies are transmission, generation, and distribution owning
members of PJM Interconnection, L.L.C. ("PJM") serving customers in
Indiana, Kentucky, Michigan, Ohio, Virginia, and West Virginia.

AEP affiliates hold market-based rate authority and supply electric
energy, capacity, and related products and services in the PJM markets.
As market participants, the AEP East Operating Companies will be directly
affected by any decision in this docket. Therefore, the AEP East
Operating Companies have an interest in this proceeding that cannot
adequately be represented by any other party.

Document Content(s)

862494_Interv.TXT.......................................................1-1

**<u>Judicial Notice DJ-4</u>**

***Motion to Intervene of Electric Power Supply Association Under EL18-135*, filed in the
FERC Proceeding on April 11, 2018**

Submission Description: (doc-less) Motion to Intervene of Electric Power
Supply Association under EL18-135-000.

Submission Date:          4/11/2018 1:52:39 PM

Filed Date:               4/11/2018 1:52:39 PM

Dockets
-------
EL18-135-000          Complaint or, In the Alternative, Request for
Declaratory Order

Filing Party/Contacts:

Filing Party                          Signer (Representative)
Other Contact (Principal)
------------                          -----------------------
------------------------
Electric Power Supply Association     NancyB@epsa.org

Basis for Intervening:
Pursuant to Rules 212 and 214 of the Commission's Rules of Practice and
Procedure, 18 C.F.R. Sections 385.212 and 385.214, the Electric Power
Supply Association (EPSA) hereby moves to intervene in this proceeding.

Launched over 20 years ago, EPSA is the national trade association
representing leading independent power producers and marketers. EPSA
members provide reliable and competitively priced electricity from
environmentally responsible facilities using a diverse mix of fuels and
technologies. Power supplied on a competitive basis collectively accounts
for 40 percent of the U.S. installed generating capacity. EPSA seeks to
bring the benefits of competition to all power customers.

EPSA and/or its members have also been and continue to be active in many
of the Commission's ongoing proceedings on PJM matters. Accordingly, EPSA
has a direct and substantial interest in the outcome of this proceeding
that cannot be represented by any other party and allowing EPSA to
participate in this proceeding would be in the public interest.
Accordingly, EPSA respectfully requests that the Commission grant this
timely motion to intervene.

Document Content(s)

865392_Interv.TXT.....................................................1-1

<u>**Judicial Notice DJ-5**</u>

***Motion of National Rural Electric Cooperative Association to Intervene in Support of Complainant Ohio Valley Electric Corporation**, filed in the FERC Proceeding on April 16, 2018*

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Ohio Valley Electric Corporation | ) | |
| v. | ) | Docket No. EL18-135-000 |
| First Energy Solutions Corp. | ) | |

**MOTION OF NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION
TO INTERVENE IN SUPPORT OF COMPLAINANT OHIO VALLEY
ELECTRIC CORPORATION**

On March 26, 2018, the Ohio Valley Electric Corporation and its wholly-owned

subsidiary, Indiana-Kentucky Electric Corporation (collectively, "Complainant" or

"OVEC"), filed a complaint against FirstEnergy Solutions Corp. ("Respondent") and an

alternative request for declaratory order in the above-captioned proceeding.  The National

Rural Electric Cooperative Association ("NRECA") moves to intervene in this

proceeding and, for the reasons discussed below, urges the Commission to grant the relief

OVEC has requested.

**MOTION TO INTERVENE**

NRECA moves to intervene as a party to this proceeding.  NRECA is the national

service organization representing the interests of the nation's more than 900 member-

owned, not-for-profit rural electric utilities. America's electric cooperatives provide

electric service to approximately 42 million consumers across 47 states—about 12

percent of the nation's population. Rural electric cooperatives account for about 11

percent of all electric energy (kilowatt-hours) sold in the United States.

138633813.1

NRECA's members include approximately 65 generation and transmission ("G&T") cooperatives and 840 distribution cooperatives. Distribution cooperatives provide electric service to their owner-members: end-use consumers. The G&T cooperatives are owned by distribution cooperatives and provide wholesale power and related services to their distribution cooperative owner-members. Both distribution and G&T cooperatives were formed to provide safe, reliable, and affordable electric service.

OVEC's complaint and petition for declaratory order involve the interplay between the Commission's jurisdiction over wholesale power supply contracts under the Federal Power Act and the authority of the bankruptcy courts to address rejection of contracts under the Bankruptcy Code, an issue that affects NRECA members generally. In addition, FirstEnergy's plans seek rejection of the Inter-Company Power Agreement ("ICPA"), a wholesale contract to which Peninsula Generation Cooperative (owned by NRECA member Wolverine Power Supply Cooperative, Inc.) and Buckeye Power Generating, LLC (owned by NRECA member Buckeye Power, Inc.) are also parties. Accordingly, NRECA has a direct and substantial interest in the outcome of this proceeding, and no other party can adequately represent NRECA's interest. NRECA's participation would be in the public interest. NRECA respectfully requests that the Commission grant its motion to intervene in this proceeding.

## SERVICE AND COMMUNICATIONS

Service should be made on, and communications directed to, the following persons:

| | |
|---|---|
| Randolph Elliott | Pamela Silberstein |
| Regulatory Counsel | Power Supply Counsel |
| National Rural Electric Cooperative | National Rural Electric Cooperative |
| Association | Association |
| 4301 Wilson Blvd. | 4301 Wilson Blvd. |
| Arlington, VA 22203 | Arlington, VA 22203 |
| 703-907-6818 | 703-907-5739 |
| randolph.elliott@nreca.coop | Pam.Silberstein@nreca.coop |

## BACKGROUND

OVEC owns and operates two coal-fired generating power plants, the Kyger Creek plant in Ohio and the Clifty Creek plant in Indiana, with a combined capacity of approximately 2,400 MW. The ICPA is a wholesale contract between OVEC and OVEC's owners or their utility-company affiliates (called "Sponsoring Companies") under which the output of OVEC's power plants is made available to the Sponsoring Companies. As OVEC explains in more detail in its Complaint, the contract runs until 2040 and makes the Sponsoring Companies, under a cost-based rate, individually responsible for their proportionate share of the fixed and operating costs of the project, including the costs of additions, upgrades, repairs and eventually decommissioning.[1] Relevant here, FirstEnergy is responsible for approximately five percent of these costs and OVEC's rural electric cooperative owners – Buckeye and Wolverine – are responsible, collectively, for about 25 percent of these costs.

Concerned about the impact loss of FirstEnergy's participation in the ICPA would have on OVEC and its other owners, and anticipating a FirstEnergy bankruptcy

---

[1] *See* ICPA Sections 7.01, 7.02, and 8.04.

3

filing that would come only days later, OVEC filed its complaint with FERC requesting

the following relief:

1. A Commission order granting OVEC's Complaint (1) by making an expedited finding that FirstEnergy's anticipatory breach of the ICPA constitutes a violation of its obligations under that agreement, and (2) by making a determination that permitting FirstEnergy to terminate its obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierra* doctrine (and to establish such additional procedures as may be necessary to make the latter determination);

2. Alternatively, a Commission order declaring that it has exclusive jurisdiction to ascertain whether FirstEnergy's termination of its purchase obligation under the ICPA, by rejection of the contract in bankruptcy or otherwise, (1) is a matter exclusively within the jurisdiction of the Commission, and (2) that such termination would be contrary to the public interest in violation of the *Mobile Sierr*a doctrine (and to establish such additional procedures as may be necessary to make the latter determination); and

3. Alternatively, should the Commission determine that it lacks exclusive jurisdiction, to initiate proceedings to ascertain whether termination of FirstEnergy's purchase obligations under the ICPA would be contrary to the public interest in violation of the *Mobile Sierr*a doctrine (and to establish such additional procedures for the development of a record as may be necessary to make the latter determination) and to advise the bankruptcy court both of its intention to makes such a determination and of its ultimate conclusions.

OVEC Complaint at 4.

On March 31, 2018, FirstEnergy filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code.[2]  The next day it made two additional filings.  It filed an

Adversary Proceeding in the Bankruptcy Case to enjoin FERC from ruling on the OVEC

complaint[3] and filed a Rejection Motion[4] in the main case seeking authority from the

---

[2] *In re First Energy Solutions Corp., et. al.*, Case No. 18-50757 (Bankr. N.D. Ohio March 31, 2018) (Jointly Administered) (the "Bankruptcy Case").

[3] *First Energy Solutions Corp v. FERC,* Adv. Proc. No. 18-05021 (Bankr. N.D. Ohio April 1, 2018) (the "Adversary Proceeding").

[4] *Motion for Entry of an Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy*

4

bankruptcy court to reject the ICPA.  On April 2, the bankruptcy court, acting *ex parte*, granted FirstEnergy a temporary restraining order ("TRO") in the Adversary Proceeding for a period running to April 16, 2018.[5]

Shortly after the bankruptcy court entered the TRO, OVEC, citing  28 U.S.C. § 157(d), filed a motion with the United States District Court for the Northern District of Ohio to withdraw FirstEnergy's Rejection Motion from the bankruptcy court's jurisdiction.  On April 5, the district court denied OVEC's motion.[6]  The district court agreed with OVEC that the cited statute requires the district court to withdraw a reference to the bankruptcy court "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." But the district court ruled that withdrawal of the Rejection Motion was unnecessary because "FERC and the Bankruptcy Court have concurrent jurisdiction over the ICPA" and the Bankruptcy court therefore would "not have to engage in any significant interpretation of the FPA." As the district court then went on to state:

> FES must seek approval from both FERC and the Bankruptcy Court to reject the ICPA. FERC will apply the FPA's public interest standard to determine if the rejection comports with federal law.  16 U.S.C. § 824b(a)(4).  The Bankruptcy Court will apply its business judgment standard to determine if the rejection is consistent with Chapter 11 of the Bankruptcy Code.  The order in which these decisions are issued is of no consequence because FES cannot reject the ICPA without approval from both FERC and the Bankruptcy Court.[7]

---

*Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement with the Ohio Valley Electric Corporation as of the Petition Date* (the "Rejection Motion") [ECF No. 44].

[5] Adversary Proceeding (ECF No. 11).

[6] *Ohio Valley Energy Corp. v. FirstEnergy Solutions Corp.*, Case No. 5:18-mc-34 (D.C. N.D. Ohio).

[7] *Id.*

5

The Monday following the district court's order, April 9, 2018, was the date scheduled for a status conference before the bankruptcy court on FirstEnergy's complaint seeking a preliminary injunction against the Commission. During that conference the Justice Department entered an appearance on behalf of the Commission, indicating that the Commission supported the district court's ruling and stating that in light of the ruling, the bankruptcy court should lift the TRO. FirstEnergy contended that the district court ruling did not preempt the TRO and stated it intended to seek reconsideration of the district court's ruling (which it did on April 10, 2018). The bankruptcy judge encouraged the parties to confer, left undisturbed the April 16, 2018, preliminary injunction hearing, and scheduled a further status conference for April 10, 2018.

On April 10, 2018 the parties to the Bankruptcy Case and the Adversary Proceeding against the Commission reached agreement, subsequently approved by the bankruptcy court, that (1) OVEC would be permitted to intervene in the Adversary Proceeding, (2) the TRO would remain in effect until the preliminary injunction hearing now scheduled for May 11 unless the district court issues an order before that date limiting the bankruptcy court's authority, and (3) the automatic stay would be modified to permit the parties to submit written filings in this proceeding. In the event that the Commission and FirstEnergy are unable to reach agreement on a stipulation regarding the TRO and modification of the automatic stay, the preliminary injunction hearing may be moved up from May 11, 2018 to April 24, 2018.

On Friday, April 13, 2018, the district court reaffirmed that the Rejection Motion should be referred to the bankruptcy court and granted FirstEnergy's motion to delete the reference to concurrent jurisdiction in the district court's order of April 5.

6

## COMMENTS

The concerns that prompted the filing of OVEC's complaint and petition for declaratory order are also of immense importance to NRECA and its members. OVEC noted in its complaint that the very threat that FirstEnergy would seek to reject the ICPA in bankruptcy has already had an adverse effect on NRECA members—OVEC's credit ratings have declined and this, in turn has raised its borrowing costs.  As NRECA members Buckeye and Wolverine have stated in their interventions (filed this date), these increases in borrowing costs are borne by OVEC's Sponsoring Companies, and particularly in the case of rural electric cooperatives whose customers are their owners, will be passed on in their entirety to consumers.

Both OVEC (in its complaint) and Buckeye and Wolverine (in their joint intervention) have aptly explained (1) why this Commission has exclusive jurisdiction to ascertain whether termination of FirstEnergy's purchase obligations under the ICPA would violate the filed-rate doctrine and be contrary to the public interest under the *Mobile-Sierra* doctrine and (2) why termination of FirstEnergy's purchase obligations under the ICPA would be contrary to the public interest. NRECA therefore comments here briefly only to make a few additional observations.

First, as to the question of the Commission's exclusive jurisdiction, NRECA points the Commission, not only to the analysis in OVEC's complaint, but to the April 5 order of the district court. As noted earlier, the district court found that while the bankruptcy court has authority to apply the "business judgement" test to FirstEnergy's motion to reject the ICPA, the bankruptcy court has no authority to approve rejection of the contract unless FERC, exercising its concurrent jurisdiction, makes the required determination that termination of FirstEnergy's purchase obligations would be in the

7

public interest. That determination, as Wolverine and Buckeye show in their motion to intervene, would require the Commission to find that leaving the terms of the contract unchanged, including provisions applicable to First Energy, "seriously harms the public interest."[8]

Second, NRECA emphasizes that, on the merits, rejection of the contract by FirstEnergy, if permitted, *would* "seriously harm[ ] the public interest." Rejection would have broad and adverse ripple effects, not only on the Sponsoring Companies, but on their ratepayers and on OVEC's roughly 600 employees and a similar number of retirees.

This is not a simple, short-term bilateral arrangement, where termination by one party would have temporary and limited effects on the general public. Rather, as OVEC emphasizes, under the ICPA, the Sponsoring Companies' obligations—which run through 2040 and beyond and include the substantial costs of decommissioning—are several and not joint. Cost shortfalls resulting from FirstEnergy's rejection of the contract would not be directly payable by the other Sponsoring Companies,[9] but would become unreimbursed costs, costs that will climb over the remaining life of the contract. The adverse effect on OVEC's credit rating and its borrowing costs will not be limited to OVEC, but will increase costs to OVEC's wholesale customers.[10] As Wolverine and Buckeye state in their intervention:

> The ICPA requires the Sponsoring Companies to pay OVEC's borrowing costs, and without FirstEnergy's contributions, OVEC and the remaining Sponsoring Companies must address this gap in OVEC's cost recovery. … If OVEC fails to find a new replacement Sponsoring Company, a task which would

---

[8] *Morgan Stanley v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008).

[9] OVEC Complaint at 13.

[10] *Id*. at 14.

be unduly (and prejudicially) burdened by FirstEnergy's contractual abrogation, the remaining Sponsoring Companies will need to increase their proportionate ownership shares and corresponding cost responsibilities, which will result in higher rates paid by end-use customers.[11]

The parties to the ICPA already know, moreover, that the costs of environmentally sound decommissioning of the OVEC plants when they retire will run into many millions (if not hundreds of millions) of dollars. And it is also a certainty that, without FirstEnergy's contributions, the proportion of decommissioning costs borne by the remaining Sponsoring Companies would likely increase significantly. What remains uncertain is the ultimate magnitude of decommissioning costs (which can only be determined in the future based on environmental and other legal requirements as they exist in 2040), an uncertainty that becomes magnified if FirstEnergy were permitted to reject the ICPA.

The concerns about the impact of FirstEnergy's rejection of the ICPA on OVEC's employees and retirees and on the many customers of the Sponsoring Companies are precisely the types of factors that bear on the public interest determination that FERC is given exclusive authority to make. By contrast, these are not factors that the bankruptcy courts are either designed or equipped to address.

## CONCLUSION

For the reasons stated above, NRECA requests that the Commission both grant its motion to intervene and grant the relief sought by OVEC in its complaint and petition for declaratory order.

---

[11] Buckeye-Wolverine Motion to Intervene at 7.

9

Respectfully submitted,


/s/  Randolph Elliott
Randolph Elliott
Regulatory Counsel
National Rural Electric
Cooperative Association
4301 Wilson Blvd.
Arlington, VA 22203
703-907-6818
Randolph.Elliott@nreca.coop

Pamela Silberstein
Power Supply Counsel
National Rural Electric
Cooperative Association
4301 Wilson Blvd.
Arlington, VA 22203
703-907-5739
Pam.Silberstein@nreca.coop

April 16, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each

person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Arlington, Virginia, this 16th day of April 2018.

        s/ Randolph Elliott
        Randolph Elliott
        Regulatory Counsel
        National Rural Electric Cooperative
        Association
        4301 Wilson Blvd., 11th Floor
        Arlington, VA 22203
        703-907-6818
        randolph.elliott@nreca.coop

11

Document Content(s)

EL18-135 NRECA Intervention Motion.PDF.................................1-11

## Judicial Notice DJ-6

***Motion to Intervene of the Environmental Law and Policy Center***, **filed in the FERC Proceeding on April 16, 2018**

| | | |
|---|---|---|
| Ohio Valley Electric Corporation | ) | Docket No. EL18-135-000 |
| | ) | |
| v. | ) | |
| | ) | |
| FirstEnergy Solutions Corp. | ) | |

## MOTION TO INTERVENE OF
## THE ENVIRONMENTAL LAW AND POLICY CENTER

Pursuant to Rules 212 and 214 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure, 18 C.F.R. §§ 385.212, 385.214, and the Commission's Notice of Complaint dated March 28, 2018, the Environmental Law & Policy Center ("ELPC") moves to intervene in the above-captioned proceeding.

## I.  INTEREST OF PETITIONER

ELPC is a public interest environmental legal advocacy and eco-business innovation organization working throughout the Midwest states to improve environmental quality and protect natural resources on behalf of our organization, members and clients. ELPC works to avoid risks and injuries to public health, clean water, clean air and landscapes in ways that are good for the environment and good for the economy.

ELPC has members throughout the Midwest, including those residing in territory serviced by utilities purchasing from Ohio Valley Electric Corporation ("OVEC"). A decision by the Commission to reject the Inter-Company Power Agreement ("ICPA") could adversely affect these members, if it were to result in ratepayers bearing the costs of the rejected contract. By raising electricity bills for consumers, including those ELPC members residing in service territories of utilities affected by the ICPA, in order to subsidize uneconomic coal generation,

this outcome would directly undermine ELPC's mission to promote affordable clean energy throughout the Midwest. Accordingly, ELPC has a direct and substantial interest in the outcome of this proceeding. This interest cannot be represented by any other party, and allowing ELPC to participate in this proceeding would be in the public interest.

## II.     COMMUNICATIONS AND SERVICE

All communications, pleadings, and orders with respect to this proceeding should be sent to the following individuals:

> Margrethe Kearney
> Andrene E. Dabaghi
> Environmental Law & Policy Center
> 35 E. Wacker Drive, Ste. 1600
> Chicago, IL 60601
> (312) 673-6500
> mkearney@elpc.org
> adabaghi@elpc.org

## III.    CONCLUSION

As set forth above, ELPC respectfully requests that the Commission grant this timely motion to intervene.

> Respectfully submitted,
>
>
> /s/ Margrethe Kearney
> Margrethe Kearney
> Andrene E. Dabaghi
> Environmental Law & Policy Center
> 35 E. Wacker Drive, Ste. 1600
> Chicago, IL 60601
> (312) 673-6500
> mkearney@elpc.org
> adabaghi@elpc.org

Dated: April 16, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served, via electronic mail, the foregoing document upon each person designated on the official service list compiled by the Commission in this proceeding.  Dated this 16th day of April, 2018.

/s/ Margrethe Kearney

| Party Name | Person or Counsel of Record to be Served |
| --- | --- |
| American Electric Power Service Corporation | Hector Garcia<br>Senior Counsel - American Elec<br>American Electric Power Service Corporation<br>1 Riverside Plaza, 29th Floor<br>Columbus, OHIO 43215<br>UNITED STATES<br>hgarcia1@aep.com |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org<br><br>Kristin V Rothey<br>Asst. Deputy General Counsel<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>krothey@amppartners.org<br><br>Christopher J Norton<br>Director of Market Regulatory<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>cnorton@amppartners.org<br><br>Gary James Newell<br>Jennings, Strouss & Salmon, P.L.C.<br>1350 I Street, N.W. |

3

| | Suite 810<br>Washington, DISTRICT OF COLUMBIA<br>20005<br>gnewell@jsslaw.com |
|---|---|
| Kentucky Utilities Company; Louisville Gas and Electric Company | Anne Dailey<br>Troutman Sanders LLP<br>401 9th Street NW<br>Washington, DISTRICT OF COLUMBIA<br>20004<br>UNITED STATES<br>anne.dailey@troutman.com<br><br>John P Fendig<br>Senior Corporate Attorney<br>LG&E and KU Services Company<br>220 West Main Street<br>Louisville, KENTUCKY 40202<br>john.fendig@lge-ku.com<br><br>Jennifer Keisling<br>Sr Corporate Attorney<br>220 West Main St<br>Louisville, KENTUCKY 40202<br>Jefferson<br>Jennifer.Keisling@lge-ku.com |
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 New York Ave. NW<br>11th FLoor<br>Washington, DISTRICT OF COLUMBIA<br>20005<br>UNITED STATES<br>NancyB@epsa.org |
| Ohio Valley Electric Corporation | Brian Chisling, ESQ<br>Senior Counsel<br>SIMPSON THACHER & BARTLETT<br>425 Lexington Ave.<br>New York, NEW YORK 10017<br>bchisling@stblaw.com<br><br>Harvey L. Reiter<br>Partner |

4

| | Stinson Leonard Street LLP<br>1775 Pennsylvania Ave., NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA<br>20006<br>harvey.reiter@stinson.com<br><br>David D'Alessandro<br>ddalessandro@stinson.com<br><br>Jonathan Trotta, ESQ<br>Stinson Leonard Street LLP<br>Stinson Leonard Street LLP<br>1775 Pennsylvania Avenue, NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA<br>20006<br>jtrotta@stinson.com<br><br>Marie D Zosa, ESQ<br>Stinson Leonard Street LLP<br>1775 Pennsylvania Avenue NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA<br>20006<br>denyse.zosa@stinson.com |
|---|---|
| The Dayton Power and Light Company | Randall Griffin<br>Chief Regulatory Counsel<br>Dayton Power and Light Company, The<br>1065 Woodman Drive<br>Dayton, OHIO 45432<br>UNITED STATES<br>randall.griffin@aes.com<br><br>John W Horstmann<br>Dayton Power and Light Company, The<br>315 Buckwalter Rd<br>Phoenixville, PENNSYLVANIA 19460<br>john.horstmann@aes.com |

5

<u>**Judicial Notice DJ-7**</u>

***Motion to Intervene and Comments in Support of Louisville Gas and Electric Company and Kentucky Utilities Company***, **filed in the FERC Proceeding on April 16, 2018**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Ohio Valley Electric Corporation, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | Docket No. EL18-135-000 |
| v. | ) | |
| | ) | |
| FirstEnergy Solutions Corp., | ) | |
| | ) | |
| Respondent. | ) | |

MOTION TO INTERVENE AND COMMENTS IN SUPPORT OF
LOUISVILLE GAS AND ELECTRIC COMPANY AND
KENTUCKY UTILITIES COMPANY

Pursuant to Rules 212 and 214 of the Federal Energy Regulatory Commission's (the "Commission") Rules of Practice and Procedure, 18 C.F.R. §§ 385.212 and 385.214 (2017), Louisville Gas and Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (collectively "LG&E/KU"), hereby submit this Motion to Intervene and Comments in support of the Ohio Valley Electric Corporation and its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation's (collectively, "OVEC") Complaint.[1]

In support of this motion and comments, LG&E/KU respectfully submit the following:

I.     BACKGROUND

On March 26, 2018, OVEC filed Complaint against FirstEnergy Solutions Corp. ("FirstEnergy").  The Complaint asked the Commission to find that FirstEnergy's anticipated breach of the Inter-Company Power Agreement ("ICPA"), to which FirstEnergy is a

---

[1]     *Ohio Valley Electric Corporation*, Docket No. EL18-135-000, Complaint Or, In the Alternative, Request for Declaratory Order (Mar. 26, 2018) ("Complaint").

counterparty, would result in the termination of FirstEnergy's purchase obligation, which would violate the filed rate doctrine and the ICPA. OVEC filed the Complaint in response to FirstEnergy's announced bankruptcy filing as well as FirstEnergy's anticipated rejection of the ICPA in the bankruptcy proceeding.[2] OVEC is concerned that, upon FirstEnergy's bankruptcy proceeding and possible rejection of the ICPA, FirstEnergy will no longer be held accountable for: (1) its share of the monthly cost shortfalls that are not payable by other Sponsoring Companies; (2) final decommissioning costs of OVEC's plants in 2040; and (3) its portion of cost recovery for any further construction by OVEC.[3] Furthermore, because the rights and obligations of all parties to the ICPA are "several and not joint or joint and several," any costs not supported by FirstEnergy may be left to OVEC and the other Sponsoring Companies to determine whether or how to cover the unattributed costs.[4]

As a result, OVEC has requested the following relief from the Commission:

- First, OVEC has requested that the Commission enforce the ICPA.

- Second, if the Commission determines not to act on the Complaint, OVEC has alternatively asked that the Commission issue a declaratory order establishing that it has exclusive jurisdiction over the ICPA.

- Finally, if the Commission determines that it does not have exclusive authority over the ICPA, OVEC has requested that the Commission issue a declaratory

---

[2]     Complaint at 9.

[3]     *Id.* at 13-14.

[4]     *Id.* 7, 14.

2

order "advising the bankruptcy court that rejection of the ICPA would be contrary to the public interest."[5]

## II. MOTION TO INTERVENE

LG&E and KU are wholly-owned subsidiaries of the PPL Corporation. LG&E provides retail electric service to over 411,000 customers in a service area that includes Louisville and 16 surrounding counties. In 1998, LG&E's then-parent company, LG&E Energy Corp. acquired KU, which provides regulated electric utility service to over 525,000 customers located in 77 Kentucky counties. Under the name Old Dominion Power, KU also provides retail electric service to 28,000 retail customers located in five counties in Virginia. Altogether, KU's service territory covers 4,800 noncontiguous square miles. LG&E's and KU's total generation capacity is 2,920 megawatts and 5,097 megawatts, respectively.

LG&E/KU are two of OVEC's Sponsoring Companies and are parties to the ICPA.[6] Accordingly, LG&E/KU have an interest in, and will be directly affected by, the outcome of this proceeding. LG&E/KU's interests will not be adequately represented or protected by any other party to this proceeding. Therefore, LG&E/KU respectfully move for leave to intervene in, and become parties to, this proceeding.

## III. COMMENTS

LG&E/KU support OVEC's efforts to seek enforcement of the ICPA, and to do so before this Commission. Because the various Sponsoring Companies to the ICPA are participants in the wholesale power markets and/or traditional public utilities, including some with market based-rate authority, open-access transmission tariffs or captive customers, FirstEnergy's potential

---

[5]     *Id*. at 3.

[6]     Complaint at 6.

3

breach or rejection of the ICPA poses risk to customers, rate-payers, and other indirect counterparties. As the federal agency tasked with ensuring that rates are just and reasonable standard under the Federal Power Act (and, under *Mobile-Sierra*, reforming a FERC-jurisdictional contract only where the rate therein "seriously harms the public interest"),[7] the Commission is in the unique – if not exclusive – position of understanding the consequences if FirstEnergy is permitted to terminate or reject its obligations under the ICPA.

## IV.   COMMUNICATIONS

LG&E/KU designate the following individuals to receive service of all filings made in this proceeding:

John P. Fendig
Senior Corporate Attorney
LG&E and KU
220 West Main Street
Louisville, KY 40202
Ph: (502)-627-2608
john.fendig@lge-ku.com

Jennifer M. Keisling
Director, Federal Policy and Senior Counsel
LG&E and KU
220 West Main Street, 11th Floor
Louisville, KY 40202
Ph: (502)-627-4303
jennifer.keisling@lge-ku.com

Anne K. Dailey
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2870
anne.dailey@troutman.com

---

[7]    16 U.S.C. §§ 824d, 824e (2018), *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 344 (1955); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353-355 (1955).

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, LG&E/KU respectfully request that the

Commission grant LG&E/KU's motion to intervene in the Docket No. EL18-135-000

proceeding and accept these comments in support of OVEC's Complaint.


Respectfully submitted,

*/s/ Anne K. Dailey*_____
Anne K. Dailey
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2870
anne.dailey@troutman.com

*Attorney for LG&E/KU*

April 16, 2018
Washington, D.C.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of April, 2018, I served the foregoing document upon each person designated on the official service list compiled by the secretary in this proceeding.

/s/ Anne K. Dailey_____
Anne K. Dailey
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004

Document Content(s)

Motion to Intervene and Comments of LG&E and KU.PDF...................1-6

**<u>Judicial Notice DJ-8</u>**

***Motion to Intervene of American Municipal Power, Inc. Under EL18-135**, filed in the FERC
Proceeding on April 16, 2018*

Submission Description: (doc-less) Motion to Intervene of American
Municipal Power, Inc. under EL18-135-000.

Submission Date:        4/16/2018 9:55:56 AM

Filed Date:             4/16/2018 9:55:56 AM

Dockets
-------
EL18-135-000        Complaint or, In the Alternative, Request for
Declaratory Order

Filing Party/Contacts:

Filing Party                        Signer (Representative)
Other Contact (Principal)
------------                        -----------------------
------------------------
American Municipal Power, Inc.      lmcalister@amppartners.org
krothey@amppartners.org
American Municipal Power, Inc.
cnorton@amppartners.org
American Municipal Power, Inc.
gnewell@jsslaw.com

Basis for Intervening:
American Municipal Power, Inc. ("AMP") is a nonprofit Ohio corporation
with members in Delaware, Indiana, Kentucky, Maryland, Michigan, Ohio,
Pennsylvania, Virginia, and West Virginia, the majority of whom are load-
serving entities within the PJM Interconnection, L.L.C. ("PJM") region.
To meet those members' load service responsibilities, AMP purchases
transmission and related services from PJM and also purchases and sells
electricity products in the markets operated by PJM. On March 26, 2018,
Ohio Valley Electric Corporation and its wholly-owned subsidiary,
Indiana-Kentucky Electric Corporation (collectively, "OVEC") filed a
Complaint against FirstEnergy Solutions Corp. ("FirstEnergy") regarding
FirstEnergy's intention to declare bankruptcy and anticipated breach of
the Inter-Company Power Agreement (ICPA"), which OVEC and FirstEnergy,
among others, are parties to. OVEC asserts that these actions would
amount to a breach of the ICPA, and in turn a termination of
FirstEnergy's purchase obligation which would violate filed rate doctrine
and the ICPA itself. As market participants that may be impacted by the
outcome of this proceeding, AMP and its members have an interest in this
proceeding that cannot be adequately represented by any other party.
Accordingly, and since it is in the public interest, AMP requests to
intervene herein.

Document Content(s)

866424_Interv.TXT...................................................1-1

<u>**Judicial Notice DJ-9**</u>

***Motions to Intervene of Wolverine Power Supply Cooperative, Inc. and Buckeye Power, Inc. and Joint Comments in Support of Ohio Valley Electric Corporation's Complaint*, filed in the FERC Proceeding on April 16, 2018**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Ohio Valley Electric Corporation | ) | |
| | ) | |
| v. | ) | Docket No. EL18-135-000 |
| | ) | |
| FirstEnergy Solutions Corp. | ) | |

**MOTIONS TO INTERVENE OF**
**WOLVERINE POWER SUPPLY COOPERATIVE, INC. AND**
**BUCKEYE POWER, INC. AND JOINT COMMENTS IN SUPPORT OF**
**OHIO VALLEY ELECTRIC CORPORATION'S COMPLAINT**

Pursuant to Rules 212 and 214 of the Federal Energy Regulatory Commission's ("Commission" or "FERC") Rules of Practice and Procedure,[1] Wolverine Power Supply Cooperative, Inc. ("Wolverine") and Buckeye Power, Inc. ("Buckeye") individually move to intervene and jointly file these comments in support of the Complaint or, in the Alternative, Request for Declaratory Order filed by Ohio Valley Electric Corporation and its wholly-owned subsidiary, Indiana-Kentucky Electric Corporation (collectively, "OVEC"), in the above-captioned docket.[2] Wolverine and Buckeye respectfully urge the Commission to grant OVEC's requested relief and find that FirstEnergy Solutions Corp.'s ("FirstEnergy") breach of the Inter-Company Power Agreement ("ICPA") is a violation of the filed rate doctrine and contrary to the public interest or, in the alternative, issue a declaratory order finding that the Commission has exclusive jurisdiction over the ICPA.[3]

---

[1] 18 C.F.R. §§ 385.212 and 385.214 (2017).

[2] *Ohio Valley Elec. Corp. v. First Energy Solutions Corp.*, Complaint or, in the Alternative, Request for Declaratory Order, Docket No. EL18-135-000 (filed March 26, 2018) ("OVEC Complaint").

[3] Although on April 3, 2018, a Judge of the US Bankruptcy Court for the Northern District of Ohio granted a Temporary Restraining Order barring the Commission from attempting to force the debtors to continue performing under several power purchase agreements, including the ICPA, Wolverine and Buckeye understand that this issue

## I.    BACKGROUND

OVEC owns and operates two coal-fired generating power plants, the Kyger Creek plant in Ohio and the Clifty Creek plant in Indiana, with a combined capacity of approximately 2,400 megawatts.  The ICPA is a wholesale power arrangement governing the allocation of the output of the Kyger Creek and Clifty Creek facilities among OVEC's owners and/or their utility-company affiliates, each of which is a "Sponsoring Company" of the ICPA.  Under the ICPA, OVEC makes its entire generating capacity exclusively available to each Sponsoring Company in proportion to its Power Participation Ratio.[4]  In turn, each Sponsoring Company is individually responsible for its assigned *pro rata* portion of OVEC's fixed and operating costs of the projects.[5]  The current, amended version of the ICPA was filed with FERC and accepted on May 23, 2011.[6]  FirstEnergy is a party to the ICPA and is responsible for approximately 5% of OVEC's costs.[7]  Wolverine is the sole member-owner of a Sponsoring Company – Peninsula Generation Cooperative ("Peninsula") – responsible for 6.65% of OVEC's costs.[8]  Similarly, Buckeye is the sole member-

---

remains subject to procedural motions or appeal and, moreover, by its terms expires on April 16, 2018, which is the due date for responses to the complaint at issue in this docket.

[4] ICPA, Section 4.03.

[5] *See id.*, Sections 7.01, 7.02, 7.03 and 8.04.

[6] *Ohio Valley Elec. Corp.*, Docket Nos. ER11-3181-000, ER11-3440-000, and ER11-3441-000 (May 23, 2011) (delegated letter order).  The ICPA was first signed (and filed with the Federal Power Commission) in 1953.

[7] ICPA, Section 1.0117.

[8] *Id.*  Peninsula is a Michigan-based, not-for-profit generation electric cooperative formed for the purpose of acquiring electric power resources for its members and patrons.  As Peninsula's sole member, Wolverine purchases the entirety of OVEC's output to which Peninsula is entitled under the ICPA.  Wolverine also is responsible for all of Peninsula's costs under a power purchase agreement.

2

owner of Buckeye Power Generating, LLC ("BPG"),[9] another Sponsoring Company, which is responsible for 18% of OVEC's costs.[10]

On March 31, 2018, FirstEnergy filed a bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[11] On April 1, 2018, FirstEnergy filed a motion in the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court") seeking to reject its obligations under the ICPA (the "Motion to Reject").[12] If granted, this motion will cause substantial harm to OVEC and its Sponsoring Companies by increasing each party's proportionate share of the costs of the generation projects, and thus likely resulting in higher consumer rates.

On March 26, 2018, in anticipation of FirstEnergy's bankruptcy, OVEC filed a complaint against FirstEnergy requesting that the Commission find that the rejection of the ICPA in bankruptcy court would violate the filed rate doctrine and the terms of the ICPA. In the alternative, OVEC requests that the Commission issue a declaratory order finding that it has exclusive jurisdiction over the ICPA or initiate proceedings to determine whether termination of FirstEnergy's obligations under the ICPA would be contrary to the public interest.

---

[9] BPG is an Ohio limited liability company, of which Buckeye is the sole member. Buckeye purchases all of BPG's entitlement to OVEC output under the ICPA. Buckeye is also responsible for all of BPG's costs under a power purchase agreement.

[10] See ICPA, Section 1.0117.

[11] In re First Energy Solutions Corp., et. al., Case No. 18-50757 (Bankr. N.D. Ohio March 31, 2018) (Jointly Administered) (the "Bankruptcy Case").

[12] See Mot. for Entry of An Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement with the Ohio Valley Electric Corporation as of the Pet. Date, Apr. 1, 2018 filed in the Bankruptcy Case (ECF. No. 44).

3

On April 1, 2018, FirstEnergy filed an adversary proceeding in the Bankruptcy Case to enjoin FERC from ruling on the OVEC complaint.[13]  On April 2, 2018, the Bankruptcy Court issued a temporary restraining order in the Adversary Proceeding enjoining any determination by FERC until April 16, 2018, the return date on the Motion to Reject.[14]  On April 5, 2018, the United States District Court for the Northern District of Ohio (the "District Court") held that FERC and the Bankruptcy Court have concurrent jurisdiction over the ICPA, and "[i]n order to reject the ICPA, [FirstEnergy] must also obtain a ruling from FERC that doing so will not contravene the public interest."[15]  On April 13, 2018, the District Court issued an order deleting "its dicta regarding concurrent jurisdiction from its April 5, 2018 Order."[16]

## II.    COMMENTS

Wolverine and Buckeye support OVEC's complaint and its requested relief.  As OVEC stated, the Commission has exclusive jurisdiction over FirstEnergy's rejection of its obligations under the ICPA in bankruptcy court.  The ICPA governs wholesale power transactions in interstate commerce, which is within FERC's exclusive jurisdiction under the Federal Power Act ("FPA"),[17] and was filed with and accepted by FERC.

Wolverine and Buckeye agree with OVEC that the holding of *In re Calpine Corp.* governs here.  In that case, the court held that it lacked jurisdiction to authorize the rejection of a FERC-

---

[13] *First Energy Solutions Corp v. FERC,* Adv. Proc. No. 18-05021 (Bankr. N.D. Ohio April 1, 2018) (the "Adversary Proceeding").

[14] Adversary Proceeding (ECF No. 11).

[15] Opinion and Order at 2, *Ohio Valley Elec. Corp. v. FirstEnergy Solutions Corp.*, Case No. 5:18-MC-34 (N.D. Ohio April 5, 2018).

[16] Minutes and Order at 2, *Ohio Valley Elec. Corp. v. FirstEnergy Solutions Corp.*, Case No. 5:18-MC-34 (N.D. Ohio April 13, 2018).

[17] 18 U.S.C. § 824.

jurisdictional power supply contract, "because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts."[18] FirstEnergy's rejection of the ICPA in bankruptcy court fundamentally would alter the duration of the contract as well as the financial obligation of each Sponsoring Company, both of which require FERC approval. The court emphasized that "[b]ecause there is nothing in the Bankruptcy Code that limits FERC's jurisdiction, [debtor] cannot achieve in Bankruptcy Court what neither it, nor any other party in this case, nor any other federally regulated energy company in the country could do without seeking FERC approval: cease performance under the rates, terms, and conditions of filed rate wholesale energy contracts in the hopes of getting a better deal."[19] Even if the Commission were to follow the narrower holding of *In re Mirant Corp.*, the Commission's authority remains exclusive where the actions of the debtor would result in changes to a FERC-filed rate.[20] Here, FirstEnergy's rejection of the ICPA will have a *direct* effect on the filed rate contained in the ICPA.

The ICPA is a wholesale power contract that was filed with, and accepted by, the Commission. The filed rate doctrine "prohibits any collateral attack in the courts on the reasonableness of rates, and . . . the only forum for such a challenge is the FERC."[21] Any change to this filed rate requires a demonstration that it is in the public interest. Under the *Mobile-Sierra* doctrine, the Commission "must presume that the rate set out in a freely negotiated wholesale-

---

[18] *In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. Jan. 27, 2006).

[19] *Id.*

[20] *In re Mirant Corp.*, 378 F.3d 511, 519 (5th Cir. 2004).

[21] *In re Calpine Corp.*, 337 B.R. at 32.

5

energy contract meets the 'just and reasonable' requirement"[22] of the FPA,[23] and this "presumption may be overcome only if FERC concludes that the contract seriously harms the public interest."[24] Furthermore, Article 9.09 of the ICPA expressly provides that absent the consent of all parties, changes to the provisions of the agreement must meet the *Mobile-Sierra* public interest standard.

The Commission is the only appropriate forum for determining the harm to the public interest that will result from FirstEnergy's rejection of the ICPA. When Congress passed the FPA, it specifically found that there is a public interest in the continuity of electrical service to the customers of public utilities.[25] The FPA and the filed rate doctrine "protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of those contracts after they are certified by FERC."[26] The consideration of the public interest is within the Commission's special competence and exclusive jurisdiction. *Calpine* noted that "[b]y holding that FERC has exclusive jurisdiction to modify or terminate the Power Agreements in this case, an issue of great public interest will be heard in a branch accountable to the electorate in a forum that specializes in considering the public interest."[27] Thus, only the Commission, to the exclusion of a bankruptcy court, is uniquely suited to assess the harm to the public interest from the rejection of the ICPA.

Wolverine and Buckeye agree with OVEC that FirstEnergy's rejection of its obligations under the ICPA is contrary to the public interest. As OVEC points out, the Sponsoring Companies'

---

[22] *Morgan Stanley v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008). *See United Gas Pipeline Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *Fed. Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

[23] 16 U.S.C. § 824d(a).

[24] *Morgan Stanley*, 554 U.S. at 530.

[25] 16 U.S.C. § 824a(g).

[26] *In re Mirant Corp.*, 378 F.3d at 525.

[27] *In re Calpine Corp.*, 337 B.R. at 38.

6

obligations under the ICPA are several and not joint, so the cost shortfalls from FirstEnergy's rejection of the contract will not be directly payable by the other Sponsoring Companies.[28] These unreimbursed costs will continue to grow over the life of the contract and will adversely affect OVEC's credit rating and raise its borrowing costs.[29] The ICPA requires the Sponsoring Companies to pay OVEC's borrowing costs, and without FirstEnergy's contributions, OVEC and the remaining Sponsoring Companies must address this gap in OVEC's cost recovery.[30] This almost certainly will result in increased debt and higher borrowing costs for the remaining Sponsoring Companies, which will result in higher costs to those companies and their customers. In addition, the Sponsoring Companies are responsible for the uncertain, yet undoubtedly substantial costs for the environmentally sound decommissioning of the OVEC plants when the plants retire or when the ICPA expires in 2040, and without FirstEnergy's contributions, the proportion of costs borne by the remaining Sponsoring Companies would likely escalate significantly.[31] If OVEC fails to find a new replacement Sponsoring Company, a task which would be unduly (and prejudicially) burdened by FirstEnergy's contractual abrogation, the remaining Sponsoring Companies will need to increase their proportionate ownership shares and corresponding cost responsibilities, which will result in higher rates paid by end-use customers.[32]

The resulting harm to the public interest can be seen clearly with respect to Wolverine and Buckeye. Wolverine and Buckeye are electric cooperatives whose customers are its member-

---

[28] OVEC Complaint at 13.

[29] *Id.*

[30] *Id.* at 14.

[31] *Id.* at 13-14.

[32] *Id.* at 23.

owners. Thus, unlike many of the other Sponsoring Companies, whose higher costs may (at least initially) be borne by their shareholders, the increased costs resulting from FirstEnergy's rejection of the contract will be borne directly by Wolverine's and Buckeye's distribution cooperative members, who themselves are owned by end-use consumers. In other words, every dollar avoided by FirstEnergy's rejection of the ICPA will likely result in another 6.65 cents and 18 cents, respectively, shouldered by Wolverine and Buckeye (to say nothing of the increased cost of borrowing to cover this ever-increasing hole in payment of costs). This presents an immediate harm to the public interest that far outweighs the expediency of FirstEnergy's effort to evade its contractual obligations.

Furthermore, the notion, likely asserted by FirstEnergy, that abrogation of the OVEC ICPA will not cause any disruption in the supply of electricity is a red herring. The near truism that no customers will have their power supply disrupted if the ICPA is rescinded does not obviate the heightened burden that a signatory to a *Mobile-Sierra* contract must meet to amend its terms – even in bankruptcy. The point is, only the Commission has the expertise to weigh the myriad factors and adverse consequences attributable to a proposed unilateral abrogation of a multi-party jurisdictional contract, the subject matter of which is within FERC's exclusive jurisdiction as mandated by Congress in the FPA; thus only the Commission can determine whether FirstEnergy's rejection of its obligations under the ICPA is in the public interest.

Accordingly, Wolverine and Buckeye ask that the Commission grant OVEC's requested relief and find that FirstEnergy's breach of the ICPA violates the filed rate doctrine and is contrary to the public interest. In the alternative, the Commission should issue a declaratory order finding that it has exclusive jurisdiction to address FirstEnergy's rejection of the ICPA. However, if the Commission concludes that it does not have exclusive jurisdiction here, the Commission should

issue a declaratory order advising the bankruptcy court that the rejection of the ICPA is contrary to the public interest. Wolverine and Buckeye would also support the Commission's initiation of proceedings to gather more information relevant to these complicated issues.

## III. MOTIONS TO INTERVENE

Wolverine is a Michigan-based, not-for-profit generation and transmission electric cooperative that provides wholesale service to its seven members and is subject to the Commission's jurisdiction under the FPA. Wolverine generates and purchases electricity primarily to serve its members-owners and supplements and balances its power supply portfolio with short-term purchases from, and sales to, the Midcontinent Independent System Operator, Inc. ("MISO") and PJM Interconnection, L.L.C. ("PJM") markets. Wolverine is a Transmission-Owner member of the MISO with a transmission system consisting of approximately 1,600 miles of 69 kV and 138 kV looped transmission lines and associated facilities. Wolverine's transmission facilities are subject to the terms of the MISO Open Access Transmission, Energy and Operating Reserve Markets Tariff ("MISO Tariff") and are located in the Michigan Joint Zone pursuant to Attachment O of the MISO Tariff.

Buckeye is an Ohio non-profit corporation and a generation and transmission cooperative that produces, procures, and provides at wholesale all of the electric capacity and energy required by its 25 member electric distribution cooperatives operating in Ohio. Those member cooperatives serve more than 380,000 residential, commercial, and industrial customers in service territories encompassing 77 of Ohio's 88 counties. Buckeye and its affiliates own or control power generation resources with nameplate capacity totaling approximately 2,600 megawatts. Buckeye and its members depend entirely upon PJM for open access transmission service to transmit electric capacity and energy from Buckeye's generation resources to its members' delivery points.

9

As the sole members of separate Sponsoring Companies that are parties to the ICPA, Wolverine and Buckeye will be directly affected by any decision regarding FirstEnergy's cost obligations under the ICPA. Thus, Wolverine and Buckeye have a substantial interest in the outcome of this proceeding that necessitates their participation, and their interest cannot be adequately represented by another party. Accordingly, it is in the public interest to grant their motions to intervene and allow Wolverine and Buckeye each to become parties to this proceeding.

## IV.    COMMUNICATIONS

All communications, correspondence, and documents related to this proceeding should be directed to the following persons and such persons should be placed on the official service list maintained by the Commission's Secretary for this proceeding:

For Wolverine:

| | |
|---|---|
| Joseph J. Baumann | Michael J. Rustum |
| Vice President and General Counsel | Winston & Strawn LLP |
| Wolverine Power Supply Cooperative, Inc. | 1700 K Street, N.W. |
| 10125 West Watergate Road | Washington, D.C. 20006-3817 |
| Cadillac, MI 49601 | Tel: (202) 282-5645 |
| Tel: (231) 779-3320 | Fax: (202) 282-5100 |
| Fax: (231) 775-2077 | Email: mrustum@winston.com |
| Email: jbaumann@wpsci.com | |

For Buckeye:

| | |
|---|---|
| Kurt P. Helfrich | Marvin T. Griff |
| General Counsel | Thompson Hine LLP |
| Buckeye Power, Inc. | 1919 M Street, N.W. |
| 6677 Busch Boulevard | Washington, D.C. 20036-1600 |
| Columbus, OH 43229 | Tel: (202) 263-4109 |
| Tel: (614) 681-5151 | Fax: (202) 331-8330 |
| khelfrich@ohioec.org | marvin.griff@thompsonhine.com |

## V.        CONCLUSION

WHEREFORE, for the foregoing reasons, Wolverine and Buckeye respectfully request that the Commission grant their motions to intervene in this proceeding and find that FirstEnergy's rejection of the ICPA is a violation of the filed rate doctrine and contrary to the public interest or, in the alternative, issue a declaratory order finding that the Commission has exclusive jurisdiction over the ICPA.

Respectfully submitted,

*/s/ Michael J. Rustum*
Michael J. Rustum
Victoria L. Hsia
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006-3817
Tel: (202) 282-5645
Email:  mrustum@winston.com
            vhsia@winston.com

*Counsel for Wolverine Power Supply*
*Cooperative, Inc.*

*/s/ Marvin T. Griff*
Marvin T. Griff
Thompson Hine LLC
1919 M Street, N. W.
Washington, D.C. 20036-1600
Tel (202) 263-4109
Email:  marvin.griff@thompsonhine.com

*Counsel for Buckeye Power, Inc.*

Dated:  April 16, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list in this proceeding in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure.

Dated at Washington, D.C. this 16th day of April, 2018.

_/s/ Carlos L. Sisco_
Carlos L. Sisco
Senior Paralegal
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006-3817
202-282-5000

Document Content(s)

4-16-18 Wolverine-Buckeye Filing (EL18-135).PDF.......................1-12

<u>**Judicial Notice DJ-10**</u>

***Motion to Intervene of EDP Renewables North America LLC Under EL18-135***, **filed in the FERC Proceeding on April 19, 2018**

Submission Description: (doc-less) Motion to Intervene of EDP Renewables
North America LLC under EL18-135-000.

Submission Date:           4/19/2018 2:51:18 PM

Filed Date:                4/19/2018 2:51:18 PM

Dockets
-------
EL18-135-000           Complaint or, In the Alternative, Request for
Declaratory Order

Filing Party/Contacts:

Filing Party                          Signer (Representative)
Other Contact (Principal)
------------                          ----------------------
------------------------
EDP Renewables North America LLC       leslie.freiman@edpr.com

Basis for Intervening:
EDP Renewables North America LLC (EDPRNA) develops, owns, and operates,
through
wholly-owned or partially-owned subsidiaries, renewable electric
generation facilities
throughout the United States. EDPRNA's affiliate High Trail Wind Farm,
LLC (High
Trail) and FirstEnergy Solutions Corp. (FES) are parties to a wholesale
power purchase
agreement (PPA), which FES is seeking to reject in connection with FES's
pending
Chapter 11 bankruptcy proceeding before the United States Bankruptcy
Court for the
Northern District of Ohio, Eastern Division. EDPRNA and its affiliates,
including High
Trail, have a direct interest in the outcome of this proceeding that
cannot be adequately
represented by any other party. Therefore, EDPRNA respectfully requests
leave to
intervene in this proceeding and participate as a party with full rights.

Document Content(s)

868039_Interv.TXT.....................................................1-1

<u>**Judicial Notice DJ-11**</u>

***Motion to Intervene, Preliminary Comments, and Motion for an Extension of Time to File Comments of Krayn Wind LLC***, **filed in the FERC Proceeding on April 26, 2018**

# UNITED STATES OF AMERICA
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Ohio Valley Electric Corporation | ) | |
| | ) | Docket No. EL18-135-000 |
| v. | ) | |
| | ) | |
| FirstEnergy Solutions Corp., | ) | |

## MOTION TO INTERVENE, PRELIMINARY COMMENTS, AND MOTION FOR AN EXTENSION OF TIME TO FILE COMMENTS OF KRAYN WIND LLC

Pursuant to Rules 211, 212, and 214 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission (the "Commission"),[1] Krayn Wind LLC ("Krayn") hereby submits this Motion to Intervene, Preliminary Comments, and Motion for an Extension of Time to File Comments in response to the Complaint, or in the Alternative, Petition for Declaratory Order, filed on March 26, 2018 by Ohio Valley Electric Corporation ("OVEC") against FirstEnergy Solutions Corporation ("FES").[2] While Krayn is not a party to the agreement at issue in the Complaint, it is the counterparty to FES in a separate power purchase agreement. Like the OVEC agreement, FES has sought to reject its agreement with Krayn in *In re FirstEnergy Solutions Corp.*, No. 18-50757-AMK (N.D. Oh. 2018) ("the bankruptcy proceeding").

Krayn supports the Complaint's request that the Commission exercise its jurisdiction over power purchase agreements between FES and OVEC. Before FES is permitted to reject these contracts in bankruptcy, the Commission must evaluate whether the *Mobile-Sierra* public interest standard is met.[3] Because the rejection involves altering a filed rate, the Commission has

---

[1] 18 C.F.R. §§ 385.211, 385.212, and 385.214 (2017).
[2] Complaint or, in the Alternative, Request for Declaratory Order, Ohio Valley Electric Corporation v. FirstEnergy Solutions Corporation, Docket No. EL18-135-000, March 26, 2018 ("Complaint").
[3] *United Gas Pipeline Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *Federal Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

1

jurisdiction to make that determination under the Federal Power Act. While an older Fifth Circuit case[4] suggests that the Commission may lack such jurisdiction in some cases, more recent Supreme Court cases interpreting *Mobile-Sierra* have undermined the Fifth Circuit's reasoning. As a result, the Commission is not bound by its conclusion and has jurisdiction here.

Krayn recognizes that the Commission has already issued one extension of time in this matter. However, good cause exists to grant an additional extension of time to file further comments.[5] At the present time, the Commission is subject to a temporary restraining order preventing it from taking action in this proceeding. Issues relating to the jurisdiction of the Commission and the bankruptcy court are now being litigated as part of the bankruptcy proceeding. To allow consideration of these developments, once the injunction is lifted, we respectfully request that the Commission set an additional deadline for comments seven days after the injunction terminates.

Krayn sets forth its motion to intervene herein, as well as preliminary comments on jurisdiction, and will file additional comments once the injunction is lifted and the Commission sets a new deadline.

## I.     MOTION TO INTERVENE AND COMMUNICATIONS

Krayn owns a 63 MW wind facility located in Adams Township, Pennsylvania. In a power purchase agreement dated August 20, 2008, Krayn contracted to sell the output of this facility to FES (the "Krayn PPA"). FES has sought to reject this agreement in the bankruptcy proceeding. FES has filed a similar motion to reject relating to the agreements between FES and OVEC at issue in the Complaint. Because Krayn may be affected by the Commission's decision as it relates to

---

[4] *In re Mirant*, 378 F.3d 511 (5th Cir. 2004).
[5] 18 C.F.R. §§ 385.2008 (2017) (providing that the Commission can extend time for parties to act on "good cause").

2

the OVEC agreements, it has a direct and substantial interest in this proceeding and its interest

cannot be represented by any other party. Krayn requests that the Commission grant this motion

to intervene and allow Krayn to become a party to this proceeding.

All communications and correspondence relating to this proceeding should be directed to

the following person, who should be included on the official service lists compiled by the Secretary

of the Commission in these proceedings.

> Suedeen Kelly
> JENNER & BLOCK LLP
> 1099 New York Ave. NW Suite 900
> Washington, DC 20001
> (202) 639-6055
> skelly@jenner.com

## II.   PRELIMINARY COMMENTS IN SUPPORT OF THE COMMISSION'S JURISDICTION[6]

Both the Krayn PPA and the OVEC agreement are indisputably protected by the *Mobile-*

*Sierra* doctrine. As a "freely negotiated wholesale-energy contract," the Commission must

presume the PPA "meets the 'just and reasonable' requirement of the Federal Power Act."[7]

Moreover, "that presumption may be overcome only if FERC concludes that *the contract seriously*

*harms the public interest*."[8]  The public interest standard presents a high bar for challengers to

meet. "Framed with a view to the[] protection" of third parties, the *Mobile-Sierra* doctrine only

allows "the Commission to reject a contract rate that seriously harms the consuming public."[9]

As OVEC correctly argues, this determination under the Federal Power Act is one for the

---

[6] Krayn reserves all rights to assert these and additional factual and legal arguments in support of the Commission's jurisdiction and in defense of any attempt to reject the Krayn PPA, before the Commission or the Bankruptcy Court.

[7] *Morgan Stanley Capital Group Inc. v. Pub Util. Dist. No. 1*, 554 U.S. 527, 530 (2008).

[8] *Id.* (emphasis added).

[9] *NRG Power Marketing, LLC v. Maine Pub. Util. Comm'n,* 558 U.S. 165, 175 (2010) (internal quotation omitted).

3

Commission to make. The Commission has previously ruled that jurisdictional agreements protected by *Mobile-Sierra* cannot be rejected in bankruptcy simply because they have become uneconomic.[10] And the most recent federal court opinions on this issue support the Commission's exercise of its jurisdiction here. Multiple decisions by the United States District Court for the Southern District of New York have analyzed the jurisdictional question and concluded that the bankruptcy courts lack exclusive authority to reject power purchase agreements.[11] Thus, in order to escape its obligations under a jurisdictional agreement, a debtor must seek and receive a determination from the Commission that the public interest standard permits invalidating the contract.

There is one, now-dated, case that holds to the contrary. In 2004, the Fifth Circuit held in *Mirant* that the bankruptcy court could reject contracts regulated by the Federal Power Act even without a separate public interest determination by the Commission,[12] and the Commission subsequently acknowledged that holding in connection with the Calpine bankruptcy.[13] The *Mirant* decision should not be relied upon by the Commission, both because the United States District Court for the Southern District of New York has declined to follow it, and, more importantly, it is now stale law. Two recent U.S. Supreme Court decisions interpreting *Mobile-Sierra* have fatally undercut *Mirant*'s reasoning. For these reasons, the Commission must ignore *Mirant* and the previous Commission order acknowledging it and find that current law requires the Commission to return to its pre-*Mirant* posture—that is, that the Commission must determine whether

---

[10] *Blumenthal v. NRG Power Marketing*, 104 FERC ¶ 61,210 at P 58 (2003).

[11] *In re Boston Generating, LLC*, No. 10 CIV. 6528 DLC, 2010 WL 4616243 at *3 (S.D.N.Y. Nov. 12, 2010); *In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. 2006).

[12] 378 F.3d at 521.

[13] *Cal. Oversight Bd. et al. v. Calpine Energy Servs., L.P. et al.*, 114 FERC ¶ 61,003, at P 11 (2006).

4

jurisdictional agreements protected by *Mobile-Sierra* may be rejected in bankruptcy and that agreements may not be rejected simply because they have become uneconomic.

*Mirant* depended on an outdated interpretation of the Federal Power Act. The Court of Appeals concluded that the rejection of contracts in bankruptcy was acceptable because the bankruptcy court decision would only have an "indirect effect" upon the filed rate protected by the FPA.[14] *Mirant* first emphasized the impact of the rejection on the counterparty. Because the counterparty received an unsecured claim based on the filed rate, *Mirant* held that there was no collateral attack on that rate.[15] Next, *Mirant* emphasized the debtor's lack of need for the power and concluded that there was no "collateral attack on the filed rate when the electricity purchased under the rejected contract is not necessary to fulfill a debtor's supply obligations."[16] *Mirant* thus saw the impact of rejection of the *rate* only through the lens of the impact on the contracting *parties*.

This narrow focus on the significance of the rejection motion on the parties to the contract does not survive the Supreme Court's current interpretation of the Federal Power Act and *Mobile-Sierra*. Since the 2004 decision in *Mirant*, the Supreme Court has issued two landmark decisions clarifying the scope of the *Mobile-Sierra* doctrine: *Morgan Stanley* and *NRG*. These cases establish two clear foundational principles underlying the public interest standard, and these principles are inconsistent with those relied upon by the *Mirant* court. First, the *Mobile-Sierra* doctrine exists to protect the interests of third parties, not just the interests of contracting parties.[17] Consumers and other market participants have significant interests at stake when energy contracts are rejected.

---

[14] *Mirant*, 378 F.3d at 520.
[15] *Id.*
[16] *Id.*
[17] *NRG*, 558 U.S. at 175 ("[T]he Mobile-Sierra doctrine does not overlook third-party interests; it is framed with a view to their protection."); *Morgan Stanley*, 554 U.S. at 530.

Second, the "animating purposes of the doctrine" include the "promotion of the stability of supply arrangements which all agree is essential to the health of the energy industry."[18] Disrupting jurisdictional contracts necessarily undermines this stability.

In light of these two substantive principles, the jurisdictional holding of *Mirant* cannot stand.[19]  *Mirant*'s conclusion that the effect on the filed rate was "indirect" rested solely, and explicitly, on its analysis of the consequences of the contract rejection on the *contracting* parties. *Morgan Stanley* and *NRG* hold, though, that *Mobile-Sierra* rates are protected for reasons that extend far more broadly than the interests of the contracting parties.  The rates protect consumers and other third parties to the contracts as well as the stability of the energy markets.  *Mirant*, with its narrow analysis of the interests at stake in these matters, is no longer good law.

The logic of both *Morgan Stanley* and *NRG* necessitates a Commission decision to accept OVEC's argument and return to its previous interpretation of its jurisdiction.  Rejection of a power purchase agreement in bankruptcy impacts not only the parties to the agreement, but also third party consumers and the stability of the market.  Thus, rejection is a direct attack on the filed rate that falls within the Commission's jurisdiction.  Under the Federal Power Act, the Commission must take into account all of these interests in analyzing whether the public interest standard is met.  That analysis requires a close consideration of the interests of consumers and other stakeholders and the consequences of destabilizing the settled expectations of market participants. Bankruptcy courts have neither the background nor the authority to easily evaluate the impact of changes to a filed rate on those interests as outlined by *Morgan Stanley* and *NRG*.  In contrast, this Commission possesses both the jurisdiction and the expertise to conduct the *Mobile-Sierra*

---

[18] *NRG*, 558 U.S. at 175 (internal quotations and brackets omitted).
[19] Krayn has several additional factual and legal arguments as to why the *Mirant* ruling should not apply, which will be raised in due course.

6

analysis required by the Supreme Court.[20]

### III. MOTION FOR FURTHER EXTENSION OF TIME TO FILE COMMENTS

In addition to these initial comments on the jurisdictional question here, Krayn requests that the Commission establish an additional period for comments following the termination of the injunction currently barring the Commission from acting in this proceeding. The jurisdictional issues referenced here have also been raised in the bankruptcy litigation. The Commission and commenters would benefit from the ability to respond to any arguments or decisions arising out of that proceeding in the record here. In addition, because the Commission is currently enjoined, an extension of the comment period will not create significant delay in the final resolution of this matter. Further, if the Bankruptcy Court determines that it has exclusive jurisdiction over the proposed rejection of the power purchase agreements, then this proceeding may not move forward. Thus, good cause exists to grant the requested extension.

### CONCLUSION

Krayn supports the Complaint's request that the Commission exercise its jurisdiction over the contract at issue in this proceeding and further requests that the Commission set an additional deadline for comments to be filed seven days after the termination of any injunction barring Commission action.

April 26, 2018                                    Respectfully submitted,

                                                  /s/ Suedeen Kelly

                                                  Suedeen Kelly
                                                  Max Minzner
                                                  JENNER & BLOCK LLP

---

[20] *Mirant* did correctly recognize that the *Mobile-Sierra* standard applied to contracts such as these, but concluded that the bankruptcy court should apply that standard. *Mirant*, 378 F.3d at 525. That substantive conclusion supports the Commission's jurisdiction. The Commission, not bankruptcy courts, is the preferred institution to conduct that analysis.

7

1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6055
skelly@jenner.com
mminzner@jenner.com

8

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this motion and comments via email upon each person designated in the official service list compiled by the Secretary in this proceeding. Dated at Washington, D.C., April 26, 2018.

/s/ Suedeen Kelly

Suedeen Kelly
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6055
skelly@jenner.com

9

Document Content(s)

Krayn Motion FOR FILING.PDF.........................................1-9

## Judicial Notice DJ-12

*Motion to Intervene of Duke Energy Ohio, Inc. Under EL 18-135*, **filed in the FERC Proceeding on April 26, 2018**

Submission Description: (doc-less) Motion to Intervene of Duke Energy Ohio, Inc. under EL18-135-000.

Submission Date:      4/26/2018 4:30:22 PM

Filed Date:      4/26/2018 4:30:22 PM

Dockets
-------
EL18-135-000      Complaint or, In the Alternative, Request for Declaratory Order

Filing Party/Contacts:

| Filing Party | Signer (Representative) | Other Contact (Principal) |
| ----------- | ---------------------- | ------------------------- |
| Duke Energy Ohio, Inc. | nsymons@mcguirewoods.com | cfrancis@mcguirewoods.com |

Basis for Intervening:
Basis for Intervening:

Pursuant to Rules 212 and 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.212, 214 (2018), Duke Energy Ohio, Inc. ("DEO") moves for leave to intervene in this proceeding.  As a Sponsoring Company to the Inter-Company Power Agreement ("ICPA"), DEO is subject to the same filed rate as FirstEnergy Solutions Corp. ("FES") and will be directly affected by the outcome of this proceeding. See 18 C.F.R. § 385.214(b)(2)(ii).

DEO, a wholly-owned subsidiary of Duke Energy Corporation, provides electric and natural gas utility service in Ohio. DEO integrated its electric transmission facilities into PJM Interconnection, L.L.C. on January 1, 2012.  See PJM Interconnection, L.L.C., et al., 139 FERC ¶ 61,068 (2012).  DEO, as a Sponsoring Company, has a direct and immediate interest in the proceeding that is not adequately represented by OVEC or any other party.

<u>**Judicial Notice DJ-13**</u>

***Comments of the Indicated ICPA Sponsors in Support of Complaint***, **filed in the FERC Proceeding on April 27, 2018**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Ohio Valley Electric Corporation | ) | Docket No. EL18-135-000 |
| | ) | |
| v. | ) | |
| | ) | |
| FirstEnergy Solutions Corp. | ) | |

**COMMENTS OF THE INDICATED ICPA SPONSORS IN SUPPORT OF COMPLAINT**

Pursuant to Rule 211,[1] Duke Energy Ohio, Inc.; Vectren Corporation, on behalf of the

Southern Indiana Gas and Electric Company; and American Electric Power Service Corporation,

on behalf of Appalachian Power Company, Indiana Michigan Power Company and Ohio Power

Company (the "Indicated ICPA Sponsors") comment in support of certain relief requested in the

Complaint filed in this docket on March 26, 2018.[2]  Specifically, the Federal Energy Regulatory

Commission ("FERC") should find that any rejection of the Inter-Company Power Agreement

("ICPA") must be approved by FERC under the public interest standard.  Here, FirstEnergy

Solutions Corp. ("FES") cannot meet that standard.  Consequently, FES must continue to fulfill

its obligations under the ICPA.

The ICPA is a complex filed rate contract.  It provides for the sale of the full output of the

OVEC facilities to ICPA "Sponsoring Companies," including (among others) FES and the

Indicated ICPA Sponsors, in return for the payment of FERC-approved energy and demand

---

[1] 18 C.F.R. §§ 385.211 (2018).

[2] *See Complaint, or in the Alternative, Request for Declaratory Order* ("Complaint")*,* filed by the Ohio
Valley Electric Corporation and its wholly-owned subsidiary Indiana Kentucky Electric Corporation,
(collectively, "OVEC").

1

charges. Sales to each Sponsoring Company are according to pre-assigned output shares, and payment responsibility tracks those same shares. FES's share is 4.85%.

FERC is uniquely qualified and empowered to evaluate FES's attempted rejection of its obligations under the ICPA and the harsh effect that such rejection may have on the public. Here, the Federal Power Act and the Bankruptcy Code are both implicated. In the absence of specific language that Congress intended one statute to trump another, the presumption must be that both statutes should be effectuated[3] – meaning that FERC necessarily needs to act independently from the Bankruptcy Court to ensure that the public interest standard is applied, and applied correctly. That is an important independent function, because while the bankruptcy code tends to require examination of whether a contract remains profitable, that is expressly *not* the test under the public interest standard, where "FERC's abrogation or modification of an existing contract rate may not hinge on the mere fact that one of the parties finds it unprofitable."[4]

FES has not yet asked FERC for permission to reject or otherwise modify the ICPA. It follows, therefore, that the first step by FERC should be to rule that FES must seek FERC permission before FES may reject the ICPA in Bankruptcy Court. Because that issue is pending before the Bankruptcy Court, it would be helpful and administratively efficient for FERC to confirm at this early stage that FES must meet the public interest standard in seeking FERC approval to reject the ICPA.

---

[3] *See Morton v. Mancari,* 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

[4] *Wis. Pub. Power, Inc. v. FERC,* 493 F.3d 239, at 271 (D.C. Cir. 2007) ("*WWPI*").

FES seeks to avoid FERC review of its proposed rejection of the ICPA not only by filing to enjoin FERC altogether, but by arguing in the Bankruptcy Court that a bankruptcy "rejection" of the ICPA is nothing more than a breach of contract and not an abrogation that would require FERC review. But this contract invokes the public interest standard. As the case law makes clear, any change that affects performance under such a filed rate contract is subject to FERC jurisdiction and scrutiny under the public interest standard.

FERC should take notice that the ICPA does not contain any provision authorizing a Sponsoring Company to reject its purchase obligations. FES's motion to reject, filed with the Bankruptcy Court, is not a case in which a single buyer seeks to reject a market-derived contract with a single seller. The ICPA involves 13 off-takers ("Sponsoring Companies"), some of whom serve retail customers with the power provided by OVEC and/or are subject to state regulation with respect to their share, and all of these interests must be considered under the public interest inquiry. The ICPA calls for, and has always called for, several liability as between OVEC and the Sponsoring Companies and does not authorize a contractual rejection.[5] An FES rejection is not subject to the ordinary remedies available for a simple breach. In fact, there are no contractual remedies available to the individual Sponsoring Companies for the burden that FES's rejection may impose on them and or their retail customers.

## I.    BACKGROUND

On March 31, 2018, after OVEC filed the Complaint with FERC, FES and certain of its affiliates filed Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court"), jointly administered as Case No. 18-50757. On April 1, 2018, FES filed a *Motion for Entry of an Order Authorizing [FES] and FirstEnergy*

---

[5] ICPA, Part 9.11.

3

*Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement with the Ohio Valley Electric Corporation as of the Petition Date* (" ICPA Rejection Motion") and a second motion entitled *Motion for Entry of an Order Authorizing [FES] and FirstEnergy Generation, LLC to Reject Certain Energy Contracts as of the Petition Date* by which FES seeks to reject its obligations under the FERC-approved ICPA under a "business judgement" legal standard that is not found in or supported by the Federal Power Act.

At the same time, FES filed a *Complaint for Declaratory Judgment, Preliminary and Permanent Injunction against the Federal Energy Regulatory Commission*, Adversary Proceeding No. 18-0502, seeking to temporarily restrain and subsequently, to preliminarily and permanently enjoin FERC from taking any action in this proceeding and in FES's bankruptcy proceedings. FES also sought a declaration that FERC be precluded from having any input on its motions to reject the ICPA.

On April 2, 2018 based on the FES motions, the Bankruptcy Court entered a temporary restraining order ("TRO") against FERC on an *ex parte* basis. The TRO, originally in place until 11:59 p.m. on April 16, 2018, purports to bar FERC "from initiating or continuing, or encouraging any person or entity to initiate or continue, any proceeding before FERC, or from issuing any order, to require or coerce [FES] to continue performing under the [ICPA and other power purchase agreements] or limiting [FES] to seeking abrogation of such contract under [t]he Federal Power Act." On April 16, 2018, the Bankruptcy Court extended the TRO through a preliminary injunction hearing on May 11, 2018, and amended the TRO to allow interested parties to (i) submit comments in the present proceeding, (ii) allow FERC to review and evaluate such comments, and (iii) allow FERC to take procedural actions including actions related to

extensions of time. On April 16, 2018, FERC issued a notice extending the due date for answers, interventions and protests in this proceeding to April 30, 2018.

## II.     COMMENTS

### A.  FERC has Jurisdiction over the ICPA

The Indicated ICPA Sponsors support OVEC's position that FERC must assume concurrent jurisdiction with the Bankruptcy Court. Once FERC assumes that jurisdiction, FERC must apply the public interest standard in evaluating any request by FES to reject its share of the ICPA.

FES receives 4.85% of the energy and capacity that OVEC provides, which FES sells into the wholesale electricity market administered by PJM Interconnection, L.L.C.  In return, FES must pay monthly energy and demand charges under the ICPA, a FERC-approved contract comprised of a variety of components that include OVEC's fixed and variable costs.  FES is severally, *not jointly and severally*, responsible for its share.[6]  And, under the ICPA, FES's obligation to pay monthly demand, transmission and other charges is unconditional.[7]

Neither FES's Rejection Motion in Bankruptcy Court nor any related proceeding divests FERC of its authority, and indeed, its responsibility to ensure that any change to the ICPA meets the public interest standard.  In fact, FES has admitted that "in certain respects" the ICPA is subject to FERC's jurisdiction (FES Brief in Support of Preliminary and Permanent Injunction and Declaratory Judgement, Paragraph 3, page 3).  The Indicated ICPA Sponsors support

---

[6] ICPA, Sections 7.01, 7.02, 7.03 and 7.04.

[7] ICPA, Sections 5.03, 5.04 and 8.04.

OVEC's analysis of the *Calpine*[8] and *Boston Generating*[9] cases that OVEC set forth in Section

IV of its Complaint, including the conclusion that, the Bankruptcy Code does not strip FERC of

jurisdiction over a challenge to a filed rate.  Succinctly stated, rejection of a filed rate contract

based solely on a bankruptcy court's application of section 365 of the Bankruptcy Code "directly

interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power

contracts and otherwise constitutes a collateral attack on the filed rate."[10]

 In *Calpine*, the debtor sought to reject energy contracts in bankruptcy court.  The matter

was removed to the district court which then vacated a temporary restraining order against FERC

and dismissed motions to reject the energy contracts.  The *Calpine* court reasoned that the

Bankruptcy Code does not expressly limit FERC jurisdiction and that "it is clear the bankruptcy

court's authority cannot be exercised so as to interfere with the jurisdiction of a federal agency

acting in its regulatory capacity."[11]  Accordingly, the court found that the FERC had exclusive

authority to change, modify or terminate the filed rate energy contracts.   Similarly, in *Boston

Generating,* the Southern District of New York held that in order for debtors to reject FERC-

jurisdictional transportation contracts, they must obtain a ruling from FERC that abrogation of

the contracts did not contravene the public interest, in addition to a ruling from the Bankruptcy

Court.[12]

---

[8] *In re Calpine Corp.,* 337 B.R. 27(S.D.N.Y. Jan 27, 2006) ("*Calpine*").

[9] *In re Boston Generating, LLC,* No. 10 CIV. 6528 DLC, 2010 WL 4288171 (S.D.N.Y. Nov. 1, 2010); *In re Boston Generating, LLC,* No. 10 CIV. 6528 DLC, 2010 WL 4616243 (S.D.N.Y. Nov. 12, 2010) (*"Boston Generating"*).

[10] *Calpine*, 337 B.R. at 36.

[11] *Calpine,* 337 B.R. at 35.

[12] *Boston Generating,* 2010 WL 4616243, at 1.

## B. Standard of Review

Were FES to file a complaint with FERC or if FERC participates concurrently with the Bankruptcy Court, FERC would be required to follow the express terms of the ICPA and apply the public interest standard.

Section 9.09 of the ICPA states:

> "Absent the agreement of all parties to this Agreement, the standard for changes to the provisions of this Agreement related to rates proposed by a party … shall be the "public interest" standard of review set forth in *United Gas Pipeline Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332 (1956) and *Federal Power Comm'n v. Sierra Pacific Power Co.,* 350 U.S. 348 (1956)."

This is "a provision relinquishing [the party's] right to file for a unilateral change in rates."[13]  Under this standard, "FERC may abrogate a valid contract only if it harms the public interest."[14]  The same is true of modifications to such a contract.[15]

It seems likely that FES is seeking to avoid Commission review because it knows that it cannot meet the public interest standard here. It is not enough for FES to show that the contract is "unprofitable" for FES.[16]  FES must demonstrate that its continued performance under the ICPA would cause significant harm to the public.  The Supreme Court has said examples of when the public interest standard could be met include where "there is unfair dealing at the contract formation stage,"[17] or where contracts were executed during periods of market

---

[13] *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) (*"Atl. City"*).

[14] *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527 (2008) (*"Morgan Stanley"*).

[15] *Atl. City* at 14.

[16] *WPPI,* 493 F.3d 239, at 271.

[17] *Morgan Stanley*, 554 U.S. at 547 (quoting *Verizon Commc'n, Inc. v. FCC*, 535 U.S. 467, 479 (2002)).

7

dysfunction "caused by illegal action of one of the parties."[18]  While those situations are not present here, they illustrate the high bar that this standard sets.  Further, changes that affect filed rate contracts can run afoul of the public interest standard notwithstanding that those changes did not themselves "rewrite" the contract.  For example, the D.C. Circuit upheld FERC's decision that subjecting bilaterally negotiated agreements to otherwise applicable regional scheduling practices would effectively modify those contracts "by pervasively disrupting" the parties' existing contractual scheduling practices, such that FERC properly decided, under the public interest standard, that it was impermissible to subject the contract parties to the regional scheduling practices.[19]

Here, FES has argued in Bankruptcy Court that the rejection of the contract is simply a breach of a contract, not a change to the contract justiciable by FERC.  FES further opines that rejection of the ICPA, which relieves the debtor of its obligations to perform future obligations under the contract, may be achieved on merely showing that the burdens of a contract outweigh the benefits of the contract *as to the debtor*.  FES has offered no consideration of the public interest and in fact, appears doubtful that it can meet this standard since it seeks to enjoin the FERC from acting or applying the public interest standard.

---

[18] *Id.*

[19] *WPPI,* 493 F.3d at 272-73 (upholding FERC's determination that "while the [MISO Tariff] does not rewrite the GFAs, it would impose significant changes in the manner in which transmission service is provided for [in] transactions under the GFAs that could result in cost shifts between the parties to the individual GFAs and thus affect the bargain between the parties to the individual GFAs."). Here, the ICPA contains robust scheduling provisions, and those provisions are tied to the power entitlement shares of each Sponsor. *See, e.g.,* ICPA Section 4.031 ("Each Sponsoring Company shall schedule the delivery of all or any portion … of its entitlement…."). So one of the issues that FES would need to address, and show to be in the public interest, is how responsibilities for scheduling would change, if at all.

Moreover, given that the ICPA a) involves 14 counterparties that must unanimously agree on any change to the ICPA, b) 13 Sponsoring Company off-takers, some of whom serve retail customers with the power provided by OVEC and/or are subject to state regulation with respect to their share, c) calls for several liability as between the counterparties, and d) does not permit a contractual rejection, FES's request for rejection is not subject to the ordinary remedies available for a simple breach. In fact, there are no remedies available to the individual Sponsoring Companies for the burden that FES's rejection may impose on other Sponsoring Companies and, in some cases, on their retail customers. Even if rejection itself was notionally tantamount to a breach, the *consequences* of rejection – the remedies available for the "breach" -- represent an alteration to the filed rate. That is even more apparent in this case, in which FES seeks retroactive rejection of the ICPA while continuing to resell the applicable offtake, thereby plainly modifying the filed rates.

In sum, FES is required to involve FERC and it must satisfy the public interest standard. But it cannot.

## III. CONCLUSION

For all of the reasons stated above, the Indicated ICPA Sponsors request that FERC require that FES seek FERC permission to reject its obligations under the ICPA, and review any such FES effort to reject the ICPA under the contractually mandated public interest standard.

Respectfully submitted,

Ariane S. Johnson
Associate General Counsel
Duke Energy
1000 E. Main Street
Plainfield, IN 46168
(317) 838-1035
Ariane.johnson@duke-energy.com

*/s/ Noel Symons*
Noel Symons
Colin Francis
McGuireWoods LLP
2001 K Street N.W.
Suite 400
Washington, DC 20006-1040
(202) 857-2929

9

Nsymons@mcguirewoods.com

*Counsel for Duke Energy Ohio, Inc.*

Robert E. Heidorn
P. Jason Stephenson
Vectren Corporation
One Vectren Square
211 NW Riverside Drive
Evansville, IN 47708
Telephone: (812) 491-4093
jstephenson@vectren.com
rheidorn@vectren.com

*Counsel for Vectren Corporation,
on behalf of Southern Indiana Gas
and Electric Company*

Jessica A. Cano
American Electric Power Service
Corporation
1 Riverside Plaza
Columbus, Ohio 43215
614-716-2921
jacano@aep.com

*Counsel for American Electric
Power Service Corporation, on
behalf of Appalachian Power
Company, Indiana Michigan Power
Company and Ohio Power Company*

Dated: April 27, 2018

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this motion and comments via email upon each person designated in the official service list compiled by the Secretary in this proceeding. Dated at Washington, D.C., April 27, 2018.

*/s/ Noel Symons*
Noel Symons
McGuireWoods LLP
2001 K Street N.W.
Suite 400
Washington, DC 20006-1040
(202) 857-2929
Nsymons@mcguirewoods.com

11

Document Content(s)

Comments of the Indicated ICPA Sponsors.PDF..........................1-11

<u>**Judicial Notice DJ-14**</u>

***Motion to Intervene and Protest of the Ad Hoc Group of Bruce Mansfield Certificateholders***, **filed in the FERC Proceeding on April 30, 2018**

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION


**Ohio Valley Electric Corporation**

        **v.**                                        **Docket No. EC18-135-000**

**First Energy Solutions Corp.**


## MOTION TO INTERVENE AND PROTEST OF THE AD HOC
## GROUP OF BRUCE MANSFIELD CERTIFICATEHOLDERS

The Ad Hoc Group of Bruce Mansfield Certificateholders (the "Mansfield

Certificateholders") moves to intervene in the above-captioned proceeding and protests the

complaint filed by Ohio Valley Electric Corporation ("OVEC") on March 26, 2018

(the "Complaint") under Section 306 of the Federal Power Act (the "FPA")[1] against FirstEnergy

Solutions Corp. ("FES").  In the Complaint, OVEC asks that the Commission (1) find that FES's

anticipated breach of its obligations under the Inter-Company Power Agreement (the "ICPA"),

under which FES purchases a portion of the output of two power plants owned and operated by

OVEC, violates FES's obligations under the ICPA and (2) determine that permitting FES to

terminate its obligations under the ICPA would be contrary to the public interest in violation of

the *Mobile Sierra* doctrine.[2]  In the alternative, OVEC asks that the Commission (1) declare that

it has exclusive jurisdiction to ascertain whether FES's anticipatory breach of its purchase

obligations under the ICPA is a matter exclusively within FERC's jurisdiction and would be

contrary to the public interest, or, (2) if the Commission determines that it lacks such exclusive

---

[1]      16 U.S.C. § 825e (2017).

[2]      Based on the copy of the ICPA attached to the Complaint, it appears that FirstEnergy Generation Corp. ("FG"), rather than its parent company, FES, is a party to the ICPA.

jurisdiction, initiate proceedings to ascertain whether terminating FES's purchase obligations under the ICPA would be contrary to the public interest (and advise the bankruptcy court both of its intention to make such a determination and of its ultimate conclusions).

## I.    Background

### *FES and certain of its subsidiaries filed for bankruptcy and moved to reject the ICPA and the Lease Agreements.*

On March 31, 2018, shortly after OVEC filed the Complaint (and as the Complaint anticipated), FES and certain of its subsidiaries (collectively, the "Debtors"), filed petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the U.S. Bankruptcy Court for the Northern District of Ohio, Eastern Division (the "Bankruptcy Court"). The Debtors' chapter 11 cases are jointly administered under Case No. 18-50757. Among a number of motions filed in the Debtors' chapter 11 cases, the Debtors filed a motion to reject the ICPA [Bankr. Docket No. 44].

### *The Lease Agreements were part of a 2007 sale-and-leaseback transaction.*

On April 1, 2018, the Debtors also filed a motion [Bankr. Docket No. 64] to reject certain "Lease Agreements" related to the "Bruce Mansfield Plant," which is an approximately 2,490 MW, three-unit, coal-fired power plant located in Shippingport, Pennsylvania, that is operated by FES's subsidiary, FG.[3] The Lease Agreements were entered into as part of a 2007 sale-and-leaseback transaction relating to a 93.825% undivided interest in Unit 1 of the Bruce Mansfield Plant. Approximately 85% of the financing for the sale-leaseback was provided through a public

---

[3]    The characterization of the Lease Agreements (including whether the Lease Agreements represent "true leases" or financings, and whether the property covered thereby is real or personal property) is the subject of significant dispute in the Debtors' chapter 11 cases. Nothing herein should be construed as an admission by the Mansfield Certificateholders concerning the characterization of the Lease Agreements or the property covered thereby.

2

offering of pass-through trust certificates sold to qualified buyers (the "Pass-Through Trust Certificates").

> ### *The Mansfield Certificateholders are one of the Debtors' largest creditor constituencies.*

The Pass-Through Trust Certificates represent interests in a Pass-Through Trust that is entitled to debt payments from certain trusts established in the 2007 sale-leaseback transaction; these debt payments are secured by, among other things, the 93.825% undivided interest in Unit 1 and rights against FG under the Lease Agreements and related documents. In addition, FES has issued guarantees of FG's obligations under the Facility Leases and certain other related agreements for the benefit of certain parties, including the Mansfield Certificateholders.

The individual Mansfield Certificateholders are various financial institutions and other investors who hold Pass-Through Trust Certificates. The aggregate principal currently outstanding on the Pass-Through Trust Certificates is $769 million; this amount, together with other potential claims that the Mansfield Certificateholders and other holders of Pass-Through Trust Certificates may be able to assert, represent one of the largest claims against Debtors' estate.

Accordingly, the Mansfield Certificateholders represent one of the largest constituencies in the Debtors' chapter 11 cases.

## II. Motion to Intervene

The Bankruptcy Code contains a mechanism to allocate fairly a debtor's limited assets in a single forum—*i.e.*, the Bankruptcy Court—among different creditors. But OVEC, as one of the Debtors' creditors, commenced a proceeding before this Commission to override the Bankruptcy Code regime and unfairly improve its position relative to other creditors, including the Mansfield Certificateholders. In other words, this proceeding threatens to affect negatively

3

the Mansfield Certificateholders' rights. Therefore, the Mansfield Certificateholders have an interest in this proceeding that warrants intervention under Rule 214(b)(2)(ii) of the Commission's Rules of Practice and Procedure.[4] No other party adequately represents this interest. As such, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure[5] and the Commission's March 28, 2018 Notice of Complaint and April 16, 2018 Notice Extending Due Date for Answers, Interventions, and Protests, the Mansfield Certificateholders hereby move to intervene.

### III.    Protest

The Mansfield Certificateholders herby protest the Complaint and respectfully request that the Commission deny all of the relief sought by OVEC. Because the Mansfield Certificateholders expect that FES will answer the Complaint and provide ample reasons why it should be denied, there is no need to state them here. In short, the Debtors' rejection of the ICPA represents a breach of that contract, rather than termination or change to the rates, terms, or conditions under that contract, such that it does not trigger review under the FPA, including any review under the "public interest" standard.[6] Specifically, the Mansfield Certificateholders wish to address two issues that are particularly important to them.

**First**, granting the Complaint could potentially lead to the unfair result of the Bankruptcy Court not authorizing rejection of the ICPA, which could make OVEC a super-priority creditor.

---

[4]    18 C.F.R. § 385.214(b)(2)(ii) (2017).

[5]    18 C.F.R. §§ 385.211 and 385.214.

[6]    This is consistent with the Commission's action in *Cal. Oversight Bd. et al. v. Calpine Energy Servs.*, 114 FERC ¶ 61,003 at P 11 (2006) (holding that "the Commission is precluded from taking action under the FPA that impacts a debtor's ability to reject an executory contract"). Of course, should the Bankruptcy Court request it (which we believe it should not), the Commission could provide assistance to the Bankruptcy Court in its efforts to determine whether to grant the Debtors' motion to reject the ICPA.

4

That would undermine the essence of the Bankruptcy Code, which is to create a mechanism to resolve in an orderly fashion both debtor-creditor and intercreditor disputes, placing counterparties to the Debtors' burdensome prepetition contracts on equal footing with other unsecured creditors. In other words, the Bankruptcy Code's protections exist for the benefit of debtors and creditors alike. But OVEC—which is undeniably a general unsecured creditor—is attempting to scramble that scheme and gain an improper advantage over other general unsecured creditors by imposing conditions on the Debtors' ability to use their business judgment in rejecting an economically untenable contract. That is fundamentally unfair to the Mansfield Certificateholders and other creditors.

It is not as though OVEC has any other interest here. The only reason OVEC rushed into the Commission with the Complaint was to cut in line ahead of all other general unsecured creditors. That is surely not what either the Bankruptcy Code or the FPA authorizes or even intends. And OVEC cites no law suggesting otherwise.

**Second**, any attempt by the Commission to exercise jurisdiction over the rejection of the ICPA would interfere with the orderly disposition of the Debtors' chapter 11 cases. A key aspect of the Bankruptcy Code's carefully calibrated regime is a debtor's "vital" and "fundamental" right to reject burdensome executory contracts. *Leasing Serv. Corp. v. First Tenn. Bank N.A.*, 826 F.2d 434, 436 (6th Cir. 1987). Here, the Debtors have demonstrated to the Bankruptcy Court that the ICPA is harmful to their business and over its remaining term would drain $268 million from their bankruptcy estates, a claim that OVEC cannot seriously dispute. That would obviously damage the Debtors and their stakeholders. Indeed, the Debtors have already exercised their right to reject many contracts, including those with the Mansfield Certificateholders.

5

Apart from being legally unsupportable, OVEC's strategy would jeopardize the Debtors' restructuring and have real-world consequences: it would affect thousands of employees, millions of customers, and holders of billions of dollars of debt. The various competing interests need to be resolved in a single forum that is especially designed for that purpose—the Bankruptcy Court. As a practical matter, there cannot be concurrent jurisdiction in the Bankruptcy Court and FERC because imposing the "public interest" standard on the Debtors' rejection of the ICPA would be inconsistent with the Bankruptcy Court's application of the deferential Bankruptcy Code rejection standard, which looks to the soundness of the Debtors' business judgment and is undoubtedly satisfied with respect to the proposed rejection of the ICPA. As a result, the Bankruptcy Court should have exclusive jurisdiction to resolve this dispute.

The Commission need not make any finding about the interplay between the Bankruptcy Code and the Federal Power Act in the context of power purchase agreements. Instead, the Commission need only decide that, based on the facts of this case, the Debtors' rejection of the ICPA does not change the rates, terms, or conditions under any Commission-jurisdictional power contract and therefore does not require Commission review.[7]

*[Continued on the following page.]*

---

[7] Even if the Commission were to find that rejection of the ICPA constitutes a change to any "filed rate" and therefore merits Commission review under the "public interest" application of the FPA's "just and reasonable" standard, the Commission should find that rejection meets that standard. However, any review by the Commission under that standard has the potential of delaying resolution of the Debtors' chapter 11 cases. Accordingly, the Commission should refrain from any attempt to exercise jurisdiction over rejection of the ICPA.

## IV.    Conclusion

For the reasons set forth above, the Mansfield Certificateholders respectfully request that the Commission grant their motion to intervene in this proceeding and deny the relief requested by OVEC in its Complaint.

Respectfully submitted,

*/s/ Hugh E. Hilliard*
Hugh E. Hilliard
O'Melveny & Myers LLP
1625 Eye St., NW
Washington, DC  20006
(202) 383-5109
hhilliard@omm.com

-and-

George A. Davis
Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200
george.davis@lw.com

*Counsel for*
*the Ad Hoc Group of Bruce Mansfield*
*Certificateholders*

Dated:  April 30, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served copies of the foregoing document upon each

person designated on the official service list as compiled by the Secretary in this proceeding.

Dated at Washington, DC on this 30th day of April, 2018.


*/s/ Hugh E. Hilliard*
Hugh E. Hilliard

O'Melveny & Myers LLP
1625 Eye St., NW
Washington, DC  20006
(202) 383-5109
hhilliard@omm.com

**<u>Judicial Notice DJ-15</u>**

***Motion to Intervene of the Office of the Ohio Consumers' Counsel Under EL18-135**, filed in the FERC Proceeding on April 30, 2018*

Submission Description: (doc-less) Motion to Intervene of the Office of the Ohio Consumers' Counsel under EL18-135-000.

Submission Date:       4/30/2018 3:59:03 PM

Filed Date:            4/30/2018 3:59:03 PM

Dockets
-------
EL18-135-000         Complaint or, In the Alternative, Request for Declaratory Order

Filing Party/Contacts:

| Filing Party | Signer (Representative) | Other Contact (Principal) |
| ------------ | ----------------------- | ------------------------- |
| Ohio Consumers' Counsel | kevin.moore@occ.ohio.gov | bryce.mckenney@occ.ohio.gov |

Basis for Intervening:
The Office of the Ohio Consumers' Counsel ("OCC") is the authorized representative of approximately 4.5 million Ohio residential utility customers, per Ohio R.C. Chapter 4911. The OCC routinely participates in state and federal regulatory proceedings, and represents Ohio residential energy consumers located within the PJM Interconnection, LLC region.

Ohio's residential utility consumers may be impacted by a complaint of the Ohio Valley Electric Corporation ("OVEC") against FirstEnergy Solutions Corp. ("FES"), filed at the Federal Energy Regulatory Commission. OVEC claims in its complaint that the remaining owners and their customers could potentially pay "hundreds of millions of dollars" over the remaining life of the contract, if FES breaches the Inter-Company Power Agreement between OVEC, FES, and several other companies. (OVEC Complaint at 2, 28). These additional charges would be particularly harmful for Ohio's residential consumers because the Public Utilities Commission of Ohio has to date authorized above-market charges (subsidies) collected from monopoly local distribution customers to subsidize these OVEC generation facilities.

OCC seeks to intervene to protect Ohio's residential customers. The OCC has a direct and material interest in the outcome of the proceeding. That interest cannot be represented adequately by another party. OCC's participation would enable it to protect the interests of Ohio's residential customers. This intervention is timely filed. As such, OCC's intervention is in the public interest. OCC respectfully requests that it be granted intervention, allowing it to have all rights belonging to a party.

file://kirkland.com...[illegible] [11:59 PM]

<u>**Judicial Notice DJ-16**</u>

*Comments of the Office of the Ohio Consumers' Counsel*, filed in the FERC Proceeding on April 30, 2018

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Ohio Valley Electric Corporation, | ) | |
| | ) | |
| v. | ) | Docket No. EL18-135-000 |
| | ) | |
| FirstEnergy Solutions Corp., | ) | |
| | ) | |

---

**COMMENTS**
**OF**
**THE OFFICE OF THE OHIO CONSUMERS' COUNSEL**

---

Granting the complaint of the Ohio Valley Electric Corporation ("OVEC") will protect Ohio's monopoly consumers from funding additional and unnecessary subsidies for OVEC's power plants – potential subsidies that OVEC claims would amount to hundreds of millions of dollars in total for all affected states. In its March 26, 2018 complaint, OVEC asked the Federal Energy Regulatory Commission ("FERC") to find that the then-anticipated intent of FirstEnergy Solutions ("FES") to declare bankruptcy and seek rejection of the OVEC Inter-Company Power Agreement ("ICPA" or "OVEC Agreement") would amount to a violation of the filed-rate doctrine and would be inconsistent with the public interest.

The Office of the Ohio Consumers' Counsel ("OCC") has opposed making Ohio electric consumers subsidize OVEC's power plants under the ICPA between OVEC, FES, and other OVEC owners (or their utility-company affiliates). Consistent with OCC's consumer protection position against power plant subsidies for OVEC, OCC supports OVEC's Complaint. Granting the Complaint should stop an effort by FES to reject or

breach the ICPA through bankruptcy. That FES effort could result in a possible shift -- to Ohio monopoly consumers of AEP, Duke and DP&L – of the OVEC power plant costs now borne by FES. It has been estimated that FES is losing $12 million per year under the ICPA, and is expected to lose $268 million over the remaining 22 years left on the OVEC Agreement.[1]

The public interest requires that the ICPA be enforced against FES. To release FES of its obligation to pay for 4.85% of OVEC's two aging coal plants would be significantly worse for other Ohio monopoly consumers than requiring FES to honor its contractual obligations. While OCC would support a FERC determination allowing each of Ohio's utilities to leave the OVEC Agreement without further cost to Ohio consumers, allowing just FES to leave could drive up costs on the captive customers of Ohio's other electric utilities.[2] Letting FES off the hook for these costs, a risk FES voluntarily assumed, could result in shifting a significant portion of FES' share of hundreds of millions of dollars in current operating and capital costs, future decommissioning costs, and pension costs to other Ohio monopoly consumers. OCC, the agency with the statutory authority to represent residential consumers in Ohio, seeks by these Comments

---

[1] *In re FirstEnergy Solutions Corp., et al.*, Case No. 18-50757, Motion for Entry of an Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement with the Ohio Valley Electric Corporation as of the Petition Date (Filed April 1, 2018) at 2.

[2] The PUCO has directed AEP, Duke Energy Ohio, and DP&L to pursue divestiture or transfer of their OVEC entitlements. *In re The Dayton Power and Light Co*., Case No. 13-2420-EL-UNC (Sep. 17, 2014) at Paragraph 31; *In re The Dayton Power and Light Co*., Case No. 16-395-EL-SSO (Oct. 20, 2017) at 11; *In re Ohio Power Company,* Case No. 13-2385-EL-SSO, et al., Opinion and Order at 26-27 (Feb. 25, 2015); *In re Ohio Power Company*, Case No. 12-1126-EL-UNC, Finding and Order (Oct. 27, 2012), Entry on Rehearing (April 24, 2013); *In re Columbus Southern Power Company and Ohio Power Company,* Case No. 11-346-EL-SSO, et al., Opinion and Order 59-60 (Aug. 28, 2012), Entry on Rehearing at 61-65 (Jan. 30, 2013); *See In the Matter of the Application of Duke Energy Ohio for Authority to Establish a Standard Service Offer Pursuant to R. C. 4928.143, in the Form of an Electric Security Plan, Accounting Modifications and Tariffs for Generation Service*, PUCO Case No. 14-841-EL-SSO et al., Opinion and Order at 48 (Apr. 2, 2015).

2

to protect the interests of the Ohio residential consumers from any unintended adverse effects of FERC's ruling in this proceeding.

## A. BACKGROUND

By its Complaint in this docket, OVEC seeks to obtain a FERC ruling that FES is obligated to pay for its contractual share of the costs incurred by OVEC under the ICPA.[3] OVEC states that FirstEnergy's anticipated breach of the ICPA would terminate FirstEnergy's purchase obligation under the contract and thus violate the filed-rate doctrine.[4] OVEC also argues that it has already been harmed by the anticipated breach because its credit rating has been downgraded due to concerns that FES would declare bankruptcy and reject the OVEC Agreement.[5] OVEC states that rejection of the OVEC Agreement in bankruptcy court would require a change in the filed rate to ensure that OVEC still can recover all its costs. What this means is that OVEC's costs would be allocated to other owners, shifting hundreds of millions of dollars to other customers (which is an outcome OCC would oppose).[6]

OVEC states that the U.S. District Court for the Southern District of New York recently denied rejection of a FERC-jurisdictional power supply contract in bankruptcy. In that ruling the court rejected the contract because it would have directly interfered with FERC's exclusive authority over interstate sales of electricity. The court also found it to be a collateral attack on the filed rate.[7] If FERC were to decline to act on this allegation, OVEC seeks alternative relief in the form of a declaratory ruling that the FERC has

---

[3] Complaint at 1.

[4] Complaint at 1-2.

[5] Complaint at 9.

[6] Complaint at 2.

[7] Complaint at 2-3.

3

exclusive jurisdiction over the ICPA and that FES' withdrawal from the ICPA would be contrary to the public interest.[8]  OVEC set forth a third alternative as well, requesting that if FERC finds it does not have exclusive jurisdiction over the ICPA, then it should declare that rejection of the ICPA in bankruptcy would not be in the public interest.[9] Subsequent to the filing of the Complaint, FES filed for bankruptcy on March 31, 2018.

OVEC represents in its filing that it owns two coal-fired generating power plants, the Kyger Creek plant in Ohio and the Clifty Creek plant in Indiana, with a combined capacity of approximately 2,400 Megawatts ("MW").[10] OVEC's owners or their utility company affiliates ("Sponsoring Companies") furnish electric service in the Ohio River valley area.[11] OVEC initially entered into the ICPA with the Sponsoring Companies, providing for the sale to them of any power and energy not used by DOE or its predecessors.[12] Since DOE's termination of its purchase agreement in 2003, OVEC has been selling all of the power from its plants to its owners/affiliates.[13] Those owners include FirstEnergy Solutions, an affiliate of several Ohio-jurisdictional utilities that include Ohio Edison Company, Toledo Edison Company, and Cleveland Electric Illuminating Company (collectively "FirstEnergy Operating Companies").[14]  FES owns a 4.85% share in the OVEC resources and energy.[15] Additional Ohio-jurisdictional utilities that own shares in OVEC include Ohio Power, an American Electric Power ("AEP")

---

[8] Complaint at 3.

[9] *Id.*

[10] Complaint at 5.

[11] *Id.*

[12] Complaint at 5.

[13] *Id.*

[14] Complaint at 6.

[15] Complaint at 6.

4

affiliate, which owns a 19.93% share of these resources; Duke Energy Ohio, which owns a 9% share in the OVEC resources; and Dayton Power and Light Company ("DP&L"), which owns a 4.9% share in the OVEC resources.[16] OCC collectively refers to these utilities, including the FES affiliates named above, as "the Ohio Utilities."

## B. COMMENTS

### 1. FERC Should Find that FES' Rejection of the ICPA in Bankruptcy Would Be Contrary to the Public Interest Because It May Shift Hundreds of Millions of Dollars in FES' Share of Operating Expenses, Future Decommissioning Costs, and Pension Costs to Other Ohio Monopoly Consumers.

OVEC is quite clear in the Complaint that if FES is allowed to reject the ICPA in bankruptcy, OVEC would seek modifications of the ICPA to allow it to recover FES' share of costs from other owners. Any shift in the costs currently paid by FES under the ICPA to other Sponsoring Companies could result in the imposition of more than 33% of those costs on Ohio retail consumers given the current ownership shares of the Ohio Utilities in OVEC. The Public Utilities Commission of Ohio ("PUCO") has approved for DP&L,[17] Ohio Power[18] and Duke Energy Ohio[19] retail rate riders that allow them to

---

[16] *Id.*

[17] *In the Matter of the Application of the Dayton Power and Light Company to Establish a Standard Service Offer in the Form of an Electric Security Plan,* Case No. 16-395-EL-SSO, Opinion and Order (October 20, 2017).

[18] *See In the Matter of the Application of Ohio Power Company for Authority to Establish a Standard Service Offer Pursuant to R. C. 4928.143, in the Form of an Electric Security Plan*, PUCO Case No. 13-2385-EL-SSO *et al.*, Opinion and Order at 25 (Feb. 25, 2015) (approving a retail rate rider placeholder for Ohio Power), available at http://dis.puc.state.oh.us/DocumentRecord.aspx?DocID=681f956b-e3c8-45cd-b6a2-1d8391fc46e0; *see also* Ohio Power Application in that docket, available at http://dis.puc.state.oh.us/DocumentRecord.aspx?DocID=2b291c32-e9ff-4db5-b954-4a6aab9561f6; *see also In the Matter of the Application Seeking Approval of Ohio Power Company's Proposal to Enter into an Affiliate Power Purchase Agreement for Inclusion in the Power Purchase Agreement Rider, and In the Matter of the Application of Ohio Power Company for Approval of Certain Accounting Authority,* PUCO Case Nos. 14-1693-EL-RDR and 14-1694-EL-AAM (amending the application for a retail rate rider to include OVEC costs under the ICPA), available at http://dis.puc.state.oh.us/DocumentRecord.aspx?DocID=b631efde-65e7-4d63-a62d-32bf5aa0aa6e; *see also* PUCO Finding and Order (April 4, 2018) (approving a retail rate rider for Ohio Power for recovery of the

5

collect from their Ohio retail customers all of the costs associated with the OVEC power plants that are not collected from revenues OVEC earns on the sale of the energy and capacity from these units into the PJM wholesale markets. OVEC holds market-base rate authority from FERC to make these sales into the PJM markets.[20] The PUCO-approved retail rate riders allowing the Ohio Utilities to bill or credit Ohio retail consumers for the difference between the PJM market prices for the OVEC power and the costs of the resources paid to OVEC by the Sponsoring Companies under the ICPA.

FERC should note that OVEC states in the filing that "if the Commission failed to intercede, the result would necessitate a change to the filed rate reflected in the ICPA, a potential increase in costs to OVEC's other customers, and in some cases resultant higher consumer rates, all in the amount of hundreds of millions of dollars over the remaining life of the contract."[21] OCC does not agree that the ICPA would allow an automatic shift in costs to OVEC's other owners and the retail consumers they serve if FES were successful in rejecting the ICPA in bankruptcy.

The ICPA provides in Section 8.04 that the obligation of each Sponsoring Company to pay shall not be reduced regardless of any claims.[22] Section 9.12 explicitly excludes a Sponsoring Company's financial and economic condition from the definition

---

OVEC costs under the ICPA), available at
http://dis.puc.state.oh.us/TiffToPDf/A1001001A18D04B41249H00606.pdf.

[19] *See In the Matter of the Application of Duke Energy Ohio for Authority to Establish a Standard Service Offer Pursuant to R. C. 4928.143, in the Form of an Electric Security Plan, Accounting Modifications and Tariffs for Generation Service*, PUCO Case No. 14-841-EL-SSO et al., Opinion and Order at 46-47 (Apr. 2, 2015) (approving a placeholder rider for Duke Energy Ohio to seek future recovery of OVEC-related costs under the ICPA), available at http://dis.puc.state.oh.us/DocumentRecord.aspx?DocID=ff5ba1de-2f6e-4c1d-92a7-b1803e4a932e; *see also* DEO Application in that Docket, available at http://dis.puc.state.oh.us/DocumentRecord.aspx?DocID=c2288a6c-ecc5-4814-8ee2-b8ed817c9c21.

[20] *Ohio Valley Electric Corporation*, 154 FERC ¶ 61,238 (2016).

[21] Complaint at 2.

[22] Complaint, Attachment A, Amended and Restated Inter-Company Power Agreement, Section 8.04.

of Force Majeure.[23]  And Section 11.02 states that the obligation to pay remains absolute

and unconditional even in the event of default.[24]  These provisions make it clear that the

ICPA does not contemplate at this time allowing any owner to shed its obligation to pay

for its share of the costs associated with the Kyger Creek and Clifty Creek generation

facilities. Moreover, the ICPA contains no other provision that would allow the shift of

those costs to other Sponsoring Companies, as there is no joint and several liability.[25]

These provisions are explicit. FES cannot default on its obligations under the

ICPA. To allow FES to default by rejecting the ICPA in bankruptcy would raise serious

concerns about shifting to Ohio monopoly consumers the financial risk that FES (and the

Ohio Utilities) voluntarily assumed. Shifting the financial risk of a market-regulated

entity to captive retail consumers is inconsistent with FERC's objective of facilitating the

development of competitive wholesale markets. In competitive markets, suppliers and not

consumers bear those costs for deregulated unprofitable affiliate ventures.[26]  FERC

should grant the relief sought by OVEC in the Complaint. And FERC should declare that

rejection of the ICPA in bankruptcy would be contrary to the public interest.

---

[23] Complaint, Attachment A, Section 9.12.

[24] Complaint, Attachment A, Section 11.02.

[25] Complaint, Attachment A, Section 9.11.

[26] *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719 at P 1, FERC Stats. & Regs. ¶ 31,281 (2008) ("National policy has been, and continues to be, to foster competition in wholesale electric power markets."), *order on reh'g*, Order No. 719-A, FERC Stats. & Regs. ¶ 31,292; *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).   The Commission also stated that "Effective wholesale competition protects consumers by providing more supply options, encouraging new entry and innovation, spurring deployment of new technologies, promoting demand response and energy efficiency, improving operating performance, exerting downward pressure on costs, *and shifting risk away from consumers*." Order No. 719 at P 1 (emphasis added).

2. **Any Effort by OVEC to Seek Modification of the ICPA Would Require the Prior Approval of FERC and a Finding that the Resulting Rates are Just and Reasonable for Ohio Retail Consumers.**

OVEC's expressed intent to shift the costs currently being paid by FES to other owners would require a renegotiation of the ICPA to increase each remaining owner's share of the entitlements. It is an action that would require prior FERC authorization. Section 201 of the Federal Power Act ("FPA") provides FERC jurisdiction over wholesale power contracts. The ICPA is a power sales agreement that requires OVEC's owners to pay the full costs of the Kyger Creek and Clifty Creek generating facilities.

Section 35.39 of the FERC's regulations prohibits "[a]s a condition of obtaining and retaining market-based rate authority" all wholesale sales of electric energy or capacity "between a franchised public utility with captive customers and a market-regulated power sales affiliate *without first receiving Commission authorization* for the transaction under section 205 of the Federal Power Act. Section 35.44 also states that "[n]o wholesale sale of electric energy may be made between a franchised public utility with captive customers and a market-regulated power sales affiliate without first receiving FERC authorization for the transaction under section 205 of the Federal Power Act."

Ohio Power's 19.93% ownership share in OVEC makes it an affiliate of OVEC. Section 35.43(a)(1)(i)(A) of FERC's affiliate restriction regulations define an affiliate as "[a]ny person that directly or indirectly owns, controls, or holds with power to vote, 10 percent or more of the outstanding voting securities of the specified company."[27]  While

---

[27]  18 CFR § 35.43(a)(1)(i)(A).

8

Ohio Power clearly falls within this definition, OVEC's other owners do not necessarily escape a finding that they too may be found to be affiliates of OVEC. Section 35.43(a)(1)(i)(E) states that "[f]or purposes of paragraph (a)(1)(i) of this section, owning, controlling or holding with power to vote, less than 10 percent of the outstanding voting securities of a specified company creates a rebuttable presumption of lack of control."[28] That rebuttable presumption can be challenged in a hearing.

Moreover, subsection (a)(1)(i)(C) of that regulation includes within the definition of an affiliate "[a]ny person or class of persons that the Commission determines, after appropriate notice and opportunity for hearing, to stand in such relation to the specified company that there is liable to be *an absence of arm's-length bargaining in transactions between them* as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the person be treated as an affiliate."[29] There is no doubt that any effort by OVEC to renegotiate the ICPA would not be an arms-length transaction. Such a transaction could result in the shifting of FES' share of costs under the contract to the remaining OVEC owners. Several of those owners (AEP, Duke and DP&L) have captive retail customers in Ohio and have non-bypassable retail riders (approved by the PUCO) that allow them to charge their captive Ohio retail customers for OVEC costs. Thus, it is likely that FES, Duke Energy Ohio and DP&L would be found to fall within the definition of "affiliate" notwithstanding that their ownership shares in OVEC fall below the ten percent threshold.

DP&L, Ohio Power, and Duke Energy Ohio are franchised public utilities with captive customers notwithstanding Ohio's retail choice laws. FERC ruled in the *EPSA v.*

---

[28] 18 CFR § 35.43(a)(1)(i)(E).

[29] 18 CFR § 35.43(a)(1)(i)(C) (emphasis added).

*AEP Generation Resources and Ohio Power Company*[30] that the non-bypassable charges associated with the affiliate power purchase agreements effectively make Ohio retail consumers captive for purposes of cost recovery because of the Ohio retail rate riders. The fact that DP&L and Ohio Power charge all customers in the form of the Ohio retail rate riders effectively make Ohio retail customers captive for purposes of the OVEC contract. Under FERC's affiliate restriction regulations these franchised public utilities with captive customers must obtain prior FERC approval of any contract with a market-regulated affiliate like OVEC.[31] Thus, the ICPA falls within the affiliate restriction regulations, requiring prior FERC approval for any changes to the OVEC Agreement.

In any order issued in this proceeding, FERC should clarify that it is not prejudging issues regarding contract interpretation and cost recovery under the ICPA. OVEC's complaint on the surface appears limited to a request for a ruling stating that rejection of the ICPA by FES in bankruptcy proceedings would be contrary to the public interest. But OCC is concerned that OVEC, one of its owners, or another stakeholder might interpret such a ruling as a finding that FES' rejection of the ICPA in bankruptcy would require a reallocation of costs previously borne by FES to the remaining owners of OVEC.

Such interpretations about shifting costs would require a separate proceeding. It would be determined in that separate proceeding whether the ICPA allows for a shift in costs to other owners upon the default of one owner, whether the new rate is just and

---

[30] *EPSA v. AEP Generation Resources and Ohio Power Company,* 155 FERC ¶ 61,102 (2016).

[31] *Id.* at P 57  (finding that Ohio Power's "retail ratepayers are nonetheless captive in that they have no choice as to payment of the non-bypassable generation-related charges incurred under the Affiliate PPA."). Note that Ohio Power, Duke Energy Ohio and Dayton Power & Light all retained their entitlements under the ICPA rather than selling or transferring them to their unregulated market affiliates, such as AEP Generation Resources or DPL Inc.

reasonable, and whether the ICPA is even viable in the wake of a sponsoring company being able to avoid its obligation for payments thereunder.

OVEC provided no evidence in its Complaint on which FERC could make the required determinations. OCC requests that FERC clarify in any ruling that it does not predetermine the outcome of an investigation as to (a) whether the ICPA would remain a viable contract if one owner is allowed to reject that agreement in bankruptcy; (b) whether the ICPA would allow for the allocation of the costs previously borne by one owner to the remaining owners in the event of the default or rejection of the agreement; (c) whether FES' rejection of the ICPA in bankruptcy would require renegotiation of a revised ICPA and the filing of the revised ICPA with FERC; and (d) whether a shift of FES' share of costs under the ICPA to the remaining owners would result in just and reasonable rates for the captive consumers served by OVEC's owners due to the involved subsidy payments.

## C.    CONCLUSION

The Office of the Oho Consumers' Counsel respectfully requests that FERC grant OVEC's Complaint for the limited purpose of finding that an FES rejection of the ICPA in bankruptcy would be contrary to the public interest. FERC should clarify in any ruling that it does not at this time reach in its holding any issue involving interpretation of the ICPA. FERC should not now reach issues involving the shifting of FES's costs (ultimately to captive consumers) under the ICPA regarding any costs previously allocated to FES. That issue of cost shifting to captive consumers could arise in the event of FES' successful rejection of the ICPA in bankruptcy proceedings.  There also may be other consumer issues that could arise if FES obligations under the ICPA are rejected in bankruptcy court. Such issues should be heard later and not be reached now by FERC.

11

Respectfully submitted,

BRUCE WESTON
OHIO CONSUMERS' COUNSEL

*/s/ Kevin F. Moore*
Kevin F. Moore, (0089228)
Counsel of Record
Bryce McKenney, (0088203)
Assistant Consumers' Counsel

**Office of the Ohio Consumers' Counsel**
65 East State Street, 7th Floor
Columbus, Ohio 43215
(614) 387-2965 – Telephone (Moore)
(614) 466-9585 – Telephone (McKenney)
(614) 466-9475 – Facsimile
Kevin.moore@occ.ohio.gov
April 30, 2018        Bryce.mckenney@occ.ohio.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each

person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Columbus, Ohio this 30th day of April 2018.

/s/ Kevin F. Moore
Kevin F. Moore,
Counsel of Record
Bryce McKenney,
Assistant Consumers' Counsel

**Office of the Ohio Consumers' Counsel**
65 East State Street, 7th Floor
Columbus, Ohio 43215
(614) 387-2965 – Telephone (Moore)
(614) 466-9585 – Telephone (McKenney)
(614) 466-9475 – Facsimile
Kevin.moore@occ.ohio.gov
Bryce.mckenney@occ.ohio.gov

## <u>Judicial Notice DJ-17</u>

**Consent Decree, dated March 18, 2005 (*United States v. Ohio Edison Co.*, No. 2:99-cv-01181-EAS-TPK (S.D. Ohio), Dkt. No. 429)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No: 2:99-CV-1181 |
| | ) | JUDGE EDMUND A. SARGUS, JR. |
| | ) | |
| OHIO EDISON COMPANY and PENNSYLVANIA | ) | |
| POWER COMPANY, subsidiary of Ohio Edison, | ) | |
| | ) | |
| Defendants. | ) | |

<u>CONSENT DECREE</u>

March 18, 2005

**EXHIBIT DJ-017**

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE ........................................................................ 2

II. APPLICABILITY ........................................................................................... 3

III. DEFINITIONS ............................................................................................... 3

IV. NO$_X$ EMISSION REDUCTIONS AND CONTROLS ...................................... 9

   A. NO$_X$ Emission Controls ............................................................................ 9

   B. Plant-Wide Annual Cap for NO$_X$ ............................................................ 15

   C. Interim NO$_X$ Emission Reductions ......................................................... 16

   D. Use of NO$_X$ Allowances ........................................................................ 16

   E. General NO$_X$ Provisions ........................................................................ 19

V. SO$_2$ EMISSION REDUCTIONS AND CONTROLS ...................................... 20

   A. SO$_2$ Emission Controls ......................................................................... 20

   B. Plant-Wide Annual and Monthly Caps for SO$_2$ .................................... 26

   C. SO$_2$ Interim Emission Reductions ......................................................... 27

   D. Surrender of SO$_2$ Allowances ............................................................... 28

   E. General SO$_2$ Provisions ......................................................................... 30

VI. PM EMISSION REDUCTIONS AND CONTROLS ........................................ 31

   A. Demonstration and Compliance with PM Emission Limit ......................... 31

   B. PM Monitoring ........................................................................................ 31

VII. SUBSTITUTION OF ECO TECHNOLOGY ................................................. 32

VIII. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED
CONTROLS ................................................................................................ 36

IX. ENVIRONMENTALLY BENEFICIAL PROJECTS ..................................... 37

X. CIVIL PENALTY ........................................................................................ 39

XI. RESOLUTION OF CLAIMS ....................................................................... 39

XII. PERIODIC REPORTING ............................................................................ 40

XIII. REVIEW AND APPROVAL OF SUBMITTALS .......................................... 42

XIV. STIPULATED PENALTIES ........................................................................ 42

XV. FORCE MAJEURE ..................................................................................... 46

XVI. DISPUTE RESOLUTION ............................................................................ 49

XVII. PERMITS .................................................................................................... 50

i

XVIII. INFORMATION COLLECTION AND RETENTION ...................................................... 52

XIX.   NOTICES.................................................................................................................... 53

XX.    SALES OR TRANSFERS OF OWNERSHIP INTERESTS........................................... 56

XXI.   EFFECTIVE DATE...................................................................................................... 57

XXII.  RETENTION OF JURISDICTION .............................................................................. 57

XXIII. MODIFICATION ......................................................................................................... 58

XXIV. GENERAL PROVISIONS ........................................................................................... 58

XXV.  SIGNATORIES AND SERVICE ................................................................................. 60

XXVI. PUBLIC COMMENT .................................................................................................. 60

XXVII. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT
        DECREE ..................................................................................................................... 61

XXVIII. FINAL JUDGMENT .................................................................................................. 62

<u>CONSENT DECREE</u>

WHEREAS, Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiffs-Intervenors, the States of New York, New Jersey and Connecticut ("States"), filed complaints or amended complaints for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, and Section 304(a) of the Act, 42 U.S.C. § 7604(a), alleging that Defendants, Ohio Edison Company and Pennsylvania Power Company, a subsidiary of Ohio Edison ("Ohio Edison"), which in turn is a subsidiary of FirstEnergy Corp. ("FirstEnergy"), undertook construction projects at major emitting facilities in violation of the Prevention of Significant Deterioration provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492, the New Source Review provisions of the Act, 42 U.S.C. §§ 7501-7515, and in violation of the federally approved and enforceable Ohio State Implementation Plan;

WHEREAS, in its Amended Complaint, the United States and the States ("Plaintiffs") allege, inter alia, that Ohio Edison failed to obtain the necessary permits and install the controls necessary under the Act to reduce its sulfur dioxide, nitrogen oxides, and/or particulate matter emissions;

WHEREAS, the Amended Complaint alleges claims upon which relief can be granted against Ohio Edison under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477;

WHEREAS, the United States and some or all of the States provided Ohio Edison and the State of Ohio with actual notice of Ohio Edison's alleged violations in accordance with Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1);

WHEREAS, on August 7, 2003, the United States District Court for the Southern District of Ohio, Eastern Division, issued an opinion in the liability phase of this matter holding that Ohio Edison failed to obtain pre-construction permits for eleven projects it undertook at its Sammis Plant; and further held that the projects were "major modifications" and that Ohio Edison had violated 42 U.S.C. § 7475 and associated regulations; but did not reach the remedy phase of the trial and did not address the level of air pollution controls or other remedies required, if any, or the level of impact, if any, to public health or the environment;

1

WHEREAS, there are unique difficulties associated with retrofitting SCRs and FGDs at the smaller units (Units 1-5) at the Sammis Plant, due to the location of the Sammis Plant between State Route 7 and the Ohio River to the east and steep terrain to the west, prior retrofitting of particulate emission control devices located on decking built over State Route 7, existing facilities to the north and south of the plant, and the close proximity between the seven Sammis Plant units, and the Parties have considered these circumstances and overall benefit to the environment in reaching agreement herein;

WHEREAS, the Clean Air Interstate Rule ("CAIR") was proposed on January 30, 2004 and a Supplemental Proposal was proposed on June 10, 2004 (69 Fed. Reg. 4,566 (Jan. 30, 2004); 69 Fed. Reg. 32,684 (June 10, 2004)); and CAIR was promulgated as a final rule on March 9, 2005, it is anticipated that under CAIR, other owners of electric generating units in affected areas also will reduce their emissions of $NO_X$ and $SO_2$;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length and that this Consent Decree is fair, reasonable, consistent with the goals of the Act, and in the public interest;

WHEREAS, the Parties have consented to entry of this Consent Decree without trial on remedy;

WHEREAS, the Parties have agreed that settlement of this action is in the best interest of the Parties and in the public interest, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter;

NOW, THEREFORE, without any admission of fact or law or concession of any liability on the part of Ohio Edison but solely for purposes of resolving this case, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c). Solely for the purposes of this Consent Decree and the underlying Complaint, Ohio Edison waives all objections and defenses that it may have to the Court's jurisdiction

2

over this action, to the Court's jurisdiction over Ohio Edison, and to venue in this District. The Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. For purposes of the Amended Complaints filed by the Plaintiffs in this matter and resolved by the Consent Decree, and for purposes of entry and enforcement of this Consent Decree, Ohio Edison waives any defense or objection based on standing as to the Plaintiffs. Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than the Parties to this Consent Decree. Except as provided in Section XXVI (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II.     APPLICABILITY

2.     Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the Plaintiffs and Ohio Edison and their successors and assigns, and upon Ohio Edison's officers, employees and agents solely in their capacities as such.

3.     Ohio Edison shall provide notice of and access to a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or other organization retained to perform any of the work required by this Consent Decree. Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, Ohio Edison shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree. In any action to enforce this Consent Decree, Ohio Edison shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless Ohio Edison establishes that such failure resulted from a Force Majeure Event, as defined in Paragraph 157.

## III.     DEFINITIONS

4.     "30-Day Rolling Average Emission Rate" shall be determined in accordance with 40 C.F.R. Part 60, subpart Da, except that in calculating all 30-Day Rolling Average Emission Rates Ohio Edison:

3

A.  shall include all emissions and Btus from startup and shutdown events from the time the unit is synchronized with a utility electric distribution system through the time that the unit ceases to combust fossil fuel and the fire is out in the boiler, except as provided by Subparagraph B or C;

B. may exclude emissions of $NO_X$ and Btus occurring during the fifth and subsequent Cold Start Up Period(s) that occur in any 30-Day period if inclusion of such emissions would result in a violation of any applicable 30-Day Rolling Average Emission Rate, and if Ohio Edison has installed, operated and maintained the SCR, ECO, or other approved $NO_X$ control technology in question consistent with good engineering practices.  A "Cold Start Up Period" occurs whenever there has been no fire in the boiler of a unit (no combustion of any fossil fuel) for a period of six hours or more.  The emissions to be excluded during the fifth and subsequent Cold Start Up Period(s) shall be the lesser of: (1) those $NO_X$ emissions emitted during the eight-hour period commencing when the unit is synchronized with a utility electric distribution system and concluding eight hours later; or (2) those emitted prior to the time that the flue gas has achieved the SCR operational temperature range as specified by the catalyst manufacturer; and

C.  may exclude $NO_X$ and $SO_2$ emissions and Btus occurring during any period of Malfunction as defined at 40 C.F.R.§ 60.2, provided Ohio Edison (1) makes reasonable best efforts to correct the Malfunction and (2) provides notice to the United States and the States in writing containing the information specified in Paragraph 158 of this Consent Decree as soon as practicable, but in no event later than fourteen (14) business days following the date Ohio Edison first knew or by the exercise of due diligence should have known of the Malfunction.

5.    "Additional Burger Plant $NO_X$ Reductions" shall be expressed as tons of $NO_X$ and calculated in accordance with the following procedure: first, sum the total mmBtu heat input for Burger Units 4 and 5 measured by the CEMS for the subject year; second, multiply the total mmBtu heat input for Burger Units 4 and 5 by 0.411 lbs/mmBtu; third, divide the total number of pounds of $NO_X$ for Burger Units 4 and 5 by 2,000 to calculate $NO_X$ tons for the subject year; fourth, subtract the sum of the total $NO_X$ tons for Burger Units 4 and 5 measured by the CEMS for the subject year.

4

6.  "Additional Burger Plant $SO_2$ Reductions" shall be expressed as tons of $SO_2$ and calculated in accordance with the following procedure: first, sum the total mmBtu heat input for Burger Units 4 and 5 measured by the CEMS for the subject year; second, multiply the total mmBtu heat input for Burger Units 4 and 5 by 3.45 lbs/mmBtu; third, divide the total number of pounds of $SO_2$ for Burger Units 4 and 5 by 2,000 to calculate $SO_2$ tons for the subject year; fourth, subtract the sum of the total $SO_2$ tons for Burger Units 4 and 5 measured by the CEMS for the subject year.

7.  "Additional Eastlake Plant $NO_X$ Reductions" shall be expressed as tons of $NO_X$ and calculated in accordance with the following procedure: first, sum the total mmBtu heat input for Eastlake Unit 5 measured by the CEMS for the subject year; second, multiply the total mmBtu heat input for Eastlake Unit 5 by 0.894 lbs/mmBtu; third, divide the total number of pounds of $NO_X$ for Eastlake Unit 5 by 2,000 to calculate $NO_X$ tons for the subject year; fourth, subtract the sum of the total $NO_X$ tons for Eastlake Unit 5 measured by the CEMS for the subject year.

8.  "Additional Mansfield Plant $SO_2$ Reductions" shall be expressed as tons of $SO_2$ and calculated in accordance with the following procedure: first, sum the total mmBtu heat input for Mansfield Units 1, 2 and 3 measured by the CEMS for the subject year; second, multiply the total mmBtu heat input for Mansfield Units 1, 2 and 3 by 0.43 lbs/mmBtu; third, divide the total number of pounds of $SO_2$ for Mansfield Units 1, 2 and 3 by 2,000 to calculate $SO_2$ tons for the subject year; fourth, subtract the sum of the total $SO_2$ tons for Mansfield Units 1, 2 and 3 measured by the CEMS for the subject year.

9.  "Additional Reductions" means the additional tons reduced at the Burger Plant, Mansfield Plant, and Eastlake Plant.

10. "Annual Average Removal Efficiency" shall be determined in accordance with 40 C.F.R. Part 60, subpart Da, provided that ASTM fuel sampling and analysis may be used in lieu of inlet $SO_2$ emission monitoring where the inlet sampling location does not meet the minimum requirements specified in 40 C.F.R. Part 60, Appendix A, EPA Reference Method 1.

11. "Burger Plant" means the R.E. Burger Plant located near Shadyside, Ohio.

12. "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving $NO_X$ and $SO_2$ under this Consent Decree, the devices defined in 40 C.F.R. § 72.2 and

5

installed and maintained (including quarterly quality assurance procedures) as specified by 40 C.F.R. Part 75 except as provided for in Paragraphs 80 and 109 relating to data substitution provisions.

13. "Consent Decree" means this Consent Decree and the Appendices hereto, which are incorporated into this Consent Decree.

14. "Design Removal Efficiency" means the minimum removal efficiency for which a design is developed for a new or modified air pollution control device, when operating at full load maximum continuous rating ("MCR") of the boiler. The design removal efficiency shall provide the capability of attaining and maintaining at least the specified removal efficiency at MCR.

15. "Eastlake Plant" means the Eastlake Plant located near Eastlake, Ohio.

16. "Electric-Catalytic Oxidation" or "ECO" means a barrier discharge reactor, wet flue gas desulfurization and wet electrostatic precipitator ("wet ESP"), which combine to remove multiple pollutants from flue gas.

17. "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/mmBtu), measured in accordance with this Consent Decree.

18. "EPA" means the United States Environmental Protection Agency.

19. "ESP" means electrostatic precipitator, a pollution control device for the reduction of PM.

20. "FirstEnergy System" means, collectively, the Ohio Edison System, any existing units owned by a FirstEnergy subsidiary, and any new or existing units that might be built or acquired by a FirstEnergy subsidiary, provided that FirstEnergy and/or a subsidiary has a greater than 50% ownership interest in such newly-built or acquired units.

21. "Flash Dryer Absorber" means a flue gas desulfurization technology employing a fluidized bed-type absorber utilizing recycled fly ash and lime injection for $SO_2$ removal upstream of a pollution control device for the reduction of PM.

22. "Flue Gas Desulfurization System" or "FGD" means a pollution control device that employs flue gas desulfurization technology, including absorber(s) for the reduction of sulfur dioxide emissions.

6

23. "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, or natural gas.

24. "Induct Scrubber" means a flue gas desulfurization technology in which an atomized lime slurry is injected into the ductwork for $SO_2$ removal upstream of a pollution control device for the reduction of PM.

25. "KW" means kilowatt or one thousand Watts.

26. "lb/mmBtu" means pound of a pollutant per million British thermal units of heat input.

27. "Malfunction" means malfunction as that term is defined under 40 C.F.R. § 60.2.

28. "Mansfield Plant" means the Bruce Mansfield Plant located near Shippingport, PA.

29. "MW" means a megawatt or one million Watts.

30. "Monthly Cap" means the sum of the tons of the pollutant in question emitted during all periods of operation from Sammis Units 1 through 5 in a calendar month, including the pollutants emitted during periods of startup and shutdown, and Malfunction.

31. "$NO_X$" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

32. "$NO_X$ Allowance" means an authorization or credit to emit a specified amount of $NO_X$ that is allocated or issued under an emissions trading or marketable permit program of any kind that has been established under the Clean Air Act or a State Implementation Plan.

33. "Ohio Edison System" means, collectively, the Sammis Plant, Mansfield Plant and Burger Plant.

34. "Operational needs" means the allowances needed to comply with federal and/or State Clean Air Act regulatory requirements for the units at the Sammis Plant and any other existing, new, and newly acquired unit in the FirstEnergy system.

35. "Parties" means the United States of America; the States of New York, New Jersey and Connecticut; and Ohio Edison and Pennsylvania Power Company. "Party" means one of the six named "Parties."

36. "Plant-Wide Annual Cap" means the sum of the tons of the pollutant in question emitted during all periods of operation from the Sammis Plant in a calendar year, including the pollutants emitted during periods of startup and shutdown, and Malfunction.

7

37. "PM" means total particulate matter, measured in accordance with the provisions of this Consent Decree.

38. "PM Emission Rate" means pounds of PM emitted per million Btu of heat input (lb/mmBtu), as measured in annual stack tests, in accordance with the reference methods set forth in 40 C.F.R. Part 60, Appendix A, Method 5 or Method 5B if allowed by the State of Ohio or local authority.

39. "Prevention of Significant Deterioration" or "PSD" means the prevention of significant deterioration of air quality program under Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 - 7492, and 40 C.F.R. Part 52.

40. "Removal Efficiency" means the percent of an air pollutant removed from flue gas by an air pollution control device based on the mass emission rate before and after the air pollution control device.

41. "Renewable Energy Sources" means wind, solar power, or landfill gas or any other approved project.

42. "Restricted $NO_X$ Allowances" means the $NO_X$ Allowances allocated annually to Ohio Edison that were made available for sale, trade, or transfer after the date of entry of this Consent Decree as a result of the requirements of this Consent Decree, but the use of which is restricted by this Consent Decree.

43. "Restricted $SO_2$ Allowances" means (1) the $SO_2$ Allowances resulting from the one-time Additional Mansfield Plant Reductions required by Paragraph 92 for calendar years 2006 of 4,000 tons and for 2007 of 8,000 tons; (2) the $SO_2$ Allowances resulting from the one-time $SO_2$ Interim Emission Reductions required by Paragraph 97 of 35,000 tons and by Paragraph 98 of 24,600 tons; and (3) 67,503 $SO_2$ Allowances allocated annually to the Sammis Plant beginning January 2011.

44. "Sammis Plant" means the W. H. Sammis Plant, located along the Ohio River on State Route 7 in the Village of Stratton, Saline Township, Jefferson County, Ohio.

45. "Selective Catalytic Reduction System" or "SCR" means a pollution control device that employs selective catalytic reduction technology for the reduction of $NO_X$ emissions.

46. "SNCR" means a pollution control device that employs selective non-catalytic reduction, utilizing ammonia or urea injection in the boiler, for the reduction of $NO_X$ emissions.

8

47. "SO$_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

48. "SO$_2$ Allowance" means "allowance" as defined at 42 U.S.C. § 7651a(3): "an authorization, allocated to an affected unit by the Administrator of EPA under Subchapter IV of the Act, to emit, during or after a specified calendar year, one ton of sulfur dioxide."

49. "Super-compliant NO$_X$ Allowances" means those allowances attributable to reductions beyond the requirements of this Consent Decree and in accordance with Paragraph 76. NO$_X$ allowances that become available as a result of emission reductions used to demonstrate compliance with Paragraph 72 shall not be Super-compliant NO$_X$ Allowances.

50. "Super-compliant SO$_2$ Allowances" means those allowances attributable to reductions beyond the requirements of this Consent Decree and in accordance with Paragraph 106. SO$_2$ allowances that become available as a result of emission reductions used to demonstrate compliance with Paragraph 97 shall not be Super-compliant SO$_2$ Allowances.

51. "Surrender" means permanently surrendering allowances from the accounts administered by EPA for the Ohio Edison System so that such allowances can no longer be used to meet any compliance requirement under the Clean Air Act.

52. "NO$_X$ System-Wide Annual Emission Rate" means the annual average emission rate for NO$_X$ from the FirstEnergy System during a calendar year calculated in accordance with the procedures and equation set forth in 40 C.F.R. § 76.11 (d)(1)(ii)(A).

53. "Title V Permit" means the permit required of each of Ohio Edison's major sources under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

## IV. NO$_X$ EMISSION REDUCTIONS AND CONTROLS

### A. NO$_X$ Emission Controls

#### 1. SCRs on Sammis Units 6 and 7

54. Ohio Edison shall install an SCR (or the equivalent NO$_X$ control technology approved by Plaintiffs pursuant to Paragraph 55) at either Sammis Unit 6 or Unit 7 no later than December 31, 2010, and install a second SCR at either Sammis Unit 6 or 7 no later than

9

December 31, 2011.  Each SCR to be installed by Ohio Edison under this paragraph shall have at least a 90% Design Removal Efficiency for $NO_X$.  Upon operation of the unit with the installed SCR and thereafter, Ohio Edison shall continuously operate each SCR at Sammis Units 6 and 7 at all times that each unit the SCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable.  The preceding sentence shall not be construed to require that Ohio Edison achieve a more stringent unit emission rate than required by this Consent Decree.  No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate each SCR so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $NO_X$ of 0.100 lb/mmBtu.

55.  With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating an SCR (or ECO, if approved pursuant to Section VII) at any unit specified in Paragraph 54, install and operate equivalent $NO_X$ control technology, so long as such equivalent $NO_X$ control technology is designed for a 90% Removal Efficiency for $NO_X$ and achieves and thereafter maintains a 30-Day Rolling Average Emission Rate for $NO_X$ not greater than 0.100 lb/mmBtu.

        2.        <u>SNCRs at Sammis Units 1 -7, Eastlake Unit 5 and Burger Units 4-5</u>

56.  No later than thirty days after entry of the Consent Decree, Ohio Edison shall continuously operate each SNCR at Sammis Units 2 and 7 at all times that each unit the SNCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree.  No later than 210 days after entry of this Consent Decree, Ohio Edison shall operate the SNCR so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $NO_X$ of 0.250 lb/mmBtu at Sammis Unit 2.

57.  Ohio Edison shall install an SNCR (or equivalent $NO_X$ control technology approved pursuant to Paragraph 68) at either Sammis Unit 1, Unit 3, or Unit 4, no later than October 31, 2006; and install a second SNCR at either Sammis Unit 1, Unit 3, or Unit 4 no later than October 31, 2007; and install one additional SNCR at Sammis Unit 1, Unit

10

3, or Unit 4 no later than December 31, 2007. Upon operation of the unit with the installed SNCR and thereafter, Ohio Edison shall continuously operate each SNCR at Sammis Units 1, 3 and 4 at all times that each unit the SNCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate each SNCR so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $NO_X$ of 0.250 lb/mmBtu.

58. No later than December 31, 2007, Ohio Edison shall install an SNCR (or equivalent $NO_X$ control technology approved pursuant to Paragraph 68) at Sammis Unit 5. Upon operation of the unit with the installed SNCR and thereafter, Ohio Edison shall continuously operate the SNCR at Sammis Unit 5 at all times that the unit the SNCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate the SNCR so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $NO_X$ of 0.290 lb/mmBtu.

59. No later than June 30, 2005, Ohio Edison shall install an SNCR at Sammis Unit 6. Ohio Edison shall continuously operate the SNCR at Sammis Unit 6 at all times that the unit the SNCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree.

60. No later than December 31, 2006, Ohio Edison shall cause the FirstEnergy System to install low $NO_X$ burners, overfired air and SNCR (or equivalent $NO_X$ control technology approved pursuant to Paragraph 68) at Eastlake Unit 5. Upon operation of the unit with the installed $NO_X$ controls referred to above and thereafter, Ohio Edison shall cause the FirstEnergy System to continuously operate the $NO_X$ controls referred to above at

11

Eastlake Unit 5 at all times that the unit is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require Ohio Edison to cause the FirstEnergy System to achieve more stringent unit emission rate(s) than required by this Consent Decree.

61. If the FirstEnergy System does not install and commence continuous operation of low $NO_X$ burners, overfired air, and SNCR (or equivalent $NO_X$ control technology approved pursuant to Paragraph 68) as required in Paragraph 60, Ohio Edison shall submit to the Plaintiffs for approval, and implement upon approval, a substitute compliance plan that would provide for an alternative means of achieving emission reductions within the FirstEnergy System units located in Ohio and/or Pennsylvania in the same time frame through use of post-combustion $NO_X$ emission control devices, equivalent to or exceeding the emission reductions that Ohio Edison anticipated achieving by installation and operation of the low $NO_X$ burners, overfired air, and SNCR at Eastlake Unit 5.

62. Ohio Edison shall cause the FirstEnergy System to achieve Additional Eastlake Plant $NO_X$ Reductions of 11,000 tons of $NO_X$ per year commencing in calendar year 2007 provided, however, that this obligation shall be eliminated upon permanent shutdown in which Eastlake Unit 5 has been permanently retired from service and has been physically disabled. If Ohio Edison determines that it will be unable to achieve any portion of the reductions of 11,000 tons of $NO_X$ at Eastlake Unit 5 in any calendar year due to planned or unplanned outages, or any combination thereof, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented, a substitute compliance plan ("plan"). The plan shall demonstrate how Ohio Edison will achieve elsewhere in the FirstEnergy System and within the same year (or if that is not possible, within the next succeeding calendar year) all the remaining Additional Eastlake Plant $NO_X$ Reductions. The plan must identify the plant(s) in Pennsylvania and/or Ohio where any remaining Additional Eastlake Plant $NO_X$ Reductions are to be achieved. Ohio Edison shall use best efforts to submit the plan no later than 30 days after Ohio Edison determines that it will be unable to achieve Additional Eastlake Plant $NO_X$ Reductions, but in no event later than January 31 of the year following the year in which Ohio Edison makes such determination. For purposes of this paragraph, the amount of

12

Additional Eastlake Plant $NO_X$ Reductions to be achieved at such other FirstEnergy plant(s) shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu). Compliance with the approved plan shall be considered compliance with the Additional Eastlake Plant $NO_X$ Reductions requirement. The terms of this provision are in addition to, and shall not alter or affect, the provisions of Section XV relating to Force Majeure.

63. Subject to Paragraph 62, Ohio Edison shall cause the FirstEnergy System to use reasonable best efforts to achieve Additional Eastlake Plant $NO_X$ Reductions of 11,000 tons of $NO_X$ per year commencing in calendar year 2007, but in no case shall the Additional Eastlake Plant $NO_X$ Reductions be less than 10,000 tons in any given year commencing in 2007. In the event that Ohio Edison expects to be unable to achieve Additional Eastlake Plant $NO_X$ Reductions of at least 11,000 tons of $NO_X$ in 2007 or any year thereafter, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented, a substitute compliance plan to achieve elsewhere in the FirstEnergy system and within the same calendar year all the remaining Additional Eastlake Plant $NO_X$ Reductions up to 1,000 tons of $NO_X$ that will not be realized that year at the Eastlake Plant. Such a plan must identify the plants, in Pennsylvania and/or Ohio, and the controls at those plants where any remaining Additional Eastlake Plant $NO_X$ Reductions that will not be realized that year at the Eastlake Plant are to be achieved.

64. No later than December 31, 2008, Ohio Edison shall install SNCRs (or equivalent $NO_X$ control technology approved pursuant to Paragraph 68) at Burger Unit 4 and Unit 5. Upon operation of the unit with the installed SNCR and thereafter, Ohio Edison shall continuously operate each SNCR at the Burger Units 4 and 5 at all times that each unit the SNCR serves is combusting Fossil Fuel, consistent with good engineering practices for $NO_X$ control, to minimize $NO_X$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree.

65. Ohio Edison shall achieve Additional Burger Plant $NO_X$ Reductions of 1,400 tons of $NO_X$ per year commencing in calendar year 2009 provided, however, that this obligation shall be eliminated upon permanent shutdown in which one or more of the Burger units

13

has been permanently retired from service and has been physically disabled. If Ohio Edison determines that it will be unable to achieve any portion of the reductions of 1,400 tons at the Burger Plant in any calendar year due to planned or unplanned outages, or any combination thereof, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented, a substitute compliance plan ("plan"). The plan shall demonstrate how Ohio Edison will achieve elsewhere in the FirstEnergy System and within the same year (or if that is not possible, within the next succeeding calendar year) all the remaining Additional Burger Plant $NO_X$ Reductions. The plan must identify the plant(s) in Pennsylvania and/or Ohio where any remaining Additional Burger Plant $NO_X$ Reductions are to be achieved. Ohio Edison shall use best efforts to submit the plan no later than 30 days after Ohio Edison determines that it will be unable to achieve Additional Burger Plant $NO_X$ Reductions, but in no event later than January 31 of the year following the year in which Ohio Edison makes such determination. For purposes of this paragraph, the amount of Additional Burger Plant $NO_X$ Reductions to be achieved at such other FirstEnergy plant(s) shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu). Compliance with the approved plan shall be considered compliance with the Additional Burger Plant $NO_X$ Reductions requirement. The terms of this provision are in addition to, and shall not alter or affect, the provisions of Section XV relating to Force Majeure.

66.     Subject to Paragraph 65, Ohio Edison shall use reasonable best efforts to achieve Additional Burger Plant $NO_X$ Reductions of 1,400 tons of $NO_X$ per year commencing in calendar year 2009, but in no case shall the Additional Burger Plant $NO_X$ Reductions be less than 1,300 tons in any given year commencing in 2009. In the event that Ohio Edison expects to be unable to achieve Additional Burger Plant $NO_X$ Reductions of at least 1,400 tons of $NO_X$ in 2009 or any year thereafter, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval implement, a substitute compliance plan to achieve elsewhere in the FirstEnergy system and within the same calendar year all the remaining Additional Burger Plant $NO_X$ Reductions up to 100 tons of $NO_X$ that will not be realized that year at the Burger Plant. Such a plan must identify the plants, in Pennsylvania and/or Ohio, and the controls at those plants where any remaining

14

Additional Burger Plant NO$_X$ Reductions that will not be realized that year at the Burger Plant are to be achieved.

67. No later than thirty days following entry of this Consent Decree, Ohio Edison shall complete installation and operation of low NO$_X$ burners on Sammis Units 1, 2, 4, 5, 6, and 7 and overfired air on Sammis Units 1, 2, 4, 6 and 7. No later than December 1, 2005, Ohio Edison shall complete installation and operation of low NO$_X$ burners and overfired air on Sammis Unit 3, and advanced combustion control optimization with software to minimize NO$_X$ emissions from Sammis Units 1 through 5.

68. With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating an SNCR at any unit specified in Paragraphs 56, 57, 58, 60, and 66, install and operate equivalent NO$_X$ control technology, so long as such equivalent NO$_X$ control technology achieves and thereafter maintains a 30-Day Rolling Average Emission Rate for NO$_X$ not greater than 0.250 lb/mmBtu, or 0.290 lb/mmBtu for Sammis Unit 5.

B. Plant-Wide Annual Cap for NO$_X$

69. Ohio Edison shall comply with the following Plant-Wide Annual Cap for the Sammis Plant for NO$_X$, which applies collectively to all units within the Sammis Plant:

| For the Periods Commencing on the Dates Specified Below: | Plant-Wide Annual Cap For NO$_X$ |
|---|---|
| July 1, 2005 through December 31, 2005 | 11,371 tons |
| January 1, 2006 through December 31, 2006 | 21,251 tons |
| January 1, 2007 through December 31, 2007 | 20,596 tons |
| January 1, 2008 through December 31, 2008 | 18,903 tons |
| January 1, 2009 through December 31, 2009 | 17,328 tons |
| January 1, 2010 through December 31, 2010 | 17,328 tons |
| January 1, 2011 through December 31, 2011 | 14,845 tons |

15

| January 1, 2012 and every calendar year thereafter | 11,863 tons |
|---|---|

70. Compliance with the Plant-Wide Annual Cap in Paragraph 69 shall be determined by calculating actual annual emissions during all periods of operation from the Sammis plant using CEMS. The amount of $NO_X$ allowances in the possession of Ohio Edison shall not be used in determining compliance with the Plant-Wide Annual Cap in Paragraph 69.

71. Periods of nonoperation of a unit are not violations of a unit specific emission obligation of this Consent Decree. If Ohio Edison ceases operations for more than 12 months, the Plant-Wide Annual Cap in Paragraph 69 shall be reduced by one-half of the shutdown unit's(s') pro rata nameplate MW share of the Plant-Wide Annual Cap for the Sammis Plant for $NO_X$, unless Ohio Edison demonstrates to Plaintiffs that it intends to start up the unit(s) within the following 12 months and actually starts up in the following 12 months.

   C.    Interim $NO_X$ Emission Reductions

72. Between July 1, 2005 and no later than December 31, 2010, Ohio Edison shall achieve reductions in the amount of 2,483 tons of $NO_X$ using any combination of the following: (1) using a low sulfur coal at Burger Units 4 and 5; (2) operating the SCRs currently installed at Mansfield Units 1 through 3 during the months of October through April; and/or (3) emitting fewer tons than the Plant-Wide Annual Cap for $NO_X$ required under Paragraph 69 in a given year at the Sammis Plant. For purposes of determining that amount of reductions achieved at Burger, Ohio Edison shall use the procedure for determining Additional Burger Plant $NO_X$ Reductions. For purposes of this paragraph, the amount of $NO_X$ emission reductions to be achieved at the Mansfield Plant shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu).

   D.    Use of $NO_X$ Allowances

73. Except as provided in this Consent Decree, Ohio Edison shall not sell, trade, or transfer any Restricted $NO_X$ Allowances.

74. Restricted $NO_X$ Allowances resulting from actions taken by Ohio Edison to comply with the requirements of this Consent Decree may be used by Ohio Edison to meet the Operational Needs of the plant to which they were allocated but not at any other plant or

16

to sell, trade, or transfer to a third-party. In addition, Restricted $NO_X$ Allowances resulting from actions taken by Ohio Edison to comply with the requirements of this Consent Decree may be used by Ohio Edison and/or FirstEnergy to meet the Operational Needs of the FirstEnergy System but not to sell, trade, or transfer to a third-party, provided that commencing January 1, 2015, and continuing thereafter, actual $NO_X$ emissions from the FirstEnergy System do not exceed a $NO_X$ System-Wide Annual Emission Rate of 0.15 lb/mmBtu. For purposes of this paragraph, the FirstEnergy System is limited to the coal-fired units listed below less any of these units FirstEnergy or its subsidiaries sells.

| Current FirstEnergy Coal-Fired Units |
| --- |
| Mansfield 1 |
| Mansfield 2 |
| Mansfield 3 |
| Sammis 1 |
| Sammis 2 |
| Sammis 3 |
| Sammis 4 |
| Sammis 5 |
| Sammis 6 |
| Sammis 7 |
| Burger 1 |
| Burger 2 |
| Burger 3 |
| Burger 4 |
| Burger 5 |
| Ashtabula 5 |
| Bay Shore 1 |
| Bay Shore 2 |

17

| |
|---|
| Bay Shore 3 |
| Bay Shore 4 |
| Eastlake 1 |
| Eastlake 2 |
| Eastlake 3 |
| Eastlake 4 |
| Eastlake 5 |
| Lake Shore 18 |
| Toronto 5 |
| Toronto 6 |
| Toronto 7 |

75.  If Ohio Edison installs SCR, ECO if approved pursuant to Section VII, or equivalent control technology on any unit in the FirstEnergy System that is not required by this Consent Decree, the difference between the average annual $NO_X$ emissions of the 2 years before the control device is installed and the $NO_X$ Allowances allocated to such unit shall no longer be considered Restricted $NO_X$ Allowances.

76.  After Ohio Edison reports the generation of Super-compliant $NO_X$ Allowances in accordance with Section XII (Periodic Reporting), nothing in this Consent Decree shall preclude Ohio Edison from selling, trading, or transferring these reported $NO_X$ Allowances that become available for sale or trade as a result of:

a.  the installation and operation of any $NO_X$ pollution control technology or technique that is not otherwise required under this Consent Decree;

b.  the installation and operation of any SCR (or ECO if approved pursuant to Section VII or other approved equivalent $NO_X$ control technology pursuant to Paragraph 55) or SNCR, prior to the date required under this Consent Decree; or

c.  achievement and maintenance of $NO_X$ emission rates that are below the 30-Day Rolling Average Emission Rate of 0.100 lb/mmBtu for Sammis Units 6 and 7, the 30-Day Rolling Average Emission Rate of 0.250 lb/mmBtu for Sammis Units 1 through 4, and the 30-Day Rolling Average Emission Rate of 0.290

18

lb/mmBtu for Sammis Unit 5, and the applicable Plant-wide Annual Cap of 11,863 tons.

77. Except as provided in Paragraph 121, Ohio Edison may not purchase or otherwise obtain $NO_X$ Allowances from another source for purposes of complying with the requirements of this Consent Decree. However, nothing in this Consent Decree shall prevent Ohio Edison from purchasing or otherwise obtaining $NO_X$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.

78. If Ohio Edison transfers Restricted $NO_X$ Allowances to a unit within the FirstEnergy System not covered by this Consent Decree, Ohio Edison must provide or cause to provide right of entry as required by Paragraph 181.

E. General $NO_X$ Provisions

79. In determining 30-Day Rolling Average Emission Rates for $NO_X$, Ohio Edison shall operate CEMS at each unit, provided, however, that due to the common stack CEMS at Sammis Units 1 to 4, $NO_X$ pollutant concentration monitors certified in accordance with 40 C.F.R. Part 60 shall determine the 30-Day Rolling Average Emission Rates for $NO_X$ at each of Sammis Units 1 to 4. In determining compliance with the Plant-Wide Annual $NO_X$ Cap, Ohio Edison shall operate CEMS at each stack (including the common stacks that serve Sammis Units 1 and 2 and Units 3 and 4).

80. If both primary and secondary CEMS have a missing data event, Ohio Edison shall use 40 C.F.R. Part 60 to show compliance with a 30-Day Rolling Average Emission Rate for $NO_X$, provided that Ohio Edison (1) has secondary CEMS installed, and (2) places them in service within one hour of a missing data event from the primary CEMS but the secondary CEMS also fails. If Ohio Edison does not meet conditions in (1) and (2) above, Ohio Edison shall use 40 C.F.R. § 75.33 to determine compliance with the 30-Day Rolling Average Emission Rate for $NO_X$. If there is a missing data event, Ohio Edison shall use the data substitution provisions in 40 C.F.R. § 75.33 to show compliance with the Plant-Wide Annual Cap for $NO_X$.

19

## V. SO$_2$ EMISSION REDUCTIONS AND CONTROLS

A.     SO$_2$ Emission Controls

    1.     New FGD Installations at Sammis Units 6-7 and Burger Units 4-5

81.     Ohio Edison shall install an FGD (or equivalent SO$_2$ control technology approved pursuant to Paragraph 84) at each Sammis Unit 6 and Unit 7 no later than December 31, 2010. Each FGD to be installed by Ohio Edison under this paragraph shall have at least a 95% Design Removal Efficiency for SO$_2$. Upon operation of the unit with the installed FGD and thereafter, Ohio Edison shall continuously operate each FGD at Sammis Units 6 and 7 at all times that each unit the FGD serves is combusting Fossil Fuel, consistent with good engineering practices for SO$_2$ control, to minimize SO$_2$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate each FGD so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for SO$_2$ of 0.130 lb/mmBtu.

82.     Subject to Paragraph 83 below, no later than December 31, 2010, Ohio Edison shall install and commence continuous operation of wet FGDs or ECO (or equivalent SO$_2$ control technology approved pursuant to Paragraph 85) on Burger Units 4 and 5, which shall have at least a 95% Design Removal Efficiency. Ohio Edison shall achieve Additional Burger Plant SO$_2$ Reductions of 25,000 tons of SO$_2$ per year commencing on or before calendar year 2011 provided, however, that this obligation shall be eliminated upon permanent shutdown in which one or more of the Burger units is permanently retired from service and has been physically disabled. If Ohio Edison determines that it will be unable to achieve any portion of the reductions of 25,000 tons of SO$_2$ at the Burger Plant in any calendar year due to planned or unplanned outages, or any combination thereof, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented, a substitute compliance plan ("plan"). The plan shall demonstrate how Ohio Edison will achieve elsewhere in the FirstEnergy System and within the same year (or if that is not possible, within the next succeeding calendar year) all the remaining Additional Burger Plant SO$_2$ Reductions.

20

The plan must identify the plant(s) in Pennsylvania and/or Ohio where any remaining Additional Burger Plant $SO_2$ Reductions are to be achieved. Ohio Edison shall use best efforts to submit the plan no later than 30 days after Ohio Edison determines that it will be unable to achieve Additional Burger Plant $SO_2$ Reductions, but in no event later than January 31 of the year following the year in which Ohio Edison makes such determination. For purposes of this paragraph, the amount of Additional Burger Plant $SO_2$ Reductions to be achieved at such other FirstEnergy plant(s) shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu). Compliance with the approved plan shall be considered compliance with the Additional Burger Plant $SO_2$ Reductions requirement. The terms of this provision are in addition to, and shall not alter or affect, the provisions of Section XV relating to Force Majeure.

83.     No later than December 31, 2008, Ohio Edison shall elect either to satisfy the emission control requirements of Paragraph 82 for Burger Units 4 and 5, or:

a.      Shut down Burger Units 4 and 5 no later than December 31, 2010; or

b.      Repower Burger Units 4 and 5 no later than December 31, 2012, including through construction of circulating fluidized bed boilers or other clean coal technologies of equivalent environmental performance that at a minimum achieve and maintain a 30-Day Rolling Average Emission Rate not greater than 0.100 lb/mmBtu for $SO_2$ or a Removal Efficiency of at least ninety-five percent (95%) for $SO_2$; a 30-Day Rolling Average Emission Rate not greater than 0.100 lb/mmBtu for $NO_X$; and a PM Emission Rate not greater than 0.015 lb/mmBtu. In measuring the PM Emission Rate, Ohio Edison shall conduct periodic stack tests in accordance with 40 C.F.R. Part 60, Appendix A, Method 5, or Method 5B if allowed by the State of Ohio or local authority, or alternative methods requested by Ohio Edison and approved by EPA. For units that are required to be equipped with $SO_2$ control equipment and that are subject to the percent removal efficiency requirements of this Consent Decree, the outlet $SO_2$ Emission Rate and the inlet $SO_2$ Emission Rate shall be determined based on the data generated in accordance with 40 C.F.R. Part 75 (using $SO_2$ CEMS data from both the inlet and outlet of the control device), except that, if it is not feasible to install $SO_2$ CEMS at the inlet of the control device, Ohio Edison may use fuel sampling consistent with ASTM protocols and standards to compute the inlet $SO_2$ Emission Rate.

21

84. With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating wet FGDs at Sammis Units 6 and 7 (or ECO, if approved pursuant to Section VII), install and operate equivalent $SO_2$ control technology at Sammis Units 6 and 7 so long as such equivalent $SO_2$ control technology is designed for at least a 95% removal efficiency for $SO_2$ and achieves and thereafter maintains a 30-Day Rolling Average Emission Rate for $SO_2$ not greater than 0.130 lb/mmBtu.

85. With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating wet FGDs or ECO at Burger Units 4 and 5, install and operate equivalent $SO_2$ control technology so long as such equivalent $SO_2$ control technology is designed for at least a 95% Removal Efficiency for $SO_2$.

2. <u>Flash Dryer Absorber at Sammis Unit 5</u>

86. No later than December 31, 2008, Ohio Edison shall install a Flash Dryer Absorber or ECO (or equivalent $SO_2$ control technology approved pursuant to Paragraph 90) at Sammis Unit 5, which shall have at least a 50% Design Removal Efficiency for $SO_2$. Upon operation of the unit with the installed Flash Dryer or ECO and thereafter, Ohio Edison shall continuously operate the Flash Dryer at Sammis Unit 5 at all times that the unit the Flash Dryer or ECO serves is combusting Fossil Fuel, consistent with good engineering practices for $SO_2$ control, to minimize $SO_2$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate the Flash Dryer Absorber or ECO so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $SO_2$ of 1.100 lb/mmBtu. If Ohio Edison cannot install the Flash Dyer (or ECO, if so elected) on Sammis Unit 5 because of a failure to obtain a necessary permit, Ohio Edison shall submit to the Plaintiffs for approval, and implement upon approval, a substitute compliance plan that would provide for an alternative means of achieving emission reductions within the FirstEnergy System units located in Ohio and/or Pennsylvania in the same time frame through use of post-combustion $SO_2$ emission control devices, equivalent to or exceeding the emission

reductions that Ohio Edison anticipated achieving by installation and operation of the Flash Dryer at Sammis Unit 5.

87. With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating a Flash Dryer Absorber or ECO at Sammis Unit 5, install and operate equivalent $SO_2$ control technology so long as such equivalent $SO_2$ control technology has at least a 50% Design Removal Efficiency and attains a 30-Day Rolling Average Emission Rate for $SO_2$ of 1.100 lb/mmBtu.

88. No later than July 1, 2007, Ohio Edison may seek written approval from the EPA and the States of a plan to install and operate an improved $SO_2$ control technology at Sammis Unit 5 by no later than December 31, 2010. If Ohio Edison demonstrates that the improved $SO_2$ control technology is designed to meet a 75% or greater Design Removal Efficiency, Plaintiffs will approve the plan to install and operate an improved $SO_2$ control technology, in lieu of installing and operating a Flash Dryer Absorber or ECO at Sammis Unit 5. If Plaintiffs approve the plan, Ohio Edison shall implement and complete construction of the improved $SO_2$ control technology no later than December 31, 2010. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall achieve and maintain at Sammis Unit 5 a 30-Day Rolling Average Emission Rate for $SO_2$ as defined by the following formula:

2.3 lbs/mmBtu x (100% - % Design Removal Efficiency as approved).

In no event shall the 30-Day Rolling Average Emission Rate requirement for $SO_2$ be greater than 0.550 lb/mmBtu or below 0.130 lb/mmBtu for Sammis Unit 5.

### 3. Induct Scrubbing at Sammis Units 1-4

89. Ohio Edison shall install an Induct Scrubber (or equivalent $SO_2$ control technology approved pursuant to Paragraph 90) at Sammis Unit 1, Unit 2, Unit 3, or Unit 4 no later than September 30, 2008; and install a second Induct Scrubber at either Sammis Unit 1, Unit 2, Unit 3, or Unit 4 no later than December 31, 2008; and install two additional Induct Scrubbers at Sammis Unit 1, Unit 2, Unit 3 or Unit 4 no later than December 31, 2009. Each Induct Scrubber to be installed by Ohio Edison under this paragraph shall

23

have at least a 50% Design Removal Efficiency for $SO_2$. Upon operation of the unit with the installed Induct Scrubber and thereafter, Ohio Edison shall continuously operate the Induct Scrubber at the unit at all times that the unit the Induct Scrubber serves is combusting Fossil Fuel, consistent with good engineering practices for $SO_2$ control, to minimize $SO_2$ emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree. No later than 180 days after the installation date required above and thereafter, Ohio Edison shall operate each Induct Scrubber so as to achieve and thereafter maintain a 30-Day Rolling Average Emission Rate for $SO_2$ of 1.100 lb/mmBtu.

90.    With prior written notice to and written approval from EPA and the States, Ohio Edison may, in lieu of installing and operating Induct Scrubbers at Sammis Units 1 through 4, install and operate equivalent $SO_2$ control technology so long as such equivalent $SO_2$ control technology is designed for at least a 50% removal efficiency for $SO_2$ and a 30-Day Rolling Average Emission Rate for $SO_2$ of 1.100 lb/mmBtu.

4.    FGD Upgrades for Mansfield Units 1-3

91.    No later than the dates specified below, Ohio Edison shall upgrade the FGDs currently installed at Mansfield Units 1, 2 and 3 according to the following schedule:

| Mansfield Unit | Upgrade Date |
| --- | --- |
| Unit 1 | December 31 , 2005 |
| Unit 2 | December 31, 2006 |
| Unit 3 | October 31, 2007 |

The upgrade of the Mansfield FGDs shall be designed to achieve at least a 95% Design Removal Efficiency on Mansfield Units 1, 2 and 3. No later than 180 days after the upgrade dates specified above, Ohio Edison shall conduct a performance test to demonstrate a 95% Removal Efficiency. Every subsequent year, Ohio Edison shall either conduct a performance test or submit CEMS data (or combination of CEMS data and coal sampling) equivalent to the sampling period of a performance test that show that each FGD has achieved a 95% Removal Efficiency. If Ohio Edison cannot demonstrate a 95%

24

Removal Efficiency during a performance test, Ohio Edison shall modify the equipment as necessary and re-test to demonstrate a 95% Removal Efficiency.

92.  Ohio Edison shall achieve Additional Mansfield Plant $SO_2$ Reductions on or before the following dates:

| Calendar Year | Additional Mansfield Plant $SO_2$ Reductions (tons per year) |
|---|---|
| 2006 | 4,000 |
| 2007 | 8,000 |
| 2008 and every calendar year thereafter | 12,000 |

This obligation shall be eliminated upon permanent shutdown in which one or more of the Mansfield units is permanently retired from service and has been physically disabled. If Ohio Edison determines that it will be unable to achieve any portion of the reductions of 12,000 tons of $SO_2$ at the Mansfield Plant in any calendar year due to planned or unplanned outages, or any combination thereof, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented, a substitute compliance plan ("plan"). The plan shall demonstrate how Ohio Edison will achieve elsewhere in the FirstEnergy System and within the same year (or if that is not possible, within the next succeeding calendar year) all the remaining Additional Mansfield Plant $SO_2$ Reductions. The plan must identify the plant(s) in Pennsylvania and/or Ohio where any remaining Additional Mansfield Plant $SO_2$ Reductions are to be achieved. Ohio Edison shall use best efforts to submit the plan no later than 30 days after Ohio Edison determines that it will be unable to achieve Additional Mansfield Plant $SO_2$ Reductions, but in no event later than January 31 of the year following the year in which Ohio Edison makes such determination. For purposes of this paragraph, the amount of Additional Mansfield Plant $SO_2$ Reductions to be achieved at such other FirstEnergy plant(s) shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu). Compliance with the approved plan shall be considered compliance with the Additional Mansfield Plant $SO_2$ Reductions requirement. The terms of this

provision are in addition to, and shall not alter or affect, the provisions of Section XV relating to Force Majeure.

B.    <u>Plant-Wide Annual and Monthly Caps for $SO_2$</u>

93.    Ohio Edison shall comply with the following Plant-Wide Annual Cap for the Sammis Plant for $SO_2$, which applies to all units collectively within the Sammis Plant:

| For the Periods Commencing on the Dates Specified Below: | Plant-Wide Annual Cap for $SO_2$ |
|---|---|
| July 1, 2005 through December 31, 2005 | 58,000 tons |
| January 1, 2006 through December 31, 2006 | 116,000 tons |
| January 1, 2007 through December 31, 2007 | 116,000 tons |
| January 1, 2008 through December 31, 2008 | 114,000 tons |
| January 1, 2009 through December 31, 2009 | 101,500 tons |
| January 1, 2010 through December 31, 2010 | 101,500 tons |
| January 1, 2011 and every calendar year thereafter | 29,900 tons |

94.    Ohio Edison shall comply with the following Monthly Caps, which applies to Sammis Units 1 through 5 collectively:

a.    May 1, 2010 to September 30, 2010:

1)    If Plaintiffs approve an improved $SO_2$ control technology under Paragraph 88:

| Calendar Months | Sammis Units 1 through 5 Monthly Cap for $SO_2$ |
|---|---|
| May, July, August | 3,242 tons |
| June, September | 3,137 tons |

26

2) If Ohio Edison installs the SO$_2$ control technology otherwise required under Paragraph 86:

| Calendar Months | Sammis Units 1 through 5 Monthly Cap for SO$_2$ |
|---|---|
| May, July, August | 2,533 tons |
| June, September | 2,451 tons |

b. May 1, 2011 to September 30, 2011 and thereafter:

| Calendar Months | Sammis Units 1 through 5 Monthly Cap for SO$_2$ |
|---|---|
| May, July, August | 2,533 tons |
| June, September | 2,451 tons |

95. Compliance with the Plant-wide Annual and Monthly Caps in Paragraphs 93 and 94 shall be determined by calculating actual annual or monthly emissions from the Sammis plant using CEMS in accordance with the reference methods specified in 40 C.F.R. Part 75 except as provided for in Paragraphs 80 and 109 relating to data substitution provisions. The SO$_2$ Allowances in the possession of Ohio Edison shall not be used in determining compliance with the Plant-wide Annual and Monthly Caps in Paragraphs 93 and 94.

96. Periods of non-operation of a unit are not violations of a unit specific emission obligation of this Consent Decree. If Ohio Edison ceases operations for more than 12 months, the Plant-Wide Annual Cap in Paragraph 93 shall be reduced by one-half of the shutdown unit's(s') pro rata nameplate MW share of the Plant-Wide Annual Cap for the Sammis Plant for SO$_2$ unless Ohio Edison demonstrates to Plaintiffs that it intends to start up the unit(s) within the following 12 months and actually starts up in the following 12 months.

C. SO$_2$ Interim Emission Reductions

97. Beginning on January 1, 2006, and ending on December 31, 2010, Ohio Edison shall achieve reductions of SO$_2$ emissions in the amount of 35,000 tons by achieving reductions of SO$_2$ emissions in the amount of 7,000 tons per year on a rolling average basis during the applicable five-year period through the use of low sulfur coal at Burger Units 4 and 5. For purposes of determining the amount of reductions achieved at Burger

27

Units 4 and 5 through the use of low sulfur coal, Ohio Edison shall use the procedure for determining Additional Burger Plant $SO_2$ Reductions.

98. No later than December 31, 2007, Ohio Edison shall submit to the Plaintiffs for approval, and upon approval, shall implement or cause to be implemented a plan to achieve a reduction of $SO_2$ emissions from the FirstEnergy System in the amount of 24,600 tons by or before December 31, 2010. The plan must identify the plant(s) in Pennsylvania and/or Ohio where the $SO_2$ reductions will be achieved. The plan may provide that some or all of the 24,600-ton reduction will be achieved through emitting fewer tons than the Plant-Wide Annual Cap for $SO_2$ required under Paragraph 93 in a given year at the Sammis Plant. For purposes of determining any amount of the 24,600-ton reduction achieved at Mansfield and/or Burger, Ohio Edison shall use the procedure for determining Additional Burger Plant $SO_2$ Reductions and Additional Mansfield Plant $SO_2$ Reductions. If emission reductions from other FirstEnergy plants are used to achieve the $SO_2$ emission reductions of 24,600 tons, or a portion thereof, the amount of $SO_2$ Interim Emission Reductions to be achieved at such other FirstEnergy plant(s) shall be calculated based on the decrease from that plant's 2003 actual emission rate (lb/mmBtu).

D. Surrender of $SO_2$ Allowances

99. Beginning on January 1, 2006 and every year thereafter, Ohio Edison may use, sell or transfer any Restricted $SO_2$ Allowances only to satisfy the Operational Needs at the Sammis Plant, Burger Plant, Mansfield Plant and/or the Operational Needs of existing and new units within the FirstEnergy System that are equipped with emission controls for $SO_2$ that are operated year-round and that meet an Annual Average Removal Efficiency of 96% or a Annual Average Emission Rate of 0.100 lb/mmBtu for $SO_2$ ("$SO_2$ Emission Control Standards").

100. For calendar years 2006 through 2017, Ohio Edison may accumulate for its own use Restricted $SO_2$ Allowances for use at the Sammis Plant, Burger Plant, and Mansfield Plant, and for use at units within the FirstEnergy System that are equipped with "$SO_2$ Emission Control Standards." Notwithstanding this provision, however:

1. Ohio Edison cannot use, sell or transfer Restricted $SO_2$ Allowances to meet the Operational Needs of an existing unit equipped with "$SO_2$ Emission Control Standards"

28

until after such unit first uses all of the $SO_2$ Allowances allocated in that given year to such unit to meet the operational needs of that unit; and

2.    If Ohio Edison, in advance of compliance with this Consent Decree, sells or transfers to a third party $SO_2$ Allowances that, if such $SO_2$ Allowances had not been sold would be classified as Restricted $SO_2$ Allowances, Ohio Edison cannot use Restricted $SO_2$ Allowances to meet the Operational Needs of the Sammis Plant or any other plant that is allowed to use Restricted $SO_2$ Allowances under this Consent Decree until it first buys back or re-transfers all of those sold or transferred $SO_2$ Allowances and uses them to meet the Operational Needs of that unit.

101.    If Ohio Edison installs an FGD, ECO if approved pursuant to Section VII, or equivalent control technology on any unit in the FirstEnergy System that is not required by this Consent Decree, the difference between the average annual $SO_2$ emissions of the 2 years before the control device is installed and the $SO_2$ Allowance allocation of such unit shall be deducted and no longer be considered Restricted $SO_2$ Allowances.

102.    For each calendar year beginning with calendar year 2018, Ohio Edison shall surrender to EPA any Restricted $SO_2$ Allowances that were not used pursuant to Paragraphs 99 or 100. Surrender of unused Restricted $SO_2$ Allowances shall occur annually thereafter and within 45 days of Ohio Edison's receipt from EPA of the Annual Deduction Reports for $SO_2$.

103.    Ohio Edison shall surrender Restricted $SO_2$ Allowances by the use of applicable United States Environmental Protection Agency Acid Rain Program Allowance Transfer Form or transfer to a nonprofit third party selected by Ohio Edison for surrender.

104.    If any Restricted $SO_2$ Allowances are transferred directly to a third party, Ohio Edison shall include a description of such transfer in the next report submitted to the Plaintiffs pursuant to Section XII (Periodic Reporting) of this Consent Decree. Such report shall: (i) provide the identity of the non-profit third-party recipient(s) of the Restricted $SO_2$ Allowances and a listing of the serial numbers of the transferred $SO_2$ Allowances; and (ii) include a certification by the third-party recipient(s) stating that the recipient will not sell, trade, or otherwise exchange any of the allowances and will not use any of the Restricted $SO_2$ Allowances to meet any obligation imposed by any environmental law. No later than the next Section XII periodic report due 12 months after the first report due after the

29

transfer, Ohio Edison shall include in a statement that the third-party recipient(s) surrendered the Restricted $SO_2$ Allowances for permanent surrender to EPA within one year after Ohio Edison transferred the Restricted $SO_2$ Allowances to them. Ohio Edison shall not have complied with the Restricted $SO_2$ Allowance surrender requirements of this Paragraph until all third-party recipient(s) have actually surrendered the transferred Restricted $SO_2$ Allowances to EPA.

105. The requirements in Paragraphs 99-102 of this Consent Decree pertaining to Ohio Edison's use and surrender of Restricted $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Decree. These provisions shall survive any termination of this Consent Decree in whole or in part.

106. After Ohio Edison reports the generation of Super-compliant $SO_2$ Allowances in accordance with Section XII (Periodic Reporting), nothing in this Consent Decree shall preclude Ohio Edison from selling, trading, or transferring these reported Super-compliant $SO_2$ Allowances that become available for sale or trade as a result of:

   a. activities that occur prior to the date of entry of this Consent Decree;

   b. Ohio Edison's achieving $SO_2$ emissions at Sammis Plant that are below the 30-Day Rolling Average Emission Rate of 0.130 lb/mmBtu for Sammis Units 6 and 7 and the 30-Day Rolling Average Emission Rate of 1.100 lb/mmBtu for Sammis Units 1 through 5 (or the applicable rate for Sammis Unit 5 as determined under Paragraph 88), and the applicable Plant-wide Annual Cap of 29,900 tons; or

   c. the installation and operation of $SO_2$ pollution controls at units covered under this Consent Decree prior to the dates required under Section V ($SO_2$ Emission Reductions and Controls) of this Consent Decree.

107. If Ohio Edison transfers Restricted $SO_2$ Allowances to a unit within the FirstEnergy System not covered by this Consent Decree, Ohio Edison must provide or cause to provide right of entry as required by Paragraph 181.

   E. <u>General $SO_2$ Provisions</u>

108. In determining 30-Day Rolling Average Emission Rates for $SO_2$, Ohio Edison shall operate CEMS at each unit; provided, however, that due to the common stacks CEMS at Sammis Units 1 to 4, $SO_2$ pollutant concentration monitors certified in accordance with

30

40 C.F.R. Part 60 shall determine the 30-Day Rolling Average Emission Rates for $SO_2$ at each of Sammis Units 1 to 4. In determining compliance with the Plant-Wide Annual $SO_2$ Cap and the Monthly Cap, Ohio Edison shall operate CEMS at each stack (including the common stacks that serve Sammis Units 1 and 2 and Units 3 and 4).

109.  If both primary and secondary CEMS have a missing data event, Ohio Edison shall use 40 C.F.R. Part 60 to show compliance with a 30-Day Rolling Average Emission Rate for $SO_2$, provided that Ohio Edison (1) has secondary CEMS installed, and (2) places them in service within one hour of a missing data event from the primary CEMS but the secondary CEMS also fails. If Ohio Edison does not meet conditions in (1) and (2) above, Ohio Edison shall use 40 C.F.R. § 75.33 to determine compliance with the 30-Day Rolling Average Emission Rate for $SO_2$. If there is a missing data event, Ohio Edison shall use the data substitution provisions in 40 C.F.R. § 75.33 to show compliance with the Plant-Wide Annual Caps and Monthly Caps for $SO_2$.

## VI.    PM EMISSION REDUCTIONS AND CONTROLS

### A.    Demonstration and Compliance with PM Emission Limit

110.  No later than January 1, 2010, Ohio Edison shall achieve and maintain a PM Emission Rate of no greater than 0.030 lb/mmBtu at Sammis Units 6 and 7.

111.  Ohio Edison shall continuously operate each ESP at Sammis Units 6 and 7 at all times that each unit the ESP serves is combusting Fossil Fuel, consistent with good engineering practices for PM control, to minimize PM emissions to the extent practicable. The preceding sentence shall not be construed to require that Ohio Edison achieve more stringent unit emission rate(s) than required by this Consent Decree.

### B.    PM Monitoring

112.  By no later than December 31, 2005, and continuing annually thereafter, Ohio Edison shall conduct PM performance testing on Sammis Units 6 and 7. Such annual performance tests may be satisfied by stack tests conducted in a given year, in accordance with Ohio Edison's permit from the State of Ohio.

113.  In determining the PM Emission Rate, Ohio Edison shall use the reference methods specified in 40 C.F.R. Part 60, Appendix A, Method 5, or Method 5B if allowed by the

31

State of Ohio or local authority, or alternative methods requested by Ohio Edison and approved by EPA. Ohio Edison shall also calculate the PM Emission Rates from annual stack tests in accordance with 40 C.F.R. § 60.8(f). The results of each PM stack test shall be submitted to EPA within 30 days of completion of each test.

## VII.    SUBSTITUTION OF ECO TECHNOLOGY

114.    <u>Overview of ECO.</u> The Parties recognize the significant potential environmental and economic benefits that may be available if Electro-Catalytic Oxidation ("ECO") pollution control technology, which is currently being demonstrated at Ohio Edison's Burger Plant, becomes sufficiently reliable and effective to enable it to be used as substitute technology for control of nitrogen oxide, sulfur dioxide and particulate matter emissions from Sammis Units 6 and 7 in accordance with the requirements of this Consent Decree. ECO uses a form of wet scrubber technology to control $SO_2$ and a form of wet electrostatic precipitator technology to control PM, and it is a promising technology to control $NO_X$. ECO is anticipated to have the additional environmental benefits of controlling mercury, preventing a visible stack plume, and producing a commercially valuable fertilizer that minimizes waste disposal requirements, none of which is required by this Consent Decree or sought in this action. ECO is expected to be at least as effective as the conventional technology required by Sections V and VI of this Consent Decree in reducing emissions of sulfur dioxide and particulate matter; further development of the ECO technology will be required before it can provide the level of reduction of nitrogen oxides required by this Consent Decree. The performance goals for the ECO technology include emission rates of 0.010 lb/mmBtu for particulate matter, 98% removal of sulfur dioxide, 90% removal of nitrogen oxide, and 90% removal of mercury from power plant emissions. If the ECO technology achieves these goals, installation of that technology at Sammis Units 6 and 7 will provide greater reduction of emissions of pollutants specified by this Consent Decree than the conventional technology, at a potentially lower cost with the added benefits of significant reduction of mercury emissions.

115.    <u>Demonstration Requirements for Substitution of ECO Control Technology on Sammis Units 6 and 7.</u> No later than December 31, 2007, Ohio Edison may seek Plaintiffs' approval to install ECO control technology on both Sammis Units 6 and 7 by December

31, 2010 in lieu of the requirements of Paragraphs 54 and 81 of the Consent Decree to install two FGDs by December 31, 2010 and one SCR control system for $NO_X$ by December 31, 2010. Ohio Edison shall make a good faith effort to submit the data necessary for such demonstration by December 31, 2006 and shall have the right to supplement this data until December 31, 2007. To obtain Plaintiffs' approval, Ohio Edison must demonstrate that ECO technology installed at the Burger plant or another full scale commercial facility:

a.    has achieved the reliability criterion set forth in Paragraph 116 below on a consistent basis for a period of no less than 180 consecutive calendar days that ends within a year of seeking approval;

b.    has met the emission reduction requirements for $SO_2$ and PM set forth in Paragraph 117 below continuously, *i.e.* at least 95% of the time that the control equipment is running; and

c.    for at least a 135 consecutive calendar day test period, has achieved a 30-Day Rolling Average Emission Rate of $NO_X$ such that operation of ECO at both Sammis Units 6 and 7 would reduce total $NO_X$ emissions by at least ten percent (10%) more than the 30-Day Rolling Average Emission Rate for a single SCR at either Sammis Unit 6 or 7 as required in Paragraph 54 of this Consent Decree for 95% of the time that the control equipment is running at the Burger plant or any other plant in full-scale commercial operation.

116.    <u>Reliability Criteria</u>.  The reliability criterion for Plaintiffs' approval of the substitution of the ECO technology on Sammis Units 6 and 7, for purposes of Paragraph 115.a., is 95% availability, *i.e.* Ohio Edison must demonstrate that the ECO control itself has not caused outages on the unit(s) on which it has been installed more than 5% of the time those units were in operation or called upon to operate.

117.    <u>Emission Reduction Requirements for $SO_2$ and PM</u>.  The $SO_2$ and PM emission reduction requirements for demonstration of ECO technology under this paragraph shall be the limitations set forth in this Consent Decree for the emission of such pollutants from Sammis Units 6 and 7.  The limitation for $SO_2$ emissions from Units 6 and 7, as provided in Paragraph 81 of this Consent Decree, is a 30-Day Rolling Average Emission Rate for

33

SO$_2$ of 0.130 lb/mmBtu. The limitation for PM emissions from Units 6 and 7, as provided in Paragraph 110 of this Consent Decree, is 0.030 lb/mmBtu.

118. <u>Plaintiffs' Review and Approval</u>. Plaintiffs shall review Ohio Edison's proposal for substitution of ECO technology on Sammis Units 6 and 7 in accordance with Section XIII of this Consent Decree (Review and Approval of Submissions) and this paragraph, as follows:

   a. <u>Substitution of ECO Technology From December 31, 2010 to December 31, 2011</u>. If Ohio Edison demonstrates that ECO has met the requirements of Paragraph 115, Plaintiffs will approve the substitution of ECO controls at Sammis Units 6 and 7 in lieu of the requirements of Sections IV and V of this Consent Decree that one SCR and two conventional FGDs be installed by December 31, 2010.

   b. <u>Dispute Resolution</u>. If Plaintiffs do not grant their approval, Ohio Edison may seek dispute resolution from the Court pursuant to Section XVI of this Consent Decree. Ohio Edison shall have the burden of demonstrating that ECO meets the approval criteria of Paragraph 115. If Plaintiffs do not agree that ECO meets the requirements of Paragraph 115, Plaintiffs nonetheless reserve the right to grant their approval if, based on the facts and circumstances then appearing, including but not limited to engineering concerns involving scale-up and reliability, they conclude that there is a substantial likelihood that ECO will meet the requirements of this Consent Decree at the Sammis plant on a reliable and consistent basis. If the criteria set forth in Paragraph 115 are not met and Plaintiffs do not otherwise grant approval in accordance with the preceding sentence, such denial shall not be reviewable and not subject to dispute.

119. <u>Adjustment of Installation Dates</u>. In the event that Plaintiffs approve the installation of ECO on both Sammis Units 6 and 7, or the Court reverses Plaintiffs' denial of approval, the schedule and requirements for installation of controls at Sammis Units 6 and 7 shall be adjusted as follows: Ohio Edison shall install ECO control technology on Units 6 and 7 by December 31, 2010. This shall be in lieu of the requirements of Sections IV and V of this Consent Decree to install two FGDs and one SCR on those units by that date. By December 31, 2010, Ohio Edison shall complete such engineering for installation of

34

SCRs on Units 6 and 7, so that Ohio Edison is prepared, if necessary, to install such SCRs expeditiously in the event that such installation is required by December 31, 2011 under Paragraph 123 below.

120.    At all times that ECO is installed, Ohio Edison shall use reasonable best efforts to meet a 30-Day Rolling Average Emission Rate of 0.100 lb/mmBtu for NO$_X$ at Sammis Units 6 and 7.  Reasonable best efforts shall include operation of SNCR and any other NO$_X$ controls, consistent with good engineering practices, at Sammis Units 6 and 7.  The preceding two sentences shall not be construed to require that Ohio Edison achieve a more stringent unit emission rate than required by this Consent Decree.

121.    <u>Penalties and Makeup Tons for Failure to Achieve NO$_X$ Emission Limitations Between December 31, 2010 and December 31, 2011</u>.  If Ohio Edison elects to install ECO technology on Sammis Units 6 and 7 and fails to achieve the emission limitation for NO$_X$ of 0.100 lb/mmBtu on a 30-day rolling average basis as required under this Consent Decree, it shall be subject to the stipulated penalties requirements of Section XIV of this Consent Decree.  If Ohio Edison fails to achieve a 30-Day Rolling Average Emission Rate for NO$_X$ of 0.100 lb/mmBtu or the Plant-Wide Annual Cap for NO$_X$ provided under Section IV of this Consent Decree, Ohio Edison, in addition to paying stipulated penalties under Section XIV of this Consent Decree, shall purchase and retire NO$_X$ credits from the market equivalent to 1.25 times the excess tons emitted by any violation.  The assessment of stipulated penalties in accordance with this paragraph is not subject to the Dispute Resolution procedures of Section XVI of this Consent Decree.  In order to assure that the makeup tons are obtained from an area that is upwind from and impacts the air quality in Plaintiffs' States to the maximum extent practicable, Ohio Edison further agrees to seek to purchase such credits from facilities in Ohio or Pennsylvania, and to pay up to a 5% premium for such credits if necessary.

122.    <u>Evaluation</u>.  By July 31, 2011, Ohio Edison shall submit a certified report to Plaintiffs and the Court demonstrating that ECO has continuously met the emission limitation requirements of Sections IV, V, and VI of this Consent Decree for emissions from Sammis Units 6 and 7, *i.e.*, 30-Day Rolling Average Emission Rate of 0.130 lb/mmBtu for SO$_2$, 0.030 lb/mmBtu for PM and 30-Day Rolling Average Emission Rate of 0.100 lb/mmBtu for NO$_X$, for 98% of the time that the control equipment is running following a

35

shakedown period of not more than 180 days, and meeting the reliability criteria in Paragraph 116 above. The report shall include all emission data and all data showing the performance of the ECO technology at Units 6 and 7 during the evaluation period. The report shall also include reliability data identifying all outages of the ECO control system, the duration of such outages, and the causes or reasons for such outages.

123. <u>Final Approval of ECO or Installation of SCRs</u>. If Plaintiffs agree that Ohio Edison's report, submitted pursuant to the preceding paragraph, demonstrates that the ECO and the combination of other pollution control technologies installed on Sammis Units 6 and 7 have continuously met the 30-Day Rolling Average Emission Rate of 0.130 lb/mmBtu for $SO_2$, 30-Day Rolling Average Emission Rate of 0.100 lb/mmBtu for $NO_X$, and PM Emission Rate of 0.030 lb/mmBtu at Sammis Units 6 and 7 as required by this Consent Decree, and has proven to be reliable, installation of SCRs shall not be required on Units 6 and 7. If Plaintiffs do not agree that Ohio Edison has made and adequately supported this demonstration for $NO_X$, Ohio Edison shall install SCRs on Units 6 and 7 as expeditiously as possible, but in no event later than December 31, 2011. Any dispute as to whether Ohio Edison has made the required demonstration shall be subject to the Dispute Resolution procedures of Section XVI of this Consent Decree. Until the SCRs are installed, Ohio Edison shall continue to operate the ECO and other pollution control technologies to maximize reductions of emissions from Sammis Units 6 and 7, consistent with good engineering practices.

VIII.  <u>PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS</u>

124. Emission reductions generated by Ohio Edison to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a netting credit under the Clean Air Act's PSD program.

125. Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by EPA as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, visibility, air quality related values, or any other air quality impact assessment.

36

## IX.   ENVIRONMENTALLY BENEFICIAL PROJECTS

126.   Ohio Edison shall fund and/or implement the Environmentally Beneficial Projects ("Projects") described in this Section in compliance with the terms of this Consent Decree.  In funding and/or implementing the Projects, Ohio Edison shall expend moneys and/or implement Projects cumulatively valued at $25 million as allocated below.

127.   All plans and reports prepared by Ohio Edison pursuant to the requirements of this Section of the Consent Decree shall be publicly available electronically without charge.

128.   Ohio Edison shall certify for each Project that Ohio Edison is not otherwise required by law to perform the Project, that Ohio Edison is unaware of any other person who is required by law to perform the Project, and that Ohio Edison will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law in effect at the time of lodging of this Consent Decree.

129.   Cash Contribution to States: The States shall jointly submit environmentally beneficial projects to Ohio Edison for funding in amounts not to exceed $2 million per calendar year for up to five (5) years following the entry of the Consent Decree beginning as early as calendar year 2005.  The funds for these projects will be apportioned by and among the States, and Ohio Edison shall not have approval rights for the projects or the apportionment.  Ohio Edison shall pay proceeds as designated by the States in accordance with the environmentally beneficial projects submitted for funding each year within 75 calendar days after being notified in writing by the States.  Notwithstanding the $2 million and 5-year limitations above, if the total costs of the projects submitted in any one or more years are less than $2 million, the difference between that amount and $2 million will be available for funding by Ohio Edison of new or previously submitted projects in the following years, except that all amounts not designated by the States within ten (10) years after entry of this Consent Decree shall expire.

130.   Renewable Energy Development Projects.  Within three and a half years after entry of this Consent Decree, Ohio Edison shall provide proof to the Plaintiffs that it has entered into one or more contracts with providers of wind energy for purchase of at least 93 megawatts if federal tax credits are applicable to a project (or 23 megawatts if federal tax credits are not applicable).  These renewable energy development projects have a net

37

present value of $14.385 million.  Such power purchase contracts shall be for 20 years of electric generation capacity generated by wind in Pennsylvania, New Jersey and/or western New York at such megawattage described above.  Ohio Edison shall enter into one or more power purchase contracts within one year of entry of the Consent Decree for a minimum of 15 megawatts if federal tax credits are applicable to a project (or a minimum of 3.7 megawatts if tax credits are not applicable).  The amount of megawatts shall be adjusted pro rata depending on the proportion of megawatts for which tax credits are or are not applicable.

131.    With Plaintiffs' written approval, Ohio Edison may, in lieu of some or all of the wind projects under Paragraph 130, enter into contract(s) for electricity from new landfill gas projects in New Jersey, Connecticut, or New York.

132.    Allegheny County Project(s).  Ohio Edison shall provide to the Allegheny County Clean Air Fund $400,000 for municipal clean energy projects, as more fully described in Appendix A.  Ohio Edison shall pay proceeds as designated by Allegheny County within 75 calendar days after being notified in writing by Allegheny County.

133.    National Park Service Project(s). The National Park Service shall submit to Ohio Edison a plan for using $215,000 in accordance with the Park System Resource and Protection Act, 16 U.S.C. § 19jj, for a project or projects to improve air quality by addressing air quality and/or air deposition issues in and about the Shenandoah National Park.  Ohio Edison shall not have approval rights for the plan or these projects.  Ohio Edison shall transfer the sum of $215,000 to the Natural Resource Damage and Assessment Fund (instructions to be provided in the National Park Service plan) within 75 calendar days after receipt of the plan.

134.    Ohio Edison agrees that neither it, its affiliates nor the project developer shall sell, transfer, or otherwise use any renewable energy credits or any other benefits from the purchase power agreements for the wind and/or landfill gas projects undertaken (except for the federal tax credit if applicable) under any law or program enacted, adopted or promulgated on or before the date of lodging of the Consent Decree and any re-enacted or amended versions of such programs that come into effect thereafter, including, but not limited to, the Renewable Portfolio Standards enacted in Connecticut, New York, New Jersey and Pennsylvania.

38

## X.  CIVIL PENALTY

135.  Within thirty (30) calendar days after entry of this Consent Decree, Ohio Edison shall pay to the United States a civil penalty in the amount of $8.5 million.  The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2003v02237 and DOJ Case Number 90-5-2-1-06894 and the civil action case name and case number of this action.  The costs of such EFT shall be Ohio Edison's responsibility.  Payment shall be made in accordance with instructions provided to Ohio Edison by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern District of Ohio.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, Ohio Edison shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the Department of Justice and to EPA in accordance with Section XIX (Notices) of this Consent Decree.

136.  Failure to timely pay the civil penalty shall subject Ohio Edison to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Ohio Edison liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

137.  Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## XI.  RESOLUTION OF CLAIMS

138.  Entry of this Consent Decree shall resolve all civil claims of the Plaintiffs that arose from any modifications that commenced at Sammis Units 1 through 7 prior to the date of lodging of this Consent Decree (including but not limited to those modifications alleged in the Complaint in this civil action) under Parts C or D of Subchapter I of the Clean Air Act, under the New Source Performance Standard program of Section 111 of the Clean Air Act, or under the relevant provisions of the federally approved and enforceable Ohio State Implementation Plan (Ohio Admin. Code Chapter 3745-31).

39

139. Entry of this Consent Decree also shall resolve all civil claims of the United States under Parts C or D of Subchapter I of the Clean Air Act and regulations promulgated as of the date of lodging of this Consent Decree, where such claims are based on a modification, completed before December 31, 2012, that this Consent Decree directs Ohio Edison to undertake.

140. <u>Upgrades of Units 6 and 7.</u>  The United States agrees that, in conjunction with the installation of emission controls on Sammis Units 6 and 7 pursuant to this Consent Decree, Ohio Edison may make modifications to one or both of those units that increase each of their maximum hourly emission rates by up to 10%, provided that:

   a. any modifications for each unit occur simultaneously with, or no more than one year after, the installation and operation of the last of the controls as required under this Consent Decree for that unit, pursuant to Paragraphs 54, 81, and 118;

   b. Ohio Edison is in compliance with all of the requirements of the Consent Decree for installation of emission controls pursuant to Paragraphs 54, 81, and 118, and for achieving and maintaining levels of emissions reductions pursuant to Paragraphs 69 and 93 (Plant-Wide Annual Caps for $NO_X$ and $SO_2$); and

   c. the modifications for each unit, either individually or collectively, do not increase the maximum hourly emission rate of each unit for $NO_X$ or $SO_2$ (as measured by 40 C.F.R. § 60.14(b) and (h)) by more than 10%.

   If modifications occur in compliance with this paragraph, the United States agrees not to assert any claims for these modifications under Parts C and D of Subchapter I of the Clean Air Act, seeking the installation of additional $NO_X$, $SO_2$, and PM pollution controls on Units 6 and 7, other than those required by this Consent Decree.  Nothing herein shall affect Ohio Edison's obligations under Ohio law, including any permitting requirements.

## XII.    PERIODIC REPORTING

141. Beginning forty-five (45) days after the end of the first full calendar quarter following the entry of this Consent Decree, continuing on a semi-annual basis until December 31, 2015, Ohio Edison shall submit to EPA and the States a periodic report in compliance with Appendix B.

40

142. In any periodic report submitted pursuant to this Section, Ohio Edison may incorporate by reference information previously submitted under its Title V permitting requirements, provided that Ohio Edison attaches the Title V permit report (or pertinent portions of such report) and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

143. In addition to the periodic reports required pursuant to this Section, Ohio Edison shall provide a written report to Plaintiffs of the following violations of the requirements of this Consent Decree: (1) the 30-Day Rolling Average Emission Rates, (2) PM Emission Rates, (3) Annual and Monthly Caps, (4) Additional and Interim Reductions, and (5) Restricted $SO_2$ Allowance surrender within ten (10) business days of when Ohio Edison knew or should have known of any such violation. In this report, Ohio Edison shall explain to the best of its knowledge the cause or causes of the violation and all measures taken or to be taken by Ohio Edison to prevent such violations in the future. Pursuant to Section XXVII (Conditional Termination of Enforcement Under Consent Decree), when provisions of the Consent Decree are included in Title V Permits, the deviation reports required under applicable Title V regulations shall be deemed to satisfy all requirements of this paragraph.

144. Each Ohio Edison report shall be signed by Ohio Edison's Manager, Environmental Reporting and Compliance or, in his or her absence, Ohio Edison's Vice President of Environmental, or higher ranking official, and shall contain the following certification:

> his information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

41

## XIII. REVIEW AND APPROVAL OF SUBMITTALS

145. Ohio Edison shall submit each plan, report, or other submission to EPA and the States on or before the date that document is required or allowed to be submitted for review or approval pursuant to this Consent Decree. Plaintiffs shall within ninety (90) days of receipt of a plan, report, or other submission approve or decline to approve it and provide written comments. Plaintiffs' failure to respond within ninety (90) days shall not be construed as an approval or a disapproval of the submission, a wavier of the right to review the submission, or a basis to excuse compliance with the Consent Decree. Within sixty (60) days of receiving written comments from Plaintiffs, Ohio Edison shall either: (a) revise the submittal consistent with the written comments and provide the revised submittal for final approval to Plaintiffs; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVI (Dispute Resolution) of this Consent Decree.

146. Upon receipt of Plaintiffs' final approval of the submittal or upon completion of the submittal pursuant to dispute resolution, Ohio Edison shall implement the approved submittal in accordance with the schedule specified therein.

## XIV. STIPULATED PENALTIES

147. For any failure by Ohio Edison to comply with the terms of this Consent Decree, and subject to the provisions of Sections XV (Force Majeure) and XVI (Dispute Resolution) of this Consent Decree, Ohio Edison shall pay, within thirty (30) days after receipt of written demand to Ohio Edison by the United States, the following stipulated penalties to the United States:

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| a. Failure to pay the civil penalty as specified in Section X (Civil Penalty) of this Consent Decree | $10,000 |

42

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| b.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_X$ or $SO_2$, or Emission Rate for PM, where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $2,500 |
| c.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_X$ or $SO_2$, or Emission Rate for PM, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $5,000 |
| d.  Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_X$ or $SO_2$, or Emission Rate for PM, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $10,000 |
| e.  Failure to comply with the Plant-Wide Annual Caps for $SO_2$ and $NO_X$, and the Sammis Units 1 through 5 Monthly Cap for $SO_2$ | $60,000 per ton for the first 100 tons over the limit, and $120,000 per ton for each additional ton over the limit. |
| f.  Failure to achieve the required Additional Reductions for $SO_2$ and $NO_X$ | $30,000 per ton for the first 100 tons not achieved, and $60,000 per ton for each additional ton not achieved. |
| g.  Failure to achieve the required Interim Reductions for $SO_2$ and $NO_X$ | $30,000 per ton for the first 100 tons not achieved, and $60,000 per ton for each additional ton not achieved. |
| h.  Failure to install, commence operation, or continue operation of the $NO_X$, $SO_2$, and PM pollution control devices on any unit, or failure to cease operations of a unit.  This stipulated penalty will only accrue if the unit is operated without the required control device after the date by which the control device was required to be installed under this Consent Decree. | $10,000 during the first 30 days, $27,000 thereafter. |

43

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| i.  Failure to install or operate CEMS as required in Paragraphs 79 and 108 | $1,000 |
| j.  Failure to conduct annual performance tests of PM emissions, as required in Paragraph 112 | $1,000 |
| k.  Failure to apply for any permit required by Section XVII | $1,000 |
| l.  Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 during the first ten days, $1,000 thereafter. |
| m.  Using, selling, or transferring $SO_2$ Allowances, except as permitted in Section V.C. | the surrender, pursuant to the procedures set forth in Paragraphs 103 and 104 of this Consent Decree, of $SO_2$ Allowances in an amount equal to three times the number of $SO_2$ Allowances used, sold, or transferred in violation of this Consent Decree. |
| n.  Selling, trading, or transferring $NO_X$ Allowances, except as permitted in Section IV.C. | the surrender of $NO_X$ Allowances in an amount equal to three times the number of $NO_X$ Allowances sold or transferred in violation of this Consent Decree. |
| o.  Failure to surrender an $SO_2$ Allowance as required by Paragraph 102 | (a) $27,500 plus (b) 100 additional $SO_2$ Allowances per day per violation. |
| p.  Failure to fund and/or implement any of the Environmentally Beneficial Projects in compliance with Section IX (Environmentally Beneficial Projects) of this Consent Decree | $1,000 during the first 30 days, $5,000 thereafter. |
| q.  Any other violation of this Consent Decree | $1,000 |

148.  Violation of a 30-Day Rolling Average Emission Rate is a violation on every day on which the average is based.  Violation of the Plant-Wide Annual Cap or Sammis Units 1 through 5 Monthly Cap is a single violation.

149.  Where a violation of a 30-Day Rolling Average Emission Rate (for the same pollutant and from the same source) recurs within periods of less than thirty (30) days, Ohio Edison shall not pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

150.  Ohio Edison shall not be assessed or required to pay any stipulated penalties for any day on which a unit is not operated for failure to comply with a unit-specific requirement under this Consent Decree.

151.  All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

152.  Ohio Edison shall pay all stipulated penalties to the United States within thirty (30) days of receipt of written demand to Ohio Edison from the United States, and shall continue to make such payments every thirty (30) days thereafter until the violation(s) no longer continues, unless Ohio Edison elects within 20 days of receipt of written demand to Ohio Edison from the United States to dispute the accrual of stipulated penalties in accordance with the provisions in Section XVI (Dispute Resolution) of this Consent Decree.

153.  Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 151 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

   a.  If the dispute is resolved by agreement, or by a decision of Plaintiffs pursuant to Section XVI (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) days of the effective date of the agreement or of the receipt of Plaintiffs' decision;

45

b.     If the dispute is appealed to the Court and Plaintiffs prevail in whole or in part, Ohio Edison shall, within sixty (60) days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with accrued interest, except as provided in Subparagraph 153.c.;

c.     If the Court's decision is appealed by any Party, Ohio Edison shall, within fifteen (15) days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with accrued interest.

or purposes of this paragraph, the accrued stipulated penalties agreed by the Parties, or determined by the Plaintiffs through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 147.

154.   All stipulated penalties shall be paid in the manner set forth in Section X (Civil Penalty) of this Consent Decree.

155.   Should Ohio Edison fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

156.   The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to any Plaintiff by reason of Ohio Edison's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, Ohio Edison shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

## XV.   FORCE MAJEURE

157.   For purposes of this Consent Decree, including but not limited to Paragraphs 69, 93, and 94 (Plant-Wide Annual Cap and Monthly Cap), a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Ohio Edison, its contractors, or any entity controlled by Ohio Edison that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Ohio Edison's best efforts to fulfill the obligation.  "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is

46

occurring and (b) after it has occurred, such that the delay or violation is minimized to the greatest extent possible.

158. <u>Notice of Force Majeure Events</u>.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Ohio Edison intends to assert a claim of Force Majeure, Ohio Edison shall notify the United States and the States in writing as soon as practicable, but in no event later than fourteen (14) business days following the date Ohio Edison first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.  In this notice, Ohio Edison shall reference this paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Ohio Edison to prevent or minimize the delay or violation, the schedule by which Ohio Edison proposes to implement those measures, and Ohio Edison's rationale for attributing a delay or violation to a Force Majeure Event.  Ohio Edison shall adopt all reasonable measures to avoid or minimize such delays or violations.  Ohio Edison shall be deemed to know of any circumstance which Ohio Edison, its contractors, or any entity controlled by Ohio Edison knew or should have known.

159. <u>Failure to Give Notice</u>.  If Ohio Edison fails to comply with the notice requirements in Paragraph 158, the Plaintiffs may void Ohio Edison's claim for Force Majeure as to the specific event for which Ohio Edison has failed to comply with such notice requirement.

160. <u>Plaintiffs' Response</u>.  The Plaintiffs shall notify Ohio Edison in writing regarding Ohio Edison's claim of Force Majeure within twenty (20) business days of receipt of the notice provided under Paragraph 158.  If the Plaintiffs agree that a delay in performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay actually caused by the event.  In such circumstances, an appropriate modification shall be made pursuant to Section XXIII (Modification) of this Consent Decree.

161. <u>Disagreement</u>.  If the Plaintiffs do not accept Ohio Edison's claim of Force Majeure, or if the Parties cannot agree on the length of the delay actually caused by the Force Majeure

Event, the matter shall be resolved in accordance with Section XVI (Dispute Resolution) of this Consent Decree.

162. <u>Burden of Proof</u>.  In any dispute regarding Force Majeure, Ohio Edison shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event.  Ohio Edison shall also bear the burden of proving that Ohio Edison gave the notice required by Paragraph 158 and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.  An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

163. <u>Events Excluded</u>.  Unanticipated or increased costs or expenses associated with the performance of Ohio Edison's obligations under this Consent Decree shall not constitute a Force Majeure Event.

164. <u>Potential Force Majeure Events</u>.  The Parties agree that, depending upon the circumstances related to an event and Ohio Edison's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section:  construction, labor, or equipment delays; Malfunction of a unit or emission control device; coal supply interruption; acts of God; acts of war or terrorism; and orders by a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs Ohio Edison to supply electricity in response to a system-wide (state-wide or regional) emergency.  Depending upon the circumstances and Ohio Edison's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Ohio Edison and Ohio Edison has taken all steps available to it to obtain the necessary permit, including, but not limited to:  submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

48

165. As part of the resolution of any matter submitted to this Court under Section XVI (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the Parties by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States and the States or approved by the Court. Ohio Edison shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

## XVI. DISPUTE RESOLUTION

166. The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Parties.

167. The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Parties advising of a dispute pursuant to this Section. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute. The Parties receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such notice.

168. Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties. Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the disputing Parties' representatives unless they agree in writing to shorten or extend this period. During the informal negotiations period, the disputing Parties may also submit their dispute to a mutually-agreed-upon alternative dispute resolution ("ADR") forum if the Parties agree that the ADR activities can be completed within the 30-day informal negotiations period (or such longer period as the Parties may agree to in writing).

169. If the disputing Parties are unable to reach agreement during the informal negotiation period, the Plaintiffs shall provide Ohio Edison with a written summary of their position

regarding the dispute.  The written position provided by the Plaintiffs shall be considered binding unless, within forty-five (45) calendar days thereafter, Ohio Edison seeks judicial resolution of the dispute by filing a petition with this Court.  The Plaintiffs may respond to the petition within forty-five (45) calendar days of filing.

170. Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be shortened upon motion of one of the Parties to the dispute.

171. This Court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

172. As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  Ohio Edison shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Ohio Edison shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

173. The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their initial filings with the Court under Paragraph 169, the disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

XVII.  PERMITS

174. Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Ohio Edison to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under state law, Ohio Edison shall make such application in a timely manner.  The United States will use its best efforts to expeditiously review all permit applications submitted by Ohio Edison in order to meet the requirements of this Consent Decree.

50

175. When permits are required as described in Paragraph 174, Ohio Edison shall complete and submit applications for such permits to the appropriate authorities to allow sufficient time for all legally required processing and review of the permit request, including requests for additional information by the permitting authorities. Any failure by Ohio Edison to submit a timely permit application for any unit in the Ohio Edison System shall bar any use by Ohio Edison of Section XV (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

176. <u>Title V Permits</u>. Whenever Ohio Edison applies for Title V Permit(s) or for amendment(s) to existing Title V Permit(s) to include any of the requirements of this Consent Decree in such permit, Ohio Edison shall send, at the same time, a copy of such application to each Plaintiff. Also, upon receiving a copy of any permit proposed for public comment as a result of such application, Ohio Edison shall promptly send a copy of such proposal to each Plaintiff, thereby allowing for timely participation in any public comment opportunity.

177. <u>Title V Permits Enforceable on Their Own Terms</u>. Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act. The Title V permits shall not be directly enforceable under this Consent Decree, though any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V Permit subject to the limits of Section XXVII ("Conditional Termination of Enforcement Under Consent Decree").

178. <u>Consent Decree Requirements To Be Proposed for Inclusion in Title V Permits</u>. Whenever Ohio Edison applies for Title V Permit(s), or for amendment(s) to existing Title V Permit(s) to include any of the requirements of this Consent Decree in such permit, Ohio Edison shall include in such application all "applicable requirements" (as defined in the Title V program regulations) including but not limited to (1) unit specific emission rates, (2) Plant-Wide Annual and Monthly Sammis Caps, (3) Additional and Interim Reductions and (4) $SO_2$ Allowance surrender requirements and $NO_X$ Allowance restrictions. The $NO_X$ Allowance restrictions that are based upon the FirstEnergy System-Wide Emission Rate required in Paragraph 74 shall be incorporated into the Sammis facility Title V permit.

51

179. <u>New Source Review Permits</u>.  This Consent Decree shall not be construed to require Ohio Edison to apply for or obtain a permit pursuant to the New Source Review requirements of Parts C and D of Title I of the Act.

180. If Ohio Edison sells or transfers to an entity unrelated to Ohio Edison ("Third Party Purchaser") part or all of its ownership interest in a unit in the Ohio Edison System ("Ownership Interest") covered under this Consent Decree, Ohio Edison shall comply with the requirements of Paragraph 178 with regard to that unit prior to any such sale or transfer unless, following any such sale or transfer, Ohio Edison remains the holder of the Title V permit for such facility.

## XVIII. <u>INFORMATION COLLECTION AND RETENTION</u>

181. Any authorized representative of the Plaintiffs, including their attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of Sammis, Mansfield, Burger, Eastlake, and any facility that Ohio Edison must provide or cause to provide right of entry as required by Paragraphs 78 and 98, at any reasonable time for the purpose of:

   a. monitoring the progress of activities required under this Consent Decree;

   b. verifying any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

   c. obtaining samples and, upon request, splits of any samples taken by Ohio Edison or its representatives, contractors, or consultants; and

   d. assessing Ohio Edison's compliance with this Consent Decree.

182. Ohio Edison shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in its or its contractors' or agents' possession or control, and that directly relate to Ohio Edison's performance of its obligations under this Consent Decree, until December 31, 2020.  This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

183. All information and documents submitted by Ohio Edison pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or

52

protection or (b) Ohio Edison claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

184.  Nothing in this Consent Decree shall limit the authority of the Plaintiffs to conduct tests and inspections at facilities covered under this Consent Decree under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XIX.   NOTICES

185.  Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States of America:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
DJ# 90-5-2-1-06894

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

and

Air Enforcement & Compliance Assurance Branch
U.S. EPA Region V
77 West Jackson Blvd.
Mail Code AE17J
Chicago, IL 60604-3590

As to the State of New York:

Chief, Environmental Protection Bureau
New York State Attorney General's Office
120 Broadway
New York, NY 10271

As to the State of New Jersey:

Administrator, Air and Environmental Quality Compliance and Enforcement
P.O. Box 422
401 East State Street, Floor 4
Trenton, NJ 08625

and

Section Chief, Environmental Enforcement Section Division of Law
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NJ 08625-0093

As to the State of Connecticut:

Department Head
Environment Department
State of Connecticut
Office of the Attorney General
55 Elm Street
Hartford, CT 06106

and

Bureau Chief
Air Bureau
State of Connecticut
Department of Environmental Protection
79 Elm Street
Hartford, CT 06106

As to Ohio Edison:

Leila Vespoli
Senior Vice President and General Counsel
Ohio Edison Company
76 South Main Street
Akron, OH  44308

and

Daniel V. Steen
Vice President of Environmental
Ohio Edison Company
76 South Main Street
Akron, OH  44308

and

Douglas J. Weber
Environmental Counsel
Ohio Edison Company
76 South Main Street
Akron, OH  44308

and

E. Donald Elliott
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC 20006

and

Robert L. Brubaker
Porter, Wright, Morris & Arthur LLP
41 S. High Street
Columbus, Ohio 43215

186.    All notifications, communications or submissions made pursuant to this Section shall be

sent either by:  (a) overnight mail or delivery service; (b) certified or registered mail,

return receipt requested; or (c) electronic transmission, unless the recipient is not able to

review the transmission in electronic form.  All notifications, communications and

transmissions (a) sent by overnight, certified or registered mail shall be deemed

55

submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service. All notifications, communications, and submissions made by electronic means shall be electronically signed and certified, and shall be deemed submitted on the date that Ohio Edison receives written acknowledgment of receipt of such transmission.

187. Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XX.  SALES OR TRANSFERS OF OWNERSHIP INTERESTS

188. If Ohio Edison proposes to sell or transfer part or all of its ownership interest in any of its real property or operations subject to this Consent Decree ("Ownership Interest") to an entity unrelated to FirstEnergy ("Third Party Purchaser"), it shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the Plaintiffs pursuant to Section XIX (Notices) no later than thirty (30) days before closing.

189. At the time of sale or transfer of an Ownership Interest (but in no case later than ten (10) days after closing) Ohio Edison shall move the Court for a modification of this Consent Decree to make the purchaser or transferee a party to this Consent Decree and jointly and severally liable with Ohio Edison for all requirements of this Consent Decree that are applicable to the transferred or purchased Ownership Interests. Until the Court approves the modification of the Consent Decree, Ohio Edison shall remain fully liable for compliance with the Consent Decree notwithstanding the sale or transfer.

190. This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between Ohio Edison and/or FirstEnergy and any Third Party Purchaser as long the requirements of this Consent Decree are met. This Consent Decree shall not be construed to prohibit a contractual allocation – as between Ohio Edison and/or First Energy and any Third Party Purchaser of Ownership Interests – of the burdens of compliance with this Consent Decree, provided that both Ohio Edison and such Third Party Purchaser shall remain jointly and severally liable for the obligations of the

56

Consent Decree applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 191.

191.    If the Plaintiffs agree that the conditions of Paragraph 189 are satisfied and determine in their sole and unreviewable discretion that a transfer of liability and obligations is justified upon consideration of the Third Party Purchaser's technical capability, financial capability, and recent history of environmental compliance, Plaintiffs, Ohio Edison, and/or the Third Party Purchaser that has become a party to this Consent Decree pursuant to Paragraph 189 may move the Court for a modification that relieves Ohio Edison of its liability under this Consent Decree for the obligations of the Consent Decree applicable to the transferred or purchased Ownership Interests and makes the Third Party Purchaser solely liable for all requirements under the Consent Decree that are applicable to the transferred Ownership Interests.

192.    Unless and until such modification relieving Ohio Edison of liability for the obligations and liabilities associated with the transferred Ownership Interest is entered by the Court, Ohio Edison shall remain liable for all the requirements of this Consent Decree, including those that may be applicable to the purchased or transferred Ownership Interests.

193.    Notwithstanding the foregoing, however, Ohio Edison shall not assign, and shall not be released from, any obligation under this Consent Decree that is not specifically applicable to the purchased or transferred Ownership Interests, including the obligations set forth in Sections IX (Environmentally Beneficial Projects) and X (Civil Penalty).

## XXI.    EFFECTIVE DATE

194.    The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

## XXII.    RETENTION OF JURISDICTION

195.    Continuing Jurisdiction.  The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

57

## XXIII. <u>MODIFICATION</u>

196.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XXIV. <u>GENERAL PROVISIONS</u>

197.    This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The emission rates set forth herein do not relieve Ohio Edison from any obligation to comply with other state and federal requirements under the Clean Air Act, including Ohio Edison's obligation to satisfy any state modeling requirements set forth in the Ohio State Implementation Plan.

198.    This Consent Decree does not apply to any claim(s) of alleged criminal liability.

199.    In any subsequent administrative or judicial action initiated by the United States for injunctive relief or civil penalties relating to the facilities covered by the Complaint in this action, Ohio Edison shall not assert any defense or claim based upon principles of waiver, <u>res</u> <u>judicata</u>, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the Plaintiffs in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this paragraph is intended to, or shall, affect the validity of Section XI (Resolution of Claims) of this Consent Decree.

200.    Ohio Edison shall be bound by the law and/or regulations under Parts C & D of Subchapter I of the Clean Air Act in effect at the time of any physical change in, or change in the method of operation of, a stationary source.

201.    Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Ohio Edison of its obligation to comply with all applicable federal, state, and local laws and regulations, nor shall be construed to prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

202.    Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Consent Decree,

every other term used in this Consent Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Consent Decree what such term means under the Act or those implementing regulations.

203. Nothing in this Consent Decree is intended to, or shall alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8315 (Feb. 27, 1997)) concerning the use of data for any purpose under the Act, generated either by the reference methods specified herein or otherwise.

204. Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

205. Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101. Ohio Edison shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits. For example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100. Ohio Edison shall report data to the number of significant digits in which the standard or limit is expressed.

206. This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against or on behalf of any third parties. Entry of this Consent Decree shall be solely for purposes of resolving this case and does not affect any other claims, including any claims by third parties. Entry of this Consent Decree as a final judgment shall not be considered binding on Ohio Edison in litigation with third parties. Except as provided in Paragraph 178, no portion of this Consent Decree or any prior rulings or orders in this case shall be enforceable by any person or entity other than the Parties. Ohio Edison's settlement of this case without exercising its right of appeal shall not be construed in any litigation between Ohio Edison and third parties as a final judgment or final determination on the issues addressed by the prior rulings or orders in this case.

59

207. This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supercedes all prior agreements and understandings among the Parties related to the subject matter herein. No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

208. Each Party to this action shall bear its own costs and attorneys' fees.

## XXV.  SIGNATORIES AND SERVICE

209. Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

210. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

211. Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXVI. PUBLIC COMMENT

212. The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper or inadequate. Ohio Edison shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified Ohio Edison, in writing, that the United States no longer supports entry of the Consent Decree.

60

## XXVII. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER CONSENT DECREE

213. <u>Termination as to Completed Tasks.</u>  As soon as Ohio Edison completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, Ohio Edison may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

214. <u>Conditional Termination of Enforcement Through the Consent Decree.</u>  After Ohio Edison:

   a.    has successfully completed construction, and has maintained operation, of all pollution controls as required by this Consent Decree;

   b.    has obtained final Title V permits (i) as required by the terms of this Consent Decree; (ii) that cover all units in this Consent Decree; and (iii) that include as enforceable permit terms all of the unit performance and other requirements specified in Section XVII (Permits) of this Consent Decree; and

   c.    certifies that the date is later than December 31, 2015;

Ohio Edison may so certify these facts to the Plaintiffs and this Court.  If the Plaintiffs do not object in writing with specific reasons within forty-five (45) days of receipt of Ohio Edison's certification, then, for any Consent Decree violations that occur after the filing of notice, the Plaintiffs shall pursue enforcement of the requirements contained in the Title V permit through the applicable Title V permit and not through this Consent Decree.

215. <u>Resort to Enforcement under this Consent Decree.</u>  Notwithstanding Paragraph 214, if enforcement of a provision in this Consent Decree cannot be pursued by a Party under the applicable Title V permit, or if a Consent Decree requirement was intended to be part of a Title V Permit and did not become or remain part of such permit, such requirement may be enforced under the terms of this Consent Decree at any time.

61

## XXVIII.    <u>FINAL JUDGMENT</u>

216.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment in the above-captioned matter between the Plaintiffs and Ohio Edison.

SO ORDERED, THIS _____ DAY OF _____, 2005.


_____

UNITED STATES DISTRICT COURT JUDGE

FOR THE UNITED STATES OF AMERICA:

_____
THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


_____
CATHERINE R. MCCABE
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


_____
ARNOLD S. ROSENTHAL
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


_____
JEROME W. MACLAUGHLIN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

63

THOMAS V. SKINNER
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


ADAM M. KUSHNER
Acting Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


RICHARD ALONSO
Attorney Advisor
Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

BHARAT MATHUR
Acting Regional Administrator
U.S. Environmental Protection Agency
Region 5

JOHN C. MATSON
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5

FOR THE STATE OF NEW YORK:

_____
ELIOT SPITZER
Attorney General
State of New York


_____
PETER LEHNER
Assistant Attorney General
State of New York


_____
ROBERT ROSENTHAL
Assistant Attorney General
State of New York

FOR THE STATE OF NEW JERSEY:

_____
PETER C. HARVEY
Attorney General
State Of New Jersey


_____
KEVIN P. AUERBACHER
Deputy Attorney General
State of New Jersey


_____
JEAN P. REILLY
Deputy Attorney General
State of New Jersey

FOR THE STATE OF CONNECTICUT:

_____

RICHARD BLUMENTHAL
Attorney General
State of Connecticut


_____

KIMBERLY P. MASSICOTTE
Assistant Attorney General
State of Connecticut


_____

LORI D. DIBELLA
Assistant Attorney General
State of Connecticut

18-05021-amk    Doc 149-1    FILED 06/14/18    ENTERED 06/14/18 17:25:16    Page 212 of

FOR DEFENDANTS OHIO EDISON COMPANY AND PENNSYLVANIA POWER
COMPANY:

_____

RICHARD H. MARSH
Senior Vice President and Chief Financial Officer
Ohio Edison Company and Pennsylvania Power
Company

_____

E. DONALD ELLIOTT
CARRIE F. JENKS
Willkie Farr & Gallagher LLP

_____

ROBERT L. BRUBAKER
JAMES A. KING
JAMES B. HADDEN
Porter, Wright, Morris & Arthur LLP

_____

MICHAEL L. HARDY
Thompson Hine LLP

# APPENDIX A - ALLEGHENY COUNTY ENVIRONMENTALLY BENEFICIAL PROJECTS

In accordance with Paragraph 132, the following describes the Environmentally Beneficial Projects for the residents of Allegheny County, Pennsylvania.

A.  A 52 kW-DC rated Grid Connected Solar Power System, described below.  This project shall be installed on the roof of the Monument Hill Building, 808 Ridge Avenue, Pittsburgh, PA 15212-6097.  This environmentally beneficial project is estimated to prevent the emission of 68.5 tons of $CO_2$, 0.38 tons of $SO_2$, and 0.10 tons of $NO_X$ per year of operation.

B.  Project Parameters:

The Grid Connected Solar Power System is a 52 kW-DC rated grid tied design. This system is configured as twenty-four parallel-connected arrays, each dedicated to an inverter.  Within each array are twenty-two 100 watt modules. The system will include a PV performance monitoring system to provide a system display.  The system will also include appropriate DC and AC disconnects, ground fault protection, and lightning surge protection.  Additional hardware requirements may be imposed by Duquesne Light (the local electric utility).  The estimated roof area for this installation is 5,800 square feet.  The GCSPS will be mounted to the roof via a standard industrial roof mounting system.  The GCSPS design and installation must be completed in accordance with the National Electric Code Section 690 provisions pertaining to photovoltaic systems.

C.  Specific components include:

1.  528 Solar Power Industries M100 100 watt modules (SPI-M100) designed to meet "World Class" quality, reliability and performance requirements, and UL 1703 and IEC 612215 certification requirements. The SPI-M100 modules include 150mm square multi-crystalline solar cells, PECVD antireflective coating, heavy duty anodized aluminum frames, tempered low iron front cover glass, EVA encapsulation and

1

multi-layer back sheet protection, high capacity junction box with diodes, and quick connect polarized DC connectors.

2. Twenty-four (24) 2500 watt SunnyBoy inverters, model 2500U, housed in NEMA 4X stainless steel outdoor enclosures, with an efficiency of at least 90% at maximum output. The Sunny Boy inverters must include DC and AC disconnects to isolate the inverters from the photovoltaic array and grid, respectively.

3. Twenty-four (24) SunnyBoy PC options to monitor each inverter's performance, to be connected to the central PC.

4. One (1) Sunny Control Lite Unit

5. Twenty-four (24) 250V safety switches

6. One 250 Amp AC Load Center

7. One (1) RS-485 Cable

8. Twenty-four (24) Cutler Hammer Heavy Duty Disconnect Switches (30A dc)

9. Twenty-four (24) Lightning Surge Arrestors

10. One (1) UniRac Roof Mount System, including mounting hardware

11. Thirty thousand (30,000) feet of Use 2 wire

12. One (1) personal computer and display monitor

13. Two (2) Installation and Operations manuals

D. Payments to fund this project shall be made to the order of the Allegheny County Clean Air Fund, and submitted to the following address:

Allegheny County Health Department
Air Quality Program
301 Thirty-ninth Street
Pittsburgh, Pennsylvania 15201-1891

2

# APPENDIX B – REPORTING REQUIREMENTS

I.     Semi-annual Reporting Requirements

Ohio Edison shall submit semi-annual reports, electronically and in hard copy, as required by Paragraph 141 and certified as required by Paragraph 144 of this Consent Decree. Ohio Edison shall provide the following information in each of the semi-annual reports.

A.  Installation of $NO_X$ and $SO_2$ Removal Equipment

     Report the progress of construction of $NO_X$ and $SO_2$ removal equipment, including:

     1.  If construction is not underway, the construction schedule, dates of contract execution, and major component delivery;

     2.  If construction is underway, the estimated percent of installation and estimated construction completion date; and

     3.  Once construction is complete, the date of final installation and of acceptance testing.

B.  30-Day Rolling Average Emission Rates for $NO_X$ and $SO_2$

     1.  Report a $NO_X$ and $SO_2$ 30-Day Rolling Average Emission Rate (lb/mmBtu), as defined in Paragraph 4, for each operating day of a Sammis unit commencing on the thirtieth day after 30-Day Rolling Average Emission Rates become applicable.

     2.  Within the first report that identifies a 30-Day Rolling Average Emission Rate (lb/mmBtu) at least five (5) example calculations (including hourly CEMS data in electronic format for the calculation) used to determine the 30-Day Rolling Average Emission Rate. If at any time Ohio Edison changes the methodology used in determining the 30-Day Rolling Average Emission Rate, Ohio Edison shall explain the change and the reason for using the new methodology.

1

3. Report all deviations from any 30-Day Rolling Average Emission Rate in lb/mmBtu. Ohio Edison shall identify any corrective actions taken in response to such deviation.

4. Commencing when a unit becomes subject to a 30-Day Rolling Average Emission Rate, Ohio Edison shall also report:

   a. The date and time that the unit initially combusts any fuel;

   b. The date and time that the unit is synchronized with a utility electric distribution system;

   c. The date and time that the fire is extinguished in the unit; and

   d. For the fifth and subsequent Cold Start Up Period that occurs within any 30-Day period, the earlier of the date and time that (1) is eight hours after the unit is synchronized with a utility electric distribution system, or (2) the flue gas has reached the SCR operational temperature range specified by the catalyst manufacturer.

C. PM Emission Rates

1. Commencing when a PM Emission Rate becomes applicable, report the PM Emission Rate (lb/mmBtu) as defined in Paragraph 38, for Sammis Units 6 and 7.

2. For Sammis Units 6 and 7, attach a copy of the executive summary and results of any stack test to the next semi-annual report submitted.

3. Report all deviations from the PM Emission Rate in lb/mmBtu. Ohio Edison shall identify any corrective actions taken in response to such deviations.

D. Plant-Wide Annual Cap and Monthly Cap

1. Commencing when the Plant-Wide Annual Caps becomes applicable, report the applicable $NO_X$ and $SO_2$ Plant-Wide Annual Caps (tons) as defined in Paragraph 36, for the Sammis Plant.

2

2. Commencing when the Monthly Cap becomes applicable, report the applicable $SO_2$ Monthly Cap (tons) as defined in Paragraph 30, for Sammis Units 1-5.

3. Deviations shall be reported once per year in the semi-annual report following the end of each calendar year. Ohio Edison shall identify the cause and any corrective actions, if necessary, taken for each deviation from the Plant-Wide Annual Caps and Monthly Cap reported above.

E. Additional Reductions shall be reported once per year in the semi-annual report following the end of each calendar year.

1. Commencing in calendar year 2008, report the amount of Additional Eastlake Plant $NO_X$ Reductions (tons) achieved for the applicable year for the Eastlake Plant and, if applicable, for each plant in addition to the Eastlake Plant where any remaining Additional Eastlake Plant $NO_X$ Reductions are achieved.

2. Commencing in calendar year 2010, report the amount of Additional Burger Plant $NO_X$ Reductions (tons) achieved for the applicable year at the Burger Plant and, if applicable, for each plant in addition to the Burger Plant where any remaining Additional Burger Plant $NO_X$ Reductions are achieved.

3. Commencing in calendar year 2011, unless Ohio Edison elects to satisfy the options for the Burger Plant in accordance with Paragraph 83.a. and b., report the amount of Additional Burger Plant $SO_2$ Reductions achieved for the applicable year at the Burger Plant and, if applicable, for each plant in addition to the Burger Plant where any remaining Additional Burger Plant $SO_2$ Reductions are achieved.

   a. If Ohio Edison elects to permanently shut down Burger Units 4 and 5 pursuant to Paragraph 83.a., Ohio Edison shall provide proof that the units are in fact shut down.

   b. If Ohio Edison elects to repower Burger Units 4 and 5 pursuant to Paragraph 83.b., the 30-Day Rolling Average Emission Rates for $NO_X$ and $SO_2$ and the PM Emission Rate as defined in Paragraphs 4 and 38.

3

4. Commencing in calendar year 2006, report the amount of Additional Mansfield Plant $SO_2$ Reductions (tons) achieved for the applicable year at the Mansfield Plant and, if applicable, for each plant in addition to the Mansfield Plant where any remaining Additional Mansfield Plant $SO_2$ Reductions are achieved and performance test data or CEMS data (or combination of CEMS data and coal sampling) equivalent to the sampling period of a performance test demonstrating that each FGD at Mansfield Units 1, 2, and 3 achieved a 95% Removal Efficiency in accordance with Paragraph 91.

F. Interim Reductions for $NO_X$ and $SO_2$

Commencing in calendar year 2006, report the amount of Interim Emission Reductions (tons) achieved pursuant to Paragraphs 72, 97, and 98, including identifying the location from which such emissions are reduced and the methods by which such emission reductions are achieved.

G. Surrender of Restricted $SO_2$ Allowances

1. Beginning in 2018, report the Restricted $SO_2$ Allowances surrendered to EPA pursuant to Paragraph 102 and documentation verifying such surrender.

2. If Ohio Edison surrenders any Restricted $SO_2$ Allowances to a third party:

   a. Include a description of the transfer in accordance with the provisions of Paragraph 104;

   b. No later than the next semi-annual report due 12 months after the report containing in the information in a. above, include a statement that the third party permanently surrendered the $SO_2$ Allowances to EPA within one year after Ohio Edison transferred the $SO_2$ Allowances to the third party; and

   c. Report the amount of Restricted $SO_2$ Allowances transferred and the units to which Ohio Edison transfers Restricted $SO_2$ Allowances pursuant to Paragraph 100.

4

H.  Generation of Super-Compliant Allowances

Report the generation of Super-compliant $NO_X$ and $SO_2$ Allowances as defined in Paragraphs 49 and 50 and the calculations or data justifying the generation of the used or traded Super-compliant Allowances, annually as part of the Semi-annual report following the completion of a calendar year.

I.  $NO_X$ System-Wide Annual Emission Rate

Commencing in calendar year 2016, report the $NO_X$ System-Wide Annual Emission Rate (lb/mmBtu) for the preceding year if Ohio Edison elects to use Restricted $NO_X$ Allowances pursuant to the second sentence of Paragraph 74.

J.  Environmentally Beneficial Projects

1.  Cash Contributions for Environmentally Beneficial Projects.  Report the payment of proceeds and amounts of proceeds for these projects made pursuant to Paragraphs 129, 132, and 133.

2.  Renewable Energy Development Projects.  Report the execution of each purchase power contract pursuant to Paragraph 130, including the amount of megawatts to be purchased over a 20-year period; the location and description of the renewable energy development project; and the date of commencement of operation of any renewable energy development project.

II.  Deviation Reports

In addition to the reporting requirements under Paragraph 143, a summary of all deviations from the requirements of the Consent Decree that occurred during the reporting period identifying the date and time that the deviation occurred, the date and time the deviation was corrected, the cause and any corrective actions, if necessary, taken for each deviation, and the date that the deviation was initially reported under Paragraph 143.

III.  Ohio Edison Submissions

A list of all plans or submissions and the date submitted to the Plaintiffs for the reporting period, identifying if any are pending the review and approval of the Plaintiffs.

5